**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALEXIS HOLYWEEK SAREI; PAUL E.
NERAU; THOMAS TAMAUSI; PHILLIP
MIRIORI; GREGORY KOPA;
METHODIUS NESIKO; ALOYSIUS
MOSES; RAPHEAL NINIKU; GABRIEL
TAREASI; LINUS TAKINU, LEO WUIS;
MICHAEL AKOPE; BENEDICT PISI;
THOMAS KOBUKO; JOHN TAMUASI;
NORMAN MOUVO; JOHN OSANI; BEN
KORUS; NAMIRA KAWONA; JOANNE
BOSCO; JOHN PIGOLO; MAGDALENE
PIGOLO, individually and on behalf
of themselves and all others
similarly situated,
          *Plaintiffs-Appellants,*

v.

RIO TINTO, PLC and RIO TINTO
LIMITED,
          *Defendants-Appellees.*

No. 02-56256

D.C. No.
2:00-cv-11695-
MMM-MAN

19321

ALEXIS HOLYWEEK SAREI; PAUL E.
NERAU; THOMAS TAMAUSI; PHILLIP
MIRIORI; GREGORY KOPA;
METHODIUS NESIKO; ALOYSIUS
MOSES; RAPHEAL NINIKU; GABRIEL
TAREASI; LINUS TAKINU, LEO WUIS;
MICHAEL AKOPE; BENEDICT PISI;
THOMAS KOBUKO; JOHN TAMUASI;
NORMAN MOUVO; JOHN OSANI; BEN
KORUS; NAMIRA KAWONA; JOANNE
BOSCO; JOHN PIGOLO; MAGDALENE
PIGOLO, individually and on behalf
of themselves and all others
similarly situated,
                *Plaintiffs-Appellees,*

                        v.

RIO TINTO, PLC and RIO TINTO
LIMITED,
                *Defendants-Appellants,*

No. 02-56390
D.C. No.
CV-00-11695-
MMM

ALEXIS HOLYWEEK SAREI; PAUL E.
NERAU; THOMAS TAMUASI; PHILLIP
MIRIORI; GREGORY KOPA;
METHODIUS NESIKO; ALOYSIUS
MOSES; RAPHEAL NINIKU; GARBIEL
TAREASI; LINUS TAKINU; LEO WUIS;
MICHAEL AKOPE; BENEDICT PISI;
THOMAS KOBUKO; JOHN TAMUASI;
NORMAN MOUVO; JOHN OSANI; BEN
KORUS; NAMIRA KAWONA; JOANNE
BOSCO; JOHN PIGOLO; MAGDALENE
PIGOLO, individually and on behalf
of themselves & all others
similarly situated,
                 *Plaintiffs-Appellees,*

                 v.

RIO TINTO, PLC; RIO TINTO
LIMITED,
                 *Defendants-Appellants,*

                 and

UNITED STATES OF AMERICA,
                 *Movant.*

No. 09-56381

D.C. No.
2:00-cv-11695-
MMM-MAN
Central District of
California,
Los Angeles

OPINION

Appeal from the United States District Court
for the Central District of California
Margaret M. Morrow, District Judge, Presiding

Argued and Submitted
September 21, 2010—San Francisco, California

Filed October 25, 2011

Before: Mary M. Schroeder, Harry Pregerson,
Stephen Reinhardt, Andrew J. Kleinfeld, Barry G. Silverman,
M. Margaret McKeown, Marsha S. Berzon,
Johnnie B. Rawlinson, Consuelo M. Callahan, Carlos T. Bea,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Schroeder;
Concurrence by Judge Reinhardt;
Partial Concurrence and Partial Dissent by Judge Pregerson;
Partial Concurrence and Partial Dissent by Judge McKeown;
Partial Concurrence and Partial Dissent by Judge Bea;
Dissent by Judge Kleinfeld;
Dissent by Judge Ikuta

**COUNSEL**

Steve W. Berman, Seattle, Washington, for plaintiffs-appellants-appellees Alexis Holyweek Sarei, et al.

Sri Srinivasan, Washington, DC, for defendants-appellees-appellants Rio Tinto, PLC, et al.

---

## OPINION

Opinion by Judge SCHROEDER, Circuit Judge, with whom SILVERMAN and BERZON, Circuit Judges, join. PREGER-SON and RAWLINSON, Circuit Judges, join as to all but Parts IV(C) and (D) and partially join Part IV(B)(3). REIN-HARDT, Circuit Judge, joins as to all but Part II(C) and Part IV(B)(3), as to which he concurs in the result. McKEOWN, Circuit Judge, joins as to all but Part IV(A)(3) and Part IV(B)(4):

## I. INTRODUCTION

This is an Alien Tort Statute (ATS) case arising out of the operations of Rio Tinto mining group (Rio Tinto) on the island of Bougainville in Papua New Guinea (PNG) and the uprising against Rio Tinto in the late 1980's that resulted in the use of military force and many deaths. The Plaintiffs are current or former residents of the island of Bougainville. The ATS provides that "district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

This is the second time this case has been before this en banc court. *See Sarei v. Rio Tinto PLC (Rio Tinto III)*, 550 F.3d 822, 825-26 (9th Cir. 2008). The facts are laid out comprehensively in the original district court opinion. *See Sarei v. Rio Tinto PLC (Rio Tinto I)*, 221 F. Supp. 2d 1116, 1121-27 (C.D. Cal. 2002). The original three-judge panel majority and dissenting opinions were divided on the issue of exhaustion of local remedies. *Sarei v. Rio Tinto PLC (Rio Tinto II)*, 487 F.3d 1193 (9th Cir. 2007). As a result, our first en banc

decision focused on that issue. *Rio Tinto III*, 550 F.3d 822. A majority of this en banc court took the view that exhaustion must be considered, with the narrower, and therefore controlling, plurality opinion by Judge McKeown stating that only prudential exhaustion principles apply. *Id.* at 832 n.10.

On remand, the district court held that it would be inappropriate to impose a prudential exhaustion requirement on Plaintiffs' claims for crimes against humanity, war crimes, and racial discrimination. *Sarei v. Rio Tinto PLC (Rio Tinto IV)*, 650 F. Supp. 2d 1004, 1032 (C.D. Cal. 2009). It held the remaining claims required exhaustion. The court, therefore, gave Plaintiffs the choice either to withdraw or to submit the following claims to the traditional two-step exhaustion analysis: violation of the rights to health, life, and security of the person; cruel, inhuman, and degrading treatment; international environmental violations; and a consistent pattern of gross human rights violations. *Id.*

Plaintiffs opted to withdraw those claims, reserving the right to file an amended complaint if the matter is remanded. *Id.* n.71. Thus, the only claims before this court on appeal are Plaintiffs' claims for genocide, crimes against humanity, war crimes, and racial discrimination.

The ATS, as Judge Friendly explained more than three decades ago in *ITT v. Vencap, Ltd.*, "is a kind of legal Lohengrin; although it has been with us since the first Judiciary Act, § 9, 1 Stat. 73, 77 (1789), no one seems to know whence it came." 519 F.2d 1001, 1015 (2d Cir. 1975). This case has been a perplexing one for the judges of this circuit because of the new legal uncertainties in the application of the ATS that flowed in the wake of the Supreme Court's decision in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).

[1] In *Sosa*, the Supreme Court held that the ATS is a jurisdictional grant for a limited category of claims for violation of internationally accepted norms. 542 U.S. at 729. The stat-

ute was "enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations . . . based on the present-day law of nations . . . rest[ing] on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized [violation of safe conducts, infringement of the rights of ambassadors, and piracy]." *Id.* at 724-25.

Internationally accepted norms must be "specific, universal, and obligatory." *Sosa*, 542 U.S. at 732 (citing with approval *In re Estate of Ferdinand Marcos, Human Rights Litig. (Marcos II)*, 25 F.3d 1467, 1475 (9th Cir. 1994)). Thus, in discussing the definite nature of an international norm that gives rise to a cause of action in an ATS suit against a private actor, the Supreme Court also noted that "a related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual." *Id.* at 732 n.20.

With regard to the specific claims before us, we conclude that only Plaintiffs' claims of genocide and war crimes fall within the limited federal jurisdiction created by the Act, and that the crimes against humanity arising from a blockade and the racial discrimination claims do not. Under international law, there is a distinction between genocide and crimes against humanity. We discuss this distinction in Section IV of this opinion when we deal with the specific claims. Before discussing each claim, however, we must deal with and reject the more sweeping legal principles that Rio Tinto and our dissenting colleagues argue require dismissal of the entire action. Those include the contentions that we lack jurisdiction under the ATS because all of these claims arise extraterritorially, are claims against corporations, or constitute claims of aiding and abetting liability outside the scope of international law. We also address Judge Ikuta's dissenting contention, not raised by any party, that the Act gives federal courts no authority to

hear cases between aliens because cases under the ATS are diversity cases that do not "arise under" the laws of the United States. We then reach Rio Tinto's alternative contentions that the claims in this suit are nonjusticiable on the grounds that they require prudential exhaustion, constitute political questions, are barred by principles of international comity, or invalidate acts of state.

Although the torts alleged all occurred outside of the United States, Rio Tinto has substantial operations in this country. According to the complaint, Rio Tinto operates in 40 different countries and, as of December 31, 1999, had consolidated operating assets of nearly $13 billion—47% of which are located in North America. Personal jurisdiction is not disputed.

## II.  JURISDICTIONAL ISSUES

### A.  Extraterritoriality

Extraterritoriality is generally a question of statutory interpretation going to the merits of a case. *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2877 (2010). Because the Supreme Court in *Sosa* established that the ATS is a jurisdictional statute, 542 U.S. at 712, however, and because Rio Tinto argues that we lack jurisdiction to apply the Act extraterritorially, we consider extraterritoriality in this case under the heading of jurisdictional issues.

This case concerns conduct that occurred outside the United States. Rio Tinto points to a series of cases that deny extraterritorial effect and pertain to a variety of other statutes in order to argue that the ATS does not apply extraterritorially. *EEOC v. Arabian Am. Oil Co. (Aramco)*, 499 U.S. 244 (1991) (Title VII); *The Apollon*, 22 U.S. 362 (1824) (Collection Act of 1799); *United States v. Palmer*, 16 U.S. 610 (1818) (Act for the Punishment of Certain Crimes Against the United States); *Rose v. Himley*, 8 U.S. 241 (1808) (French

condemnation laws). Additionally, in an earlier order published in this appeal, as well as in our earlier en banc opinion, Judge Kleinfeld dissented, as he does now, on the ground that the ATS applies to conduct only within the United States.

[2] Our circuit has addressed this same issue once before. In *In re Estate of Ferdinand Marcos, Human Rights Litig. (Marcos I)*, 978 F.2d 493, 499-501 (9th Cir. 1992), we considered an ATS claim based on torture that took place in the Philippines. We categorically rejected the argument that the ATS applies only to torts committed in this country. We said, "we are constrained by what § 1350 shows on its face: no limitations as to the citizenship of the defendant, or the locus of the injury." *Id.* at 500. In fact, the seminal and most widely respected applications of the statute relate to conduct that took place outside the United States. *See Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) (Bosnia-Herzegovina)*; Marcos I*, 978 F.2d 493 (Philippines); *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980) (Paraguay). The D.C. Circuit has recently concluded that there is no bar to the ATS's applicability to foreign conduct because the Supreme Court in *Sosa* did not disapprove these seminal decisions and Congress, in enacting the Torture Victim Protection Act, implicitly ratified such law suits. *Doe v. Exxon Mobil Corp.*, No. 09-7125, 2011 WL 2652384, at *25 (D.C. Cir. July 8, 2011); *see also*, *Flomo v. Firestone Nat'l Rubber, Co.*, No. 10-3675, 2011 WL 2675924, at *24 (7th Cir. July 11, 2011)..

Moreover, we know from *Sosa*, that the Congress in 1789 had overseas conduct in mind. The Supreme Court in *Sosa* explained that when the Act was enacted, in 1789, piracy was one of the paradigmatic classes of cases recognized under the ATS. 542 U.S. at 724; *see also United States v. Smith*, 5 Wheat. 153, 163-180, n.a (1820) (cited favorably in *Sosa*, 542 U.S. at 732) (illustrating the specificity with which the law of nations defined piracy). In fact, the North African Barbary Pirates were the scourge of shipping at the time of the ATS's passage. ADRIAN TINNISWOOD, PIRATES OF BARBARY: CORSAIRS,

CONQUESTS, AND CAPTIVITY IN THE 17th CENTURY MEDITERRA-
NEAN (2010). They roamed the Mediterranean region high-
jacking trading vessels, enslaving their crews, and plundering
their cargoes. *Id.* Their attacks against American ships gave
rise to the creation of the U.S. Navy in 1794, shortly after the
passage of the ATS. A. B. C. WHIPPLE, TO THE SHORES OF
TRIPOLI: THE BIRTH OF THE U.S. NAVY AND MARINES (1991,
republished in 2001).

*Morrison*, upon which Judge Kleinfeld's dissent predomi-
nantly relies, concerned the scope of § 10(b) of the Securities
Exchange Act of 1934. It employed a "presumption against
extraterritoriality" and tracked the presumption's lineage to
cases dating from 1932 onward. *Id.* at 2877-78 (citing *Black-
mer v. United States*, 284 U.S. 421 (1932); *Foley Bros., Inc.
v. Filardo*, 336 U.S. 281 (1949); *Aramco*, 499 U.S. 244; *Smith
v. United States*, 507 U.S. 197 (1993); *Sale v. Haitian Ctrs.
Council, Inc.*, 509 U.S. 155 (1993)). There is no indication in
*Morrison*, however, or elsewhere, that a "presumption against
extraterritoriality" existed and could have been invoked by
Congress in 1789.

The Court held in *Morrison* that § 10(b) did not apply to
securities transactions conducted in other nations, stating that
"[w]hen a statute gives no clear indication of an extraterrito-
rial application, it has none." 130 S. Ct. at 2878. *Morrison*,
however, did not require that Congress use the precise word
"extraterritorial" in a statute to establish such applicability. It
required only that there be a "clear indication," stating that
such an indication may come from either the text or the con-
text of the statute. *Id.* at 2883.

**[3]** There is more than one "clear indication" of extraterri-
torial applicability in both the ATS's text and its context. The
ATS provides for jurisdiction "of any civil action by an alien
. . . committed in violation of the law of nations or a treaty
of the United States." 28 U.S.C. § 1350. The statute creates
jurisdiction for claims brought by persons who are not citi-

zens of this country. The statute's explicit reference to the law of nations indicates that we must look beyond the law of the United States to international law in order to decide what torts fall under its jurisdictional grant. Piracy was one of the paradigmatic classes of cases recognized under the ATS when it was enacted. These are all indications of extraterritorial applicability.

**[4]** In his dissent, Judge Kleinfeld acknowledges that Congress expressly intended to include claims of piracy within the ambit of the ATS. Nevertheless, he discounts such inclusion for purposes of the statute's extraterritorial applicability. He states that while piracy occurs outside the United States, it takes place on the high seas, so there is no potential for interference with another nation's sovereignty. He argues that, after *Morrison*, the express inclusion of piracy as a claim under the ATS can no longer support the statute's extraterritorial application. *Morrison*, however, is very specific about the language of the Securities Exchange Act of 1934 and how it pertains to our own "national public interest." It focuses on the domestic history of the implementation of § 10(b). *Morrison* describes Congress as generally enacting statutes that apply in our country, but says nothing about any concerns for the sovereignty of other nations. It provides no reasoning to undermine our conclusion that by recognizing an ATS claim for piracy, Congress intended extraterritorial application of the statute. Judge Kleinfeld accuses us of ignoring concerns about interference with national sovereignty. Yet, the Supreme Court in *Sosa* took such concerns fully into account when it held that ATS jurisdiction was limited to claims in violation of universally accepted norms. 543 U.S. at 727-28.

**[5]** Moreover, the ATS is a jurisdictional statute; federal courts frequently exercise jurisdiction with regard to matters occurring out of the country, subject to forum non conveniens and conflict of law principles. *See Filartiga*, 630 F.2d at 885 ("Common law courts of general jurisdiction regularly [have] adjudicate[d] transitory tort claims between individuals over

whom they exercise personal jurisdiction, *wherever* the tort occurred." (emphasis added)); *see also Marcos I*, 978 F.2d at 499-50 (rejecting the argument "that there is no extraterritorial jurisdiction over civil actions based on torture"). The norms being applied under the ATS are international, not domestic, ones, derived from international law. As a result, the primary considerations underlying the presumption against extraterritoriality—the foreign relations difficulties and intrusions into the sovereignty of other nations likely to arise if we claim the authority to require persons in other countries to obey our laws—do not come into play. This is because, Judge Kleinfeld's contention notwithstanding, we are not asserting an entitlement to "make law" for the "entire planet." Kleinfeld op. at 19431. Instead, and especially in light of *Sosa*, the ATS provides a domestic forum for claims based on conduct that is illegal everywhere, including the place where that conduct took place. It is no infringement on the sovereign authority of other nations, therefore, to adjudicate claims cognizable under the ATS, so long as the requirements for personal jurisdiction are met.

The only circuit decision to apply *Morrison* in a case other than in a securities case is *Norex Petroleum v. Access Indus.*, 631 F.3d 29 (2d Cir. 2010). It dealt with the Racketeer Influenced and Corrupt Organizations Act (RICO), enacted in 1970. There, the Second Circuit, in an amended opinion, applied the *Morrison* presumption and dismissed a RICO action founded on conduct occurring in Russia. That decision was consistent with the Second Circuit's precedent, as that circuit had earlier held that RICO had no extraterritorial application because it contained no language suggesting extraterritorial applicability. *See North South Fin. Corp. v. Al-Turki*, 100 F.3d 1046, 1051 (2d Cir. 1996), *abrogated on other grounds by Norex*.

**[6]** We deal with the ATS, not RICO or a securities act. There are strong indications that Congress intended the ATS to provide jurisdiction for certain violations of international

law occurring outside the United States, and there are no indications to the contrary. We therefore conclude that the ATS is not limited to conduct occurring within the United States or to conduct committed by United States citizens. The ATS, of course, expressly creates jurisdiction for claims asserted by aliens, so that there can be no dispute that claims may, indeed must, be asserted by entities that are not citizens of the United States.

**[7]** There is no extraterritorial bar to applying the ATS to the conduct alleged in this case.

## B. Corporate Liability

Defendants are all corporate entities, referred to collectively as Rio Tinto, and they contend that the ATS does not apply to corporations. We believe there are two separate but related inquiries with respect to corporate liability in this case. The first is whether, as Rio Tinto argues, the statute itself bars all corporate liability, and to the extent it applies to private actors, permits liability only as to individuals. The second is whether, if there is no overall statutory bar to corporate liability, the particular internationally accepted norm alleged to have been violated recognizes corporate liability. We deal, at this point, with the first, and more general inquiry.

Rio Tinto urges us to hold that the ATS bars corporate liability. This is a view that is to some extent supported by the recent Second Circuit majority opinion in *Kiobel v. Royal Dutch Petroleum Co.*, holding that customary international law as a whole "has not to date recognized liability for corporations that violate its norms." 621 F.3d 111, 125 (2d Cir. 2010). We, however, conclude the sounder view is that expressed in Judge Leval's concurrence. *Id.* at 153 (Leval, J., concurring) ("No principle of domestic or international law supports the majority's conclusion that the norms enforceable through the ATS—such as the prohibition by international law of genocide, slavery, war crimes, piracy, etc.—apply only

to natural persons and not to corporations, leaving corporations immune from suit and free to retain profits earned through such acts.").

In its brief, Rio Tinto looks principally to treaties establishing international tribunals for criminal trials—i.e. the Rome Statute and the Rwanda War Crimes Commission—which do not explicitly provide for corporate liability. The appropriate inquiry, however, is to look at the ATS itself and to the international law it incorporates. *Sosa*, 542 U.S. at 733.

We have already recognized the importance of looking at the statutory language and purpose. Our circuit's most recent decision on corporate civil liability in an international context is *Bowoto v. Chevron*, 621 F.3d 1116 (2010), where we held that the Torture Victim Protection Act's express language and documented legislative history reflected congressional intent to limit liability under that statute to individuals. The statute created a civil action for recovery of damages "from an individual," *id.* at 1126, and the legislative history demonstrated that Congress considered and rejected corporate liability, *id.* at 1127.

**[8]** The ATS contains no such language and has no such legislative history to suggest that corporate liability was excluded and that only liability of natural persons was intended. We therefore find no basis for holding that there is any such statutory limitation. This is also the view supported by a distinguished contemporary scholar, Harold Hongju Koh, *Separating Myth from Reality About Corporate Responsibility Litigation*, 7 J. INT'L ECON. L. 263, 266-67 (2004). The D.C. Circuit has recently reached the same conclusion. *Doe*, at *84.

With respect to whether corporate liability exists in any given ATS case, the most recent controlling Supreme Court decision is, of course, *Sosa*, which defines the scope of the ATS in terms of internationally accepted norms and frames the question of whether a particular defendant may be held

liable in terms of the nature of the particular norm alleged to have been violated. In discussing the definite nature of an international norm required to invoke jurisdiction over a cause of action under the ATS, the Court noted:

> A related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual.

542 U.S. at 733 n.20.

**[9]** *Sosa* expressly frames the relevant international-law inquiry to be the scope of liability of private actors for a violation of the "given norm," i.e. an international-law inquiry specific to each cause of action asserted. *See id.* (citing the Second Circuit's decision in *Kadic*, 70 F.3d 232, where both the majority and the dissent applied international law principles, and citing the D.C. Circuit's decision in *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984), which also looks at international law). The proper inquiry, therefore, should consider separately each violation of international law alleged and which actors may violate it. Where no norm of international law sufficiently "specific, universal and obligatory" has been alleged to give rise to a cause of action, the ATS claim must be dismissed and we need not reach the question of corporate liability. *Marcos II*, 25 F.3d at 1475.

We therefore address the scope of liability for private actors, including corporate liability, with respect to those claims we conclude can allege a violation of a sufficiently established international norm. There is no legitimate basis for Rio Tinto's position that the statute itself is a complete bar to corporate liability.

## C.   Aiding and Abetting Liability

**[10]** In this court, although not below, Rio Tinto argues that the ATS does not encompass aiding and abetting liability.

For purposes of considering this issue, we assume, without deciding, that the complaint alleges such liability with respect to the war crimes that could be said to have been committed by PNG with the aid of Rio Tinto. Like the inquiry into corporate liability, and for similar reasons, the inquiry into aiding and abetting liability is an international-law inquiry. *See Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 268-77 (2d Cir. 2007) (Katzmann, J. concurring) ("aiding and abetting liability, . . . is sufficiently well established and universally recognized to be considered customary international law") (citations, internal quotation marks, and alterations omitted).

**[11]** The Second and Eleventh Circuits have recognized that aiding and abetting may give rise to an ATS claim. *Khulumani*, 504 F.3d at 260; *Romero v. Drummond Co.*, 552 F.3d 1303, 1315 (11th Cir. 2008) ("[T]he law of this Circuit permits a plaintiff to plead a theory of aiding and abetting liability under the Alien Tort Statute."). As Judge Katzman's concurrence in *Khulumani* noted, in that case the United States conceded and the defendants did not dispute, the well-established international law concept of aiding and abetting. 540 F.3d at 270. The D.C. Circuit recently reached the same conclusion. *Doe*, at *29. We agree. The ATS itself does not bar aiding and abetting liability. In Part IV. B., we engage in the required international law inquiry and discuss the availability of aiding and abetting liability for war crimes.

## D.   Arising Under Jurisdiction

This is a case brought under the ATS, which is a law enacted by our First Congress. Judge Ikuta's dissent argues, however, that federal courts under the ATS lack jurisdiction to adjudicate claims brought by an alien against an alien. In her view, in adjudicating claims under the ATS we are exercising foreign diversity jurisdiction and not dealing with a claim "arising under" the laws of the United States pursuant to Article III of the Constitution. Our circuit has addressed

this same issue once before in *Marcos I* and concluded that ATS claims arise under federal law. 978 F.2d at 502-03. There, we held "that Congress had the power through the 'Arising Under' Clause of Article III of the Constitution to enact the Alien Tort Statute." *Id.* Some eleven years later, we applied that precedent while sitting en banc in *Alvarez-Machain v. United States*, 331 F.3d 604, 612 (9th Cir. 2003) (en banc), *rev'd sub nom. Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). Although *Sosa* reversed *Alvarez-Machain*, it did so on unrelated grounds, and did nothing to call into question the holding that we have jurisdiction to hear claims cognizable under the ATS because they "arise under" federal law for Article III purposes. Indeed, the best reading of *Sosa* is that it confirms our circuit law on this point, to which we adhere today.

Judge Ikuta's dissent emphasizes *Sosa*'s characterization of the ATS as a jurisdictional statute. Although the Supreme Court in *Sosa* described the ATS as "jurisdictional in nature," 542 U.S. at 713, the Court rejected defendant's argument that the ATS "does no more than vest the federal court with jurisdiction." *Id.* Rather, the Court held "that federal courts could entertain claims once the jurisdictional grant was on the books, because torts in violation of the law of nations would have been recognized within the common law of the time." *See Sosa*, 542 U.S. at 714 (citing Brief of Professors of Federal Jurisdiction and Legal History as Amici Curiae in Support of Respondents, 2004 WL 419425). The Court said: "Although we agree the statute is in terms only jurisdictional, we think that at the time of enactment the jurisdiction enabled federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law." *Id.* at 712.

**[12]** Judge Ikuta's repeated assertion that *Sosa* held that the ATS is "a purely jurisdictional statute" is thus misleading, omitting the nuance in the *Sosa* opinion. *See* Ikuta op. at 19469, 19482. What *Sosa* actually said is that although the

statute is written as a grant of jurisdiction, it was understood at the time of its passage that the common law would provide a cause of action for violations of the law of nations or a treaty of the United States. *See Sosa*, 542 U.S. at 713-14. In other words, *Sosa* holds that the ATS was enacted to provide jurisdiction to hear claims brought pursuant to causes of action that already existed at common law.

Of course, as Justice Scalia points out in *Sosa*, the "common law" at the time was "the so-called general common law," and not federal law. *Id.* at 739 (Scalia, J., concurring) ("General common law was not federal law under the Supremacy Clause."). As one of our colleagues has explained, claims arising under the general common law did not arise under federal law or state law. "Federal and state courts adjudicating questions of general common law were not adjudicating questions of federal or state law, respectively—the general common law was neither." William A. Fletcher, *International Human Rights in American Courts*, 93 VA. L. REV. IN BRIEF 1, 2 (2007) ("[B]y the early nineteenth century it had become clear that the general law, including the law of nations, was not federal law in either the jurisdiction-conferring or supremacy-clause sense.").

But the concept of the "common law" changed dramatically after *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). After *Erie,* we no longer recognize a "general" common law as applicable in federal courts. Now, when federal courts decide claims arising under federal common law or federal statutes, they are applying federal law. As both the *Sosa* majority and Justice Scalia's concurrence point out, following *Erie* "[t]here developed a specifically federal common law." *Id.* at 741 (Scalia, J., concurring); *see also id.* at 726 (maj. op.) ("*Erie* . . . was the watershed in which we denied the existence of any federal 'general' common law . . . ." (citation omitted)).

**[13]** Most important for present purposes, there is no question that claims premised on federal common law arise under

the law of the United States. *See, e.g., Illinois v. City of Milwaukee*, 406 U.S. 91, 100 (1972) ("We see no reason not to give 'laws' its natural meaning, and therefore conclude that § 1331 jurisdiction will support claims founded upon federal common law as well as those of a statutory origin." (citation omitted)); 19 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 4514, 455 (2d ed. 1996) ("A case 'arising under' federal common law presents a federal question and as such is within the original subject-matter jurisdiction of the federal courts.").

Judge Ikuta's dissent insists that even today, more than seventy years after *Erie*, cases brought pursuant to the ATS do not "arise under" the Constitution or laws of the United States for Article III purposes. In essence, she maintains that as a claim brought under the ATS would not have arisen under the laws of the United States for Article III purposes at the time the ATS was enacted—because, as we have explained, the cause of action would have been supplied by the "general" common law, which did not confer jurisdiction—it cannot do so now, even though the "general" common law no longer exists. Couching her argument in terms of Congressional intent, within the framework of the law in existence in 1789, Judge Ikuta ignores the subsequent development of the law that *Sosa* so clearly explained and endorsed taking into account. In fact, an entire subsection of the opinion (IV.B) was devoted to explaining why, despite the changed understanding of "the common law," the judiciary retains the power, "subject to vigilant doorkeeping," to recognize international norms as actionable under the ATS. *Sosa*, 542 U.S. at 729. Although *Sosa* gave several reasons for this holding, most relevant to highlighting the degree to which it foreclosed Judge Ikuta's current argument is its response to Justice Scalia. Justice Scalia argued that the changes wrought by *Erie* "preclude federal courts from recognizing any further international norms as judicially enforceable today, absent congressional action." *Id.* at 729. The majority responded:

> We think an attempt to justify such a position would
> be particularly unconvincing in light of what we
> know about congressional understanding bearing on
> this issue lying at the intersection of the judicial and
> legislative powers. The First Congress, which
> reflected the understanding of the framing generation
> and included some of the Framers, assumed that fed-
> eral courts could properly identify some international
> norms as enforceable in the exercise of [ATS] juris-
> diction. *We think it would be unreasonable to
> assume that the First Congress would have expected
> federal courts to lose all capacity to recognize
> enforceable international norms simply because the
> common law might lose some metaphysical cachet
> on the road to modern realism.*

*Id.* at 729-30 (emphasis added).

*Sosa* went on to caution that it did not "imply that every
grant of jurisdiction to a federal court carries with it an oppor-
tunity to develop common law." *Id.* at 731 n.19. It rejected the
argument that "the grant of federal-question jurisdiction
[under 28 U.S.C. § 1331] would be equally as good" as the
ATS, and for two reasons. *Id.* First, the ATS "was enacted on
the congressional understanding that courts would exercise
jurisdiction by entertaining some common law claims derived
from the law of nations," whereas federal question jurisdic-
tion pursuant to § 1331 was not "extended subject to any
comparable congressional assumption." *Id.* Second, although
"international disputes implicating . . . our relations with for-
eign nations are one of the narrow areas in which federal
common law continues to exist," *id.* at 730 (citation and quo-
tation marks omitted, alteration in original), "a more expan-
sive common law power related to 28 U.S.C. § 1331" might
not be "consistent with the division of responsibilities
between federal and state courts after *Erie*," *id.* at 729 n.19.
After *Erie*, the federal common law is developed only in "in-
terstitial areas of particular federal interest." *Id.* at 726. In

other words, § 1331 did not make the ATS superfluous, because only the ATS carries with it the Congressional assumption that the judiciary would use it to develop the common law in an area of particular federal interest: international relations.

**[14]** In short, we read *Sosa* to permit courts to develop the federal common law by incorporating into it certain claims that derive from norms of international law—but only after determining that they meet the *Sosa* standards limiting those norms for ATS purposes. *Sosa*'s limitations on claims cognizable under the ATS, moreover, are themselves substantive federal law, just as the Foreign Sovereign Immunities Act (FSIA)'s statutory limitations on the sovereign immunity defenses available to foreign governments in American courts are substantive federal law. *See* FSIA, 28 U.S.C. § 1330(a); *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493-94 (9183) ("At the threshold of every action in a District Court against a foreign state, . . . the court must satisfy itself that one of the [FSIA's] exceptions applies—and in doing so it must apply the detailed federal law standards set forth in the [FSIA]. Accordingly, an action against a foreign sovereign arises under federal law, for purposes of Article III jurisdiction.").

Thus, it is by now widely recognized that the norms *Sosa* recognizes as actionable under the ATS *begin* as part of international law—which, without more, would not be considered federal law for Article III purposes—but they *become* federal common law once recognized to have the particular characteristics required to be enforceable under the ATS. *See* Fletcher, *supra*, at 8 ("[D]espite its lack of discussion, the Court's decision necessarily implies that the federal common law of customary international law is jurisdiction-conferring."); *see also, e.g.*, Harold Hongju Koh, *How Is International Human Rights Law Enforced?*, 74 IND. L.J. 1397, 1413 (1999) (describing this "legal internalization"); Harold Hongju Koh, *Is International Law Really State Law?*, 111 HARV. L. REV.

1824, 1835 (1998) (same); *see also Alvarez-Machain*, 331
F.3d at 649-50 (O'Scannlain, J., dissenting) ("The ATS's con-
formity with Article III rests on the incorporation of the law
of nations as federal common law."); RESTATEMENT (THIRD) OF
FOREIGN RELATIONS § 111, cmt. e (1987) ("[C]ases arising
under customary international law . . . are 'Cases . . . arising
under . . . the Laws of the United States, and Treaties made
. . . under their Authority,' and therefore within the Judicial
Power of the United States under Article III, Section 2 of the
Constitution." (all but first alteration in original)).

The Supreme Court in *Sosa* put it this way: "[F]ederal
courts should not recognize private claims under federal com-
mon law for violations of any international law norm with less
definite content and acceptance among civilized nations than
the historical paradigms familiar when § 1350 was enacted."
542 U.S. at 732. The clear implication of these instructions is
that claims that meet this exacting standard are "recognize[d]
. . . under federal common law." *Id.*; *see also id.* (recognizing
that ATS claims are "private claims under federal common
law for violations of . . . international law norm[s]"); *id.* at
745 n.* (Scalia, J., concurring) ("[A] federal-common-law
cause of action of the sort the Court reserves discretion to
create would 'arise under' the laws of the United States . . .
for purposes of statutory federal-question jurisdiction."
(emphasis omitted)).

Judge Ikuta's assertion that "international law is not itself
part of the 'Laws of the United States' for purposes of Article
III" is therefore not wrong, but it is incomplete. More accu-
rately, it should state: The norms underlying international law
torts are not itself part of the "Laws of the United States" for
purposes of Article III until they have been incorporated into
the federal common law pursuant to the exacting process
articulated in *Sosa*.

Other aspects of *Sosa* confirm this conclusion. *Sosa* itself
was a suit between two aliens. Two of the amicus briefs sub-

mitted on behalf of the respondent in *Sosa* pointed out the alleged Article III deficiency that Judge Ikuta asserts exists here. *See* Brief for the National Foreign Trade Council, et al., as Amici Curiae, 2004 WL 162760, at 24-25 (Jan. 23, 2004) ("Some ATS suits (including this one) feature aliens suing aliens—making the suits ineligible for federal diversity jurisdiction. For the suits to be maintainable, therefore, they would have to fall under another head of Article III jurisdiction— probably jurisdiction for 'Cases . . . arising under . . . the Laws of the United States.' But, . . . international law itself, without some congressional action incorporating it into positive domestic law, is *not* law of the United States for Article III purposes. Reading the ATS as permitting suits based only on generalized international law, with no further specification by statute or treaty, would mean the statute attempted to provide jurisdiction well beyond the Article III limits." (citations omitted, emphasis in the original)); *see also* Brief of Washington Legal Foundation, et al. as Amici Curiae, 2004 WL 162759, at *14-19 (Jan. 23, 2004) (arguing that "a claimed violation of an international-law norm that has not been codified in a federal treaty or statute does not present a federal question or arise under federal law").

The *Sosa* Court's obvious awareness of the potential Article III problem, moreover, makes even more significant *Sosa*'s acknowledgment that the ATS will call upon the federal courts "to consider suits under rules that would go so far as to claim a limit on the power of foreign governments over their own citizens, and to hold that a foreign government or its agent has transgressed those limits." *Sosa*, 542 U.S. at 727. The paradigmatic example of a suit that could "claim a limit on the power of foreign governments over their own citizens" is a case such as this one, where a foreign plaintiff is suing a foreign defendant for a tort committed in a foreign country. We are, of course, cognizant of *Sosa*'s warning regarding "the potential implications for the foreign relations of the United States of recognizing such causes," *id.*—a concern that we address in Part III.B—but *Sosa* clearly contemplated that

courts would at least have subject-matter jurisdiction, under appropriate circumstances, to hear cases brought under the ATS in which foreign plaintiffs allege that they have been wronged by their (foreign) governments. We are unwilling to assume, as Judge Ikuta apparently does, that the *Sosa* Court would warn us to be careful regarding the foreign-policy implications of hearing a type of case over which we lack subject matter jurisdiction entirely—particularly when the alleged jurisdictional defects of which Judge Ikuta complains were brought to its attention.

Others agree that *Sosa* stands for the proposition that claims cognizable under the ATS arise under the federal common law, and therefore provide subject matter jurisdiction. *See* Fletcher, *supra*, at 7-8 (explaining that, after *Sosa*, we know "that there is a federal common law of international human rights based on customary international law" and that "the federal common law of customary international law is federal law in both the jurisdiction-conferring and supremacy-clause senses"); *see also, e.g.*, *Khulumani*, 504 F.3d at 265 (Katzmann, J., concurring) (explaining how "*Sosa* makes clear that all ATCA litigation is in fact based on federal common law, rather than a statutory cause of action"); *id.* at 286 (Hall, J., concurring) ("[A]lthough the substantive norm to be applied is drawn from international law or treaty, any cause of action recognized by a federal court is one devised as a matter of federal common law." (quoting the Brief for the United States of America as Amicus Curiae at 5 (alteration in the original))); William R. Casto, *The New Federal Common Law of Tort Remedies for Violations of International Law*, 37 RUTGERS L.J. 635, 638 (2006) ("*Sosa* squarely holds that ATS litigation is based upon a federal common law cause of action . . . ."); Ernest A. Young, Sosa *and the Retail Incorporation of International Law*, 120 HARV. L. REV. F. 28, 31, 33 (2007) ("*Sosa* is best read as recognizing a federal common law implied right of action for the violation of certain [customary international law] rules of decision. . . . [O]nce *Sosa* recognized a federal right of action, that recognition was sufficient

to bring such claims within current understandings of Article III's 'arising under' jurisdiction.").

To further support the proposition that the ATS does not arise under the laws of the United States, Judge Ikuta points out that admiralty law does not arise under the laws of the United States. *Am. Ins. Co. v. 356 Bales of Cotton*, 26 U.S. 511, 545 (1828). Judge Ikuta, however, overlooks the reason. Admiralty law does not "arise under" federal law for Article III purposes because admiralty and maritime law have been carved out by the Supreme Court as special in this regard, for reasons wholly inapplicable to claims cognizable under the ATS. *See Romero v. Intern'l Terminal Operating Co.*, 358 U.S. 354, 359-80 (1959).

Article III has three specific grants of subject-matter jurisdiction. U.S. Const. art. III, § 2, cl. 1-3 (including cases arising under, cases affecting ambassadors, and cases of admiralty). In the seminal case upon which Judge Ikuta relies, Chief Justice Marshall reasoned that: "The Constitution certainly contemplates these as three distinct classes of cases; and if they are distinct, the grant of jurisdiction over one of them, does not confer jurisdiction over either of the other two." *356 Bales of Cotton*, 26 U.S. at 545. For that reason, as well as for reasons specific to notions of the "general common law" that no longer prevail, *356 Bales of Cotton* held that "[a] case in admiralty does not, in fact, arise under the Constitution or laws of the United States." *Id.*

**[15]** In conclusion, the controlling decision of the Supreme Court, *Sosa*, and the overwhelming weight of scholarly authority all compel us to hold that an ATS case "arises under" the laws of the United States and calls for the exercise of federal question jurisdiction pursuant to Article III.

## III.   NONJUSTICIABILITY ISSUES

### A.   Prudential Exhaustion

This en banc court in the controlling plurality opinion by Judge McKeown "remanded for the limited purpose to determine in the first instance whether to impose an exhaustion requirement on plaintiffs" and in the same opinion outlined a framework. *Rio Tinto III*, 550 F.3d at 831-21. The opinion explained that "[t]he lack of a significant U.S. 'nexus' is an important consideration in evaluating whether plaintiffs should be required to exhaust their local remedies in accordance with the principle of international comity." *Id.* at 831. It went on to point out that "[t]he nature of certain allegations and the gravity of the potential violations of international law" trigger America's "historical commitment to upholding customary international law." *Id.* The opinion expressly stated that prudential exhaustion "is not a prerequisite to jurisdiction" but is a principle that governs the timing of decision making. *Id.* at 828.

This is consistent with the Supreme Court's observation in *Sosa* that exhaustion might be warranted when "appropriate" in ATS cases, 542 U.S. at 733 n.21, and led the plurality of this en banc court to observe that in ATS cases "[w]here the United States 'nexus' is weak, courts should carefully consider the question of exhaustion, particularly—but not exclusively—with respect to claims that do not involve matters of 'universal concern.' " 550 F.3d 824. The district court was bound by that directive, and, since the nexus of the claims to the United States was weak, concluded exhaustion was required for all claims other than those involving matters of universal concern. *Rio Tinto IV*, 650 F. Supp. at 1031.

Defendants now maintain in this appeal that the district court's analytical framework on remand was flawed and that the district court did not consider the question of exhaustion with sufficient care. Defendants reason that if the district

court had given the issue careful consideration it would have concluded that exhaustion was required for all of the claims, essentially asserting that exhaustion is always required. This is not consistent with the controlling plurality's view that the universality of the norm alleged to have been violated is a factor in determining whether exhaustion is required, and that all claims, including claims with a weak nexus to the United States should not, for exhaustion purposes, be treated the same. *Rio Tinto III*, 550 F.3d at 831.

**[16]** The district court did not abuse its discretion when it considered whether exhaustion was required under the controlling plurality opinion of this court. The controlling rationale of our prior en banc decision did not require dismissal of the entire action for failure to exhaust.

## B. Political Question, International Comity, Act of State

**[17]** Courts have long been hesitant to decide issues that might infringe upon the conduct of the Executive Branch and hence have been concerned about what are characterized as "political questions." The doctrine "derives from the judiciary's concern for its possible interference with the conduct of foreign affairs by the political branches of the government." *DeRoburt v. Gannett Co.*, 733 F.2d 701, 703 (9th Cir. 1984). The district court originally dismissed all claims in this case as nonjusticiable political questions, relying on the initial position taken by the United States Department of State that interference with our relations with PNG might result from adjudication. *Rio Tinto I*, 221 F. Supp. at 1193-1199, 1208-09. Cases raising political questions are nonjusticiable. *Marbury v. Madison*, 5 U.S. 137, 170 (1803).

Courts considering the political question doctrine begin with *Baker v. Carr*, in which the Supreme Court described the doctrine as a function of the separation of powers and set forth six factors that require the dismissal of a suit under the

political question doctrine if any one of them is "inextricable from the case at bar." 369 U.S. 186, 217 (1962). Rio Tinto argues that four of the six *Baker* factors are at issue here:

> 1. "a textually demonstrable constitutional commitment of the issue to a coordinate political department";
>
>     * * *
>
> 4. "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government";
>
> 5. "an unusual need for unquestioning adherence to a political decision already made"; or
>
> 6. "the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

*Id.*

We will address each of these factors in turn and must, if any is inextricable from the case, dismiss the entire action as nonjusticiable. *See Corrie v. Caterpillar, Inc.,* 503 F.3d 974, 980 (9th Cir. 2007).

In evaluating whether this case involves matters submitted to another branch, the first *Baker* factor, we are mindful that the conduct of foreign policy is not the role of the courts. In this case, "we are not faced with analyzing a specific clause of the Constitution but rather proceed from the understanding that the management of foreign affairs predominantly falls within the sphere of the political branches and the courts consistently defer to those branches." *Alperin v. Vatican Bank,* 410 F.3d 532, 549 (9th Cir. 2005). The political question

inquiry "is a case-by-case inquiry because it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Id.* (citations and quotation marks omitted).

Congress expressly enacted the ATS to provide a forum for resolution of tort claims. The law to be applied emanates from international sources, and its application could call into question the actions of other nations in a way that could affect our foreign relations. This case, however, in no way calls upon the courts to judge the conduct of foreign relations by the United States government. The United States was not directly or indirectly involved in any of the events that occurred in PNG. This is not a case like *Corrie* in which the United States government financed the conduct plaintiffs sought to challenge. *See* 503 F.3d at 982 (explaining that the political question doctrine bars jurisdiction where the case would "at least implicitly" require the court to pass judgment on United States foreign policy). Nor does the fact that we must look to international law create a political question. *See Deutsch v. Turner Corp.*, 324 F.3d 692, 713 n.11 (9th Cir. 2003) (explaining that the application of treaty law does not automatically raise a nonjusticiable question). An ATS suit, such as this one, requires courts to apply the law of nations, as manifested in customary international law integrated into the United States' common law.

The fourth, fifth and sixth *Baker* factors are relevant in an ATS case "if judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests." *Kadic*, 70 F.3d at 249. Since the facts of this case present no question regarding the actual conduct of United States foreign policy, if there is any lack of respect due coordinate branches it must concern the executive's foreign policy interests related to this case. In asking whether adjudication of this matter would display a lack of respect for coordinate branches, we must ask whether

another branch has taken any action that could be jeopardized by our exercise of jurisdiction over this case.

The United States Department of State originally submitted a Statement of Interest (SOI) which concluded that "continued adjudication of the claims . . . would risk a potentially serious adverse impact on the peace process, and hence on the conduct of our foreign relations." The State Department was primarily concerned that adjudication of this case could invalidate acts of reconciliation that had already occurred in the war between PNG and the people of Bougainville and would "sweep away the basis of the peace agreement." The SOI also noted the PNG's strong objection to these proceedings. Thus, in response to Plaintiffs' original appeal, Rio Tinto supported the dismissal of the suit by arguing that there would be interference with U.S. foreign relations and relied on the SOI. When this en banc court remanded to consider prudential exhaustion, it did not expressly consider the issue. *Rio Tinto III*, 550 F.3d 822. We now do.

The political situation has significantly changed since the district court originally heard this case. Neither the PNG nor the US government now oppose the litigation going forward. In fact, in a letter sent on May 26, 2009, the PNG expressly urged that the case "be heard by courts in the United States" explaining that the Bougainville Government does "not see the case . . . adversely affecting any relations between us and [the] United States." The US government, for its part, has told this court in its briefs that it no longer believes foreign policy concerns are material in this case and has expressly stated that it is not "seeking dismissal of the litigation based on purely case-specific foreign policy concerns." Thus, there is no longer any basis for a fear of interference by the courts in the conduct of foreign affairs.

**[18]** This case presents exactly the types of questions that courts are well-suited to resolve: whether actions were lawful under specific and obligatory laws, whether the defendants

are responsible for such actions, and whether the plaintiffs are entitled to relief. The political question doctrine is thus no bar to our exercise of jurisdiction.

**[19]** Rio Tinto has also argued that all of Plaintiffs' claims are barred by the international comity doctrine, but that argument fails for similar reasons. Comity is rooted in international relations. "Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states." *Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa*, 482 U.S. 522, 544 n.27 (1987). It is out of that very spirit of cooperation and deference to tribunals in other nations that we held exhaustion may be a prudential bar to certain claims under the ATS. *Rio Tinto III*, 550 F.3d at 828-31. In particular, we instructed the district court to evaluate "whether plaintiffs should be required to exhaust their local remedies in accordance with the principle of international comity." *Id.* at 831.

The district court's consideration of exhaustion was sufficient to alleviate comity concerns. In considering whether exhaustion was required, the district court considered the universality of the norm and the nexus (or lack thereof) to the United States. *Rio Tinto IV*, 650 F.2d at 1014-31. In holding that the *jus cogens* violations alleged do not require exhaustion, the district court balanced the multiple concerns animating the comity doctrine. *Id.* at 1030-31.

The district court's earlier dismissal on comity grounds was predicated in large part on PNG's opposition. *Rio Tinto I*, 221 F. Supp. 2d 1116, 1199-1204. Such opposition is no longer present, and, in fact, the government of PNG has expressed its position that this action should go forward. *Sarei v. Rio Tinto*, Nos. 02-56256 and 02-56390, Order Granting Judicial Notice, Docket No. 354 (9th Cir. Oct. 26, 2010). In light of both the exhaustion analysis conducted by the district court and the

position of the PNG government, we conclude that comity does not bar any of the claims.

[20] Finally, Rio Tinto argues that the act of state doctrine requires dismissal of Plaintiffs' claims. This argument also fails. "The act of state doctrine . . . precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba*, 376 U.S. at 401. However, *jus cogens* norms are exempt from the doctrine, since they constitute norms "from which no derogation is permitted." *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992) (quoting the Vienna Convention on the Law of Treaties) (internal quotations omitted); *see id.* at 718 (holding a violation of a *jus cogens* norm is not a sovereign act). Thus, Plaintiffs' claims that allege *jus cogens* violations are not barred by the act of state doctrine.

## IV.   THE SPECIFIC CLAIMS THE DISTRICT COURT HELD WERE MATTERS OF UNIVERSAL CONCERN

We turn to the specific claims that the district court determined were within the jurisdiction of the ATS as alleged in Plaintiffs' complaint. They are genocide, war crimes, crimes against humanity, and racial discrimination. As a threshold matter, we explain why we consider genocide and crimes against humanity separately.

The complaint, the district court decisions, and other ATS decisions have often conflated consideration of genocide and crimes against humanity. *See Rio Tinto I*, 221 F. Supp. at 1149-51; *see also Kiobel*, 621 F.3d at 112. Genocide and crimes against humanity, however, are distinct under international law and should be considered separately. The statute of every modern international criminal tribunal has included separate articles for genocide and crimes against humanity (not, for example, making genocide a sub-section of the article pro-

hibiting crimes against humanity). *See* The Rome Statute of the International Criminal Court (Rome Statute), arts. 6-7, *opened for signature* July 17, 1998, 37 I.L.M. 1002; Statute of the International Criminal Tribunal for the former Yugoslavia (ICTY Statute), arts. 4-5; Statute of the International Criminal Tribunal for Rwanda (ICTR Statute), arts. 2-3. In addition, the Genocide Convention makes no mention of crimes against humanity. *See* Convention on the Prevention and Punishment of the Crime of Genocide (Genocide Convention), Dec. 9, 1948, S. Exec. Doc. O, 81-1 (1949), 78 U.N.T.S. 277. The elements of each violation under international law are therefore different; for that reason we consider each separately.

### A.   Genocide

The complaint alleges genocide against the indigenous population of the island of Bougainville in violation of the Convention on the Prevention and Punishment of the Crime of Genocide.

> **1.   The prohibition against genocide is a specific, universal, and obligatory internationally accepted norm.**

The concept of genocide as an internationally accepted norm was a product of World War II. Genocide was first defined in 1948 in the Genocide Convention as "any of the following acts committed with intent to destroy, in whole or in part, a national, ethnic[ ], racial or religious group, as such:"

(a) Killing members of the group;

(b) Causing serious bodily or mental harm to members of the group;

(c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part;

(d) Imposing measures intended to prevent births within the group;

(e) Forcibly transferring children of the group to another group.

Genocide Convention, art. II.

The United States ratified the Convention, although without a declaration as to whether or not the treaty was self-executing. This approach was in contrast to that taken with regard to ratification of the Convention on the Elimination of Racial Discrimination, which contained a declaration that it was not self-executing. *See* Genocide Convention Implementation Act of 1987, 18 U.S.C. § 1091 *et seq.* The Genocide Convention Implementation Act of 1987 incorporated the Genocide Convention's definition, with minor differences in language that are not significant. 18 U.S.C. § 1091(a). The Act included a provision, cited by Justice Scalia in his *Sosa* concurrence, that it should not "be construed as creating any substantive or procedural right enforceable by law by any party in any proceeding." 542 U.S. at 749 (Scalia, J. concurring) (quoting 18 U.S.C. § 1092). This did not, however, affect the availability of an ATS claim. As the Second Circuit has noted, the "decision not to create a *new* private remedy" does not repeal the pre-existing remedy under the ATS. *Kadic*, 70 F.3d at 242 (emphasis added).

Accordingly, even accepting Justice Scalia's argument that the treaty ratification itself did not create a remedy, the status of genocide as a *jus cogens* norm remains indisputable. *See, e.g.*, Restatement Third, §§ 404, 702, *Siderman de Blake*, 965 F.2d at 717. Genocide has been criminalized by all of the international criminal tribunals. Rome Statute, art. 6; ICTY

Statute, art. 4; ICTR Statute art. 2. The Genocide Convention has been ratified by more than 140 nations. U.S. Department of State, Treaties in Force (2010). The Convention itself makes clear the non-derogable nature of the prohibition by establishing that "constitutional rulers," among other parties, may be punished for genocide and that the prohibition applies irrespective of peace or war. Genocide Convention, arts. I, IV. The International Court of Justice (ICJ) reiterated that the prohibition on genocide is a *jus cogens* norm in a 2007 opinion. *Bosnia and Herzegovina v. Serbia*, 2007 I.C.J. 91, ¶ 161 (Feb. 26).

In addition, the *jus cogens* norm prohibiting genocide is sufficiently specific to give rise to an ATS claim. The definition of genocide was first articulated in the Genocide Convention, quoted above, but it has been repeatedly reaffirmed in international and domestic law since 1948. Notably, the Convention's definition has been incorporated, with insignificant modifications, into domestic law in the form of the Genocide Convention Implementation Act of 1987. *See* 18 U.S.C. § 1091(a). One-hundred and forty other nations have agreed upon this definition of genocide. Dep't of State, Treaties in Force (2010). International tribunals have, with uniformity, applied the same definition. Rome Statute, art. 6 (criminalizing genocide); ICTY Statute, art. 4 (same); ICTR Statute, art. 2 (same).

**[21]** Claims of genocide, therefore, fall within the limited category of claims constituting a violation of internationally accepted norms for ATS jurisdiction. *Sosa*, 542 U.S. at 729. They are not barred by the act of state doctrine because violations of *jus cogens* norms are not sovereign acts. *See Siderman de Blake*, 965 F.3d at 718. Rio Tinto does not contend otherwise.

## 2. The *jus cogens* prohibition of genocide extends to corporations.

Having determined that the *jus cogens* prohibition of genocide is sufficiently specific, universal, and obligatory to give

rise to an ATS claim, we must next consider whether the forms of liability alleged in the complaint are cognizable in such an action. We have, in Section II.B *supra*, already rejected Rio Tinto's contention that the ATS itself bars corporate liability across the board.

**[22]** Article IX of the Genocide Convention provides that contracting parties may submit disputes to the ICJ "including those relating to the responsibility of a State for genocide or any of the other acts enumerated in article III." Genocide Convention, art. IX. The ICJ has made it explicitly clear that a state may be responsible for genocide committed by groups or persons whose actions are attributable to states. *Bosnia and Herzegovina*, 2007 I.C.J. at ¶ 167. This clarity about collective responsibility implies that organizational actors such as corporations or paramilitary groups may commit genocide. Given the universal nature of the prohibition, if an actor is capable of committing genocide, that actor can necessarily be held liable for violating the *jus cogens* prohibition on genocide. Indeed, the implication that an actor may avoid liability merely by incorporating is inconsistent with the universal and absolute nature of the prohibition against genocide. *See Kiobel*, 621 F.3d at 149-153 (Leval, J. concurring).

The ICJ has so recognized. Examining the treaty and other sources of customary international law in 2007, the ICJ held "Contracting Parties to the Convention are bound not to commit genocide, through the actions of their organs or persons or groups whose acts are attributable to them." *Bosnia and Herzegovina*, 2007 I.C.J. ¶ 167. The ICJ acknowledged that the Convention did not explicitly provide for direct state responsibility for the commission of genocide, but held "[i]t would be paradoxical if States were thus under an obligation to prevent, so far as within their power, commission of genocide by persons over whom they have certain influence, but were not forbidden to commit such acts through their own organs, or persons over whom they have such firm control

that their conduct is attributable to the State concerned under international law." *Id.* at ¶ 166.

Corporations are recognized legal entities, yet, according to the ICJ, even amorphous "groups" may be guilty of genocide. The ICJ's analysis is instructive, in particular because the Supreme Court has noted that "[i]n interpreting our treaty obligations, we . . . consider the views of the ICJ itself, 'giving respectful consideration to the interpretation of an international treaty rendered by an international court with jurisdiction to interpret the treaty.' " *Medellin v. Texas*, 552 U.S. 491, 513 n.9 (2008) (quoting *Breard v. Greene*, 523 U.S. 371, 375 (1998) (*per curiam*)). The ICJ concluded that genocide is a violation of international law whether committed by an individual, an amorphous group, or a state, consistent with all other sources of international law recognizing the universality of the prohibition of genocide. *See Bosnia and Herzegovina*, 2007 I.C.J. at ¶ 417 (attributing the genocide in Srebrenica to "persons and groups of persons").

**[23]** The ICJ made explicitly clear that a state may be responsible for genocide committed by groups or persons whose actions are attributable to states. *Id.* at ¶ 167 (Feb. 26). Under this holding, loosely affiliated groups such as paramilitary units may commit genocide, particularly in light of consistent case law indicating that genocide does not require state action. *See id.* (attributing genocide to a non-state actor); *see also Kadic*, 70 F.3d at 241-44. Given that an amorphous group, a state, and a private individual may all violate the *jus cogens* norm prohibiting genocide, corporations likewise can commit genocide under international law because the prohibition is universal. *See* Genocide Convention, Preamble ("[G]enocide is a crime under international law, contrary to the spirit and aims of the United Nations and condemned by the civilized world.").

We recognize that this holding puts us at odds with the Second Circuit majority in *Kiobel*. *See* 621 F.3d at 120. We, like

the Second Circuit, have also taken guidance for our analysis from a footnote in *Sosa* and asked "whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued." *Kiobel*, 621 F.3d at 120 (quoting *Sosa*, 542 U.S. 732 n.20). The Second Circuit majority looked to whether any international institution had held a corporation liable for war crimes. *See* 621 F.3d at 119; 131-45. We, however, believe the proper inquiry is not whether there is a specific precedent so holding, but whether international law extends its prohibitions to the perpetrators in question. After *Sosa* we must look to congressional intent when the ATS was enacted. Congress then could hardly have fathomed the array of international institutions that impose liability on states and non-state actors alike in modern times. That an international tribunal has not yet held a corporation criminally liable does not mean that an international tribunal could not or would not hold a corporation criminally liable under customary international law. *See* Jonathan A. Bush, *The Prehistory of Corporations and Conspiracy in International Criminal Law: What Nuremburg Really Said*, 109 COLUM. L. REV. 1094, 1149-68 (2009) (exploring strategic decision not to prosecute corporations at Nuremburg trials, after determining that such prosecutions would have been available under a variety of theories); *cf.* The Nuremberg Trial, 22 *Trial of the Major War Criminals Before the International Military Tribunal* 501-17 (proceedings of Sept. 30, 1946) (declaring the Nazi Leadership Corps, Die Geheime Staatspolizei (Gestapo) and Der Sicherheitsdienst des Reichsführer SS (SD) (which were indicted together), and Die Schutzstaffeln der National-sozialistischen Deutschen Arbeiterpartei (SS) to be criminal organizations). We cannot be bound to find liability only where international fora have imposed liability. Moreover, both the District of Columbia and the Seventh Circuits have very recently upheld imposition of civil liability on corporations under the ATS. *Doe*, at *4; *Flomo*, at *15. Both courts noted that, while I.G. Farben was not criminally prosecuted after World War II, it was dissolved and it's assets seized.

*Doe*, at \*75-77; *Flomo*, at \*6-7. Corporate identity is no bar to liability under the ATS.

### 3. The complaint adequately alleges a claim of genocide.

[24] We turn, then, to whether the complaint sufficiently alleges facts supporting a claim of genocide. Plaintiffs' complaint includes allegations of killing, serious bodily harm, and the deliberate infliction of conditions of starvation "for the purpose of starving the bastards out." The complaint alleges that Rio Tinto called in military force so that it could wipe out the native inhabitants of Bougainville engaged in an uprising. Such acts are prohibited by the Genocide Convention. Genocide Convention, art. II(a), (b), and (c) (prohibiting "(a) Killing members of the group; (b) Causing serious bodily or mental harm to members of the group; (c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part" with the intent to destroy a protected group). The complaint therefore alleges facts supporting an inference of acts that could constitute genocide.

To support a claim for genocide, however, the acts listed in Art. II of the Genocide Convention must additionally be committed with "intent to destroy, in whole or in part, a national, ethnic[ ], racial, or religious group, as such." Genocide Convention, art. I. The definition of a protected group under the Genocide Convention does not protect groups of persons generally, such as groups of people who find themselves under attack for political opinion reasons because they are in the wrong place at the wrong time. As one Trial Chamber Judgment at the International Criminal Tribunal for the Former Yugoslavia (ICTY) concluded, "the Genocide Convention does not protect all types of human groups. Its application is confined to national, ethnic[ ], racial, or religious groups." *Prosecutor v. Krstic*, Case No. IT-98-33-T, Judgment, ¶¶ 554-59 (Aug. 2, 2001).

In a decision holding that Serbia violated international law by failing to prevent genocide, the ICJ also considered the definition of a "protected group" for purposes of the Genocide Convention. *Bosnia and Herzegovina*, 2007 I.C.J. at ¶¶ 193-196. This case serves as an instructive frame of reference. The ICJ held that to qualify as a protected group, the group "must have particular positive characteristics—national, ethnic[ ], racial or religious—and not the lack of them." *Id.* at ¶ 193. It held "Bosnian Muslims" constituted a protected group under the Convention, but that the negative definition of a group ("non-Serbs") did not constitute a protected group. *Id.*

In holding that "non-Serbs" could not constitute a protected group, the court emphasized that there must be a collective "group identity" that is sought to be destroyed. *Id.* at ¶ 193. Accordingly, in an ethnically-diverse environment, like the one existing in the town of Srebrenica, the intent to eradicate any person who did not belong to the preferred group did not amount to the targeting of a specific group, which is the essence of genocide. *Id.* at ¶ 191. The decision went on to point to the drafters' rejection of proposals to include political groups as illustrating the drafters' "close attention to the positive identification of groups with specific distinguishing well-established, some said immutable, characteristics." *Id.* at ¶ 194.

The general allegations of the complaint in this case describe in vivid detail the turmoil between the native inhabitants of the island and Rio Tinto, which led to the closure of the mine by the local residents in protest over the environmental destruction wrought by it. The complaint concludes its description of the events leading to the closure of the mine by asserting that "Bougainville is the first place in the world where an indigenous people have forced the closure of a mine that was raping the land and an environment, and have kept it closed." The complaint goes on to describe the acts of violence and mayhem intentionally inflicted by Rio Tinto after its summoning of military force.

**[25]** The complaint here amply shows why the residents of Bougainville constitute a protected group. The complaint defines the residents of Bougainville by reference to their "native way of life," ancestral attachment to the land, distinct culture, and black skin color. Moreover, the complaint alleges that both Rio Tinto and the PNG government saw the residents of Bougainville as a distinct group. *See* Compl. ("Rio considered the native people to be inferior in every respect: socially, economically, politically, and racially."); *id.* (quoting "the former commander of the PNG forces," referring to the residents of Bougainville as a " 'distinctive people' "); *see also Bosnia and Herzegovina*, 2007 I.C.J. at ¶ 191 (noting that "international jurisprudence accepts a combined subjective-objective approach to defining a protected group," allowing for definition both by the group itself and by outsiders). The complaint thus adequately alleges that Bougainvilleans possessed "particular positive characteristics" and "particular group identity," *Bosnia and Herzegovina*, 2007 I.C.J. at ¶ 193, both in their own eyes and in the eyes of others.

These allegations are more than enough to support the Bougainvilleans' status as a protected group for the purpose of their genocide claim. This is true no matter whether they allege the shared "social . . . and cultural" characteristics that comprise an ethnic identity, *see* David L. Nersessian, *The Razor's Edge: Defining and Protecting Human Groups Under the Genocide Convention*, 36 CORNELL INT'L L.J. 293, 300 (2003) (citing "the travaux preparatoires of the Genocide Convention"), or shared physical characteristics sufficient to constitute an identifiable "racial" group, or a hybrid of these or the other protected elements. As the ICTY has explained: "National, ethnical, racial or religious group[s] are not clearly defined in the [Genocide] Convention or elsewhere. . . . [S]etting out such a list was designed more to describe a single phenomenon . . . than to refer to several distinct prototypes of human groups." *Krstic*, ¶¶ 555-56. Plaintiffs have

adequately alleged both ethnic and racial traits sufficient to
make them a protected group.

Moreover, according to the complaint, Rio Tinto oversaw
this mass infliction of death and suffering as a part of its pat-
tern of behavior on account of its worldwide view that mem-
bers of non-white races were "expendable." Thus, the
complaint alleges that this was Rio Tinto's worldwide modus
operandi: "Rio's treatment of the Bougainville people and the
environment was a part of a pattern of behavior it has perpe-
trated throughout the world where it has regarded the non
Caucasian indigenous people who live in the areas in which
it is exploiting natural resources as racially inferior and
expendable."

Although the complaint's use of the term "non Caucasian"
might be read to conflict with *Bosnia and Herzegovina*'s sug-
gestion that protected groups must be defined in positive
rather than negative terms, 2007 I.C.J. at ¶ 193, any conflict
here is illusory, given the complaint's extensive allegations as
to the "positive characteristics," *id.*, of the people of Bougain-
ville. As in *Bosnia and Herzegovina*, the complaint's use of
the negative identifier is "very limited," *id.* at ¶ 196. The
complaint overwhelmingly describes Bougainvilleans by ref-
erence to their own characteristics, rather than by contrast to
characteristics they did not possess.

Thus, the killings of the native people of the island were
committed on account of their race at least in part, and com-
mitted with "intent to destroy in whole or in part a national,
ethnic[ ], racial or religious group, as such" within the mean-
ing of Article I of the Genocide Convention. The target was
the indigenous population of the previously pristine and iso-
lated island of Bougainville, whose members had previously
had "only the vaguest contact with the modern world," who
were non-white, and who shared a homogenous racial iden-
tity. The allegations are sufficient to constitute genocide with
respect to the Islanders. Even though the complaint alleges

that Rio Tinto harbored virtually global racial animosity toward non-white indigenous peoples, the existence of animosity toward similar groups throughout the world cannot negate the legal consequences of an attempt to destroy a specific protected group in a particularized place.

[26] The complaint adequately alleges a claim of genocide. The district court's original dismissal of the claim must be reversed.

## B.   War Crimes

The complaint alleges war crimes—in the form of murder —against the civilian population of Bougainville during a non-international armed conflict in violation of Common Article III of the Fourth Geneva Convention Relative to the Protection of Civilian Persons in Time of War (Common Article III).

### 1.   The prohibition against war crimes is a specific, universal, and obligatory internationally accepted norm.

War crimes are defined primarily by the Geneva Conventions, to which the United States, along with at least 180 nations, is a party and which constitute part of customary international law. *See, e.g.*, Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Exec. Rep. 101-30, at 15 (1990) ("[T]he Geneva Conventions, to which the United States and virtually all other countries are Parties, . . . generally reflect customary international law."). War crimes are also among the crimes of "universal concern" in *Restatement (Third)*, § 404.

War crimes, regrettably, continue to have an all too contemporary resonance. A district court in Virginia has recently recognized the status of war crimes as sufficiently specific,

obligatory, and universal to give rise to a cause of action under the ATS:

> Claims for violations of the international norm proscribing war crimes are cognizable under the ATS. By ratifying the Geneva Conventions, Congress has adopted a precise, universally accepted definition of war crimes. Moreover, through enactment of a separate federal statute, Congress has incorporated this precise definition into the federal criminal law. 18 U.S.C. § 2441. Thus, Congress has clearly defined the law of nations to include a binding prohibition on the commission of war crimes. Given this, and given *Sosa*'s teachings, it follows that an allegation of a war crime states a cause of action under the ATS.

*In re Xe Servs. Alien Tort Litig.*, 665 F. Supp. 2d 569, 582 (E.D. Va. 2009).

**[27]** The definition of war crimes found in Common Article III has been agreed to by the United States and more than 180 nations party to the Geneva Convention. Common Article III provides, in relevant part:

> In the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party to the conflict shall be bound to apply, as a minimum, the following provisions:
>
> (1) Persons taking no active part in the hostilities . . . shall in all circumstances be treated humanely, without any adverse distinction founded on race, colour . . . .
>
> To this end, the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:

(a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture
. . . .

Fourth Geneva Convention Relative to the Protection of Civilian Persons in Time of War, art. 3, Oct. 21, 1950, 75 U.N.T.S. 287 (Geneva IV). Like the provisions in international law defining genocide, this definition is sufficiently specific, obligatory, and universal to give rise to an ATS claim. Defendants do not contend otherwise.

### 2. International law recognizes corporate liability for war crimes.

With respect to corporate liability for war crimes, at least two district courts have found that corporations may be liable for war crimes under the ATS. *In re Xe Servs. Alien Tort Litig.*, 665 F. Supp. 2d 569; *Wissam Abdullateff Sa'eed Al-Quraishi v. Adel Nakhla*, 2010 U.S. Dist. LEXIS 76450, *92-93 (D. Md. 2010) ("The Fourth Geneva Convention does not limit its application based on the identity of the perpetrator of the war crimes. Rather, its protections are based on who the potential victims of war crimes are.").

The text of Common Article III binds "each Party to the conflict." Geneva IV, art. III. Because parties to a conflict not of an international character by definition must include at least one non-state actor, entity, or group, Common Article III cannot reasonably be interpreted to be limited to states. The universal, obligatory, and specific nature of the *jus cogens* prohibition on war crimes is analogous to the *jus cogens* norm prohibiting genocide in its inclusion of states, individuals, and groups within its prohibition. Like the Genocide Convention, and to an even greater degree, Common Article III to the Geneva Conventions focuses on the specific identity of the victims rather than the identity of the perpetrators.

**[28]** The Eleventh Circuit has noted that corporations may be liable under the ATS for war crimes claims. *Sinaltrainal*

*v. Coca-Cola Co.*, 578 F.3d 1252, 1263 (11th Cir. 2009). We agree and conclude that international law extends the scope of liability for war crimes to all actors, including corporations.

### 3. International law recognizes aiding and abetting liability for war crimes.

**[29]** Criminal aiding and abetting liability for war crimes has been clearly established by the war crimes tribunals. *See, e.g., Prosecutor v. Kvocka*, Case No. IT-98-30/1-T, Judgment (Nov. 2, 2001) (holding an individual responsible for aiding and abetting war crimes pursuant to the joint criminal enterprise doctrine); *Prosecutor v. Musema*, Case No. ICTR-96-13-T, Judgment (Jan. 27, 2000). *See also* ICTY Statute art. 7(1) (providing for aiding and abetting liability for all crimes in its jurisdiction, including crimes against humanity and war crimes); ICTR Statute art. 6(1) (same); Rome Statute art. 25(3)(c) (same).

Under international law, however, the required *mens rea* for aiding and abetting war crimes is subject to dispute. On the one hand, as Amici International Law Scholars describe, the Nuremberg-era trials, the ICTY, and the ICTR have required the *mens rea* of knowledge in aiding and abetting cases. Brief of Amici Curiae International Law Scholars in Support of Plaintiffs-Appellants at 4-16 (Feb. 18, 2010) (citing, among other cases, *United States v. Von Weizsaecker (The Ministries Case)*, 14 Trials of War Criminals Before the Nuernberg Military Tribunals under Control Council Law No. 10 (1949), *Prosecutor v. Furundzija*, Case No. IT-95-17/1/T, Judgment, ¶ 236 (Dec. 10, 1998), *Prosecutor v. Rutaganda*, Case No. ICTR-96-3-T, Judgment, ¶ 389-91, 416, 439 (Dec. 6, 1990)). On the other hand, the Rome Statute, art. 25(3)(c) states that aiding and abetting must be "for the purpose" of furthering the crime. *See Doe*, at *46. In accord with the Rome Statute, Judge Katzmann's concurrence in *Khulumani* concluded that aiding and abetting under international law requires the *mens rea* of purpose and the *actus reus* of "sub-

stantial assistance." *Khulumani*, 504 F.3d at 277 (Katzmann, J. concurring). *See also Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009) (stating that the *mens rea* for aiding and abetting liability under the ATS is purpose and the *actus reus* is "practical assistance to the principal which has a substantial effect").

[30] We need not resolve this dispute as to *mens rea* in order to conclude that customary international law gives rise to a cause of action for aiding and abetting a war crime under the ATS. It is absolutely clear, as a matter of international law, that *at least* purposive action in furtherance of a war crime constitutes aiding and abetting that crime. Allegations of such purposive action are therefore cognizable under the ATS. *See Sosa*, 542 U.S. at 732. We reserve decision as to whether, as Judge Pregerson suggests, allegations of knowledge but not purpose in aiding or abetting the commission of war crimes would also be cognizable under *Sosa*.

### 4. The complaint adequately alleges a war crimes claim.

The complaint alleges murder of civilians during the civil war between the people of Bougainville and the PNG, conduct which is clearly prohibited under Common Article III(1)(a) of the Fourth Geneva Convention. The complaint alleges that Rio Tinto induced the military action and intended such action, "to forcibly displace and destroy plaintiffs and members of the Class." According to Plaintiffs, Rio Tinto "understood and intended" that their actions would "likely result in military action by the PNG and intended such action to take place even if it meant the death and/or injury of residents." Plaintiffs also allege that Rio Tinto "understood that it had a great deal of the control over the situation" and "knew" that this was the only way it could reopen its profitable mine. Plaintiffs allege that Rio Tinto solicited the military action for its own private ends and directed the military response even "while reports of war crimes surfaced."

**[31]** Judge McKeown suggests that Plaintiffs do not allege Rio Tinto's specific intent to harm the residents of Bougainville. "Missing," she says, "is the link between Rio Tinto and the PNG's alleged war crimes." McKeown op. at 19419. But Judge McKeown ignores Plaintiffs' extensive allegations that Rio purposely induced the war crimes in order to protect its economic interests in PNG. Plaintiffs allege that Rio issued the PNG government "an ultimatum": displace the local residents interfering with its mining operations, no matter the means, or Rio would abandon all investments on PNG. When the PNG government employed military means to fulfill Rio's demands, Plaintiffs allege, Rio provided the PNG military helicopters and vehicles to carry out the operations, even after reports of war crimes became public. When initial efforts were insufficient to displace the locals, PNG imposed a blockade on Bougainville; Plaintiffs allege that at a meeting "between PNG officials and two top Rio executives, one top Rio manager encouraged continuation of the blockade to 'starve the bastards out . . . .' " Moreover, Rio allegedly assured the PNG government that the continued maintenance of the blockade was enough to prevent Rio from withdrawing from PNG, while Rio simultaneously attempted to repress reporting of the humanitarian crisis unfolding on the island. These allegations support much more than "an inference of mere knowledge on Rio Tinto's part," McKeown op. at 19419; it supports an inference that Rio Tinto actively *encouraged* the killing of Bougainvilleans. It is "sufficient factual matter" for plaintiffs "to 'state a claim to relief that is plausible on its face,' " even if plaintiffs must allege that Rio Tinto specifically intended to harm the residents of Bougainville. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

In any event, it is far from clear that such specific intent is necessary to satisfy a *mens rea* of purpose under international law. As our concurring colleagues note, Pregerson Op. at 19387 n.1, the "purpose" language of the Rome Statute's Article 25(c)(3) "has yet to be construed by the ICC and may

be interpreted to be consistent with customary international law, which does not contain a specific intent requirement." Brief of Amici Curiae International Law Scholars in Support of Plaintiffs-Appellants at 20-21 (Feb. 18, 2010). Under customary international law, "[i]n the absence of a specific intent requirement, a perpetrator must *act* intentionally, but must only be *aware* of the likely *outcome*," in order to be held liable. *Id.* at 21 (second emphasis added). Article 25(3)(c) thus can be read to state only the "de minimus and obvious point . . . that an aider or abettor purposely acts in a manner that has the consequence of facilitating the commission of a crime," without "fram[ing] the intent of the aider or abettor with respect to that consequence." David Scheffer & Caroline Kaeb, *The Five Levels of CSR Compliance: The Resiliency of Corporate Liability Under the Alien Tort Statute and the Case for a Counterattack Strategy in Compliance Theory*, 29 BERKELEY J. INT'L L. 334, 355 (2011); *see also* Doug Cassel, *Corporate Aiding and Abetting of Human Rights Violations: Confusion in the Courts*, 6 NW. J. INT'L HUM. RTS. 304, 312-13 (2008) ("'[P]urpose' in the ICC Statute need not mean the exclusive or even primary purpose. A secondary purpose, including one inferred from knowledge of the likely consequences, should suffice."). Because plaintiffs allege that Rio Tinto specifically intended to harm them in aiding and abetting the commission of war crimes, we need not decide whether the broader interpretation of "purpose" would also sustain liability (just as we need not decide whether allegations of knowing but not purposive action would be cognizable).

**[32]** We conclude that the allegations are sufficient to state a war crimes claim. The complaint alleges purposeful conduct undertaken by Rio Tinto with the intent to assist in the commission of violence, injury, and death, to the degree necessary to keep its mines open.

## C. Crimes Against Humanity

The complaint alleges crimes against humanity arising from a food and medical blockade. Under customary interna-

tional law, primarily defined through the international criminal tribunals at Nuremberg and elsewhere, crimes against humanity require (1) a widespread or systematic attack directed against a civilian population; and (2) a prohibited act. *See, e.g.*, Rome Statute, art. 7, ICTY Statute, art. 5; ICTR Statute, art. 3.

**[33]** Assuming, without deciding, that Plaintiffs allege the blockade was a widespread and systematic attack, then whether Plaintiffs' blockade allegation would establish a violation of the law of nations giving rise to an ATS claim under *Sosa* depends upon whether the blockade constitutes a prohibited act. The articles defining crimes against humanity in each of the relevant international statutes include a list of specific acts constituting crimes against humanity, as well as a more general "other inhumane acts" provision. Rome Statute, art. 7(1); ICTY Statute, art. 5; ICTR Statute art. 3.

All statutes list "extermination" as a prohibited act amounting to a crime against humanity. Rome Statute, art. 7(1)(b); ICTY Statute, art. 5(b); ICTR Statute art. 3(b). Their definitions of what constitutes extermination, however, differ. Only the Rome Statute refers to the denial of access to the necessities of life. Its definition of "extermination" states that the term "includes the intentional infliction of conditions of life, *inter alia* the deprivation of access to food and medicine, calculated to bring about the destruction of part of a population . . . ." Rome Statute, art. 7(2)(b). Notably, the Rome Statute does not mention a blockade. Moreover, the deprivation of access to necessities is not necessarily synonymous with a blockade, because such deprivation can be effected without the imposition of a blockade.

The ICTR and the ICTY do not refer to deprivation of food and medicine. The ICTR "requires proof that the accused participated in a widespread or systematic killing or in subjecting a widespread number of people or systematically subjecting a number of people to conditions of living that would inevita-

bly lead to death . . . ." *Gacumbitsi v. Prosecutor*, Case No. ICTR-2001-64-A, Judgment, ¶ 86 (July 7, 2006). The ICTY requires the "intent to kill on a massive scale." *Prosecutor v. Brdjanin*, Case No. IT-99-36-A, ¶ 477 (Int'l Crim. Trib. for the Former Yugoslavia Apr. 3, 2007).

Since none of the statutes explicitly include a blockade in their definition of extermination, Plaintiffs' claim for crimes against humanity can come within the statutes only if the blockade constitutes "other inhumane acts." A food and medical blockade may well be an "other inhumane act[ ]" constituting a crime against humanity. The International Law Commission has recognized that the statutes could not list every possible crime against humanity, stating that "it was impossible to establish an exhaustive list of the inhumane acts which might constitute crimes against humanity." *Prosecutor v. Kupreskic, et al.*, IT-95-16-T, Judgment, ¶ 565 n.828 (Jan. 14, 2000) (quoting Report of the International Law Commission on the Work of its Forty-Eighth Session, 6 May-26 July 1996, UNGAOR 51st Sess. Supp. No. 10 (A/51/10) (Crimes Against the Peace and Security of Mankind), ¶ 17)).

**[34]** To meet the *Sosa* test, however, the blockade must be a violation of a recognized specific norm. The statutes do not create such a norm. There is no source of recognized international law that yet identifies a food and medical blockade as an "other inhumane act[ ]" or otherwise qualifies it as a crime against humanity. In the absence of any such source, a food and medical blockade does not violate a specific internationally recognized norm within the meaning of *Sosa*.

**[35]** The district court's original dismissal of Plaintiffs' claim alleging crimes against humanity arising from the medical and food blockade must be affirmed. We note that Plaintiffs' claim for genocide is also pled as a crime against humanity, and as we have explained, the genocide claim does satisfy the *Sosa* requirements.

### D.   Racial Discrimination

The complaint alleges that Rio Tinto engaged in racial discrimination "under color of law," although it does not explain its theory. There is a great deal of support for the proposition that systematic racial discrimination by a state violates a *jus cogens* norm and therefore is not barred from consideration by the act of state doctrine. *See Siderman de Blake*, 965 F.2d at 718 (holding a violation of a *jus cogens* norm is not a sovereign act); *see also id.* at 717 (noting systematic racial discrimination violates a *jus cogens* norm when it is committed by a state) (citing *Restatement (Third)*, § 702 cmt. n).

[36] Assuming that Plaintiffs have adequately alleged action under color of law, the controlling question then becomes whether the international norm prohibiting systematic racial discrimination is sufficiently specific and obligatory to give rise to a cause of action under the ATS. We conclude it is not. Notably, the United States' ratification of the Convention on the Elimination of All Forms of Racial Discrimination contained a declaration that the treaty was not self-executing. U.S. Reservations, Declarations, and Understandings, International Convention on the Elimination of All Forms of Racial Discrimination, § III, 140 Cong. Rec. S7634-02 (June 24, 1994). This declaration indicates that the treaty alone does not establish a norm sufficiently specific, universal, and obligatory to give rise to a cause of action under the ATS, because the treaty provisions are not enforceable in our courts. *See Sosa*, 542 U.S. at 735 (noting the United States' understanding that the International Covenant on Civil and Political Rights was not self-executing meant that the treaty "did not itself create obligations enforceable in federal courts").

Additionally, the treaty itself provides a definition of racial discrimination[1] but does not provide any such definition of

---

[1]The Convention defines racial discrimination as:

　any distinction, exclusion, restriction or preference based on race,

*systematic* racial discrimination, nor even include the word "systematic." *See* International Convention on the Elimination of All Forms of Racial Discrimination, 660 U.N.T.S. 195 (entered into force Jan. 4, 1969) ("Racial Discrimination Convention"). Notably, the international norm prohibiting systematic racial discrimination has been given no further content through international tribunals, subsequent treaties, or similar sources of customary international law. The Racial Discrimination Convention is in this way quite different from the Genocide Convention, whose definition of genocide has been repeatedly reinforced in international and domestic law. *See supra*, Section IV(A)(1).

**[37]** As the Supreme Court noted in *Sosa*, "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted." 542 U.S. at 732. *See also Marcos II*, 25 F.3d at 1475 ("Actionable violations of international law must be of a norm that is specific, universal, and obligatory."). In holding on remand that the racial discrimination claim need not be exhausted, the district court understood, as do we, that there is a universally recognized prohibition against systematic racial discrimination. The district court, however, on remand did not address the additional requirement under *Sosa* that the prohibition be sufficiently specific and obligatory. The district court's original dismissal of the claim must be affirmed on the ground that the norm does not meet the *Sosa* requirements.

---

colour, descent, or national or ethnic origin which has the purpose or effect of nullifying or impairing the recognition, enjoyment or exercise, on an equal footing, of human rights and fundamental freedoms in the political, economic, social, cultural or any other field of public life.

International Convention on the Elimination of All Forms of Racial Discrimination, 660 U.N.T.S. 195 (entered into force Jan. 4, 1969), art. 1(a).

It is important to recognize that the claim of racial discrimination as set forth in Count IV of the complaint is for a violation of the Racial Discrimination Convention. It is not a claim of apartheid as defined in the relevant international statutes. *See* International Convention on the Suppression and Punishment of the Crime of Apartheid, 13 I.L.M. 50, 1015 U.N.T.S. 243 (1976); *see also* Rome Statute of the International Criminal Court ("Rome Statute"), July 17, 1998, 2187 U.N.T.S. 90 (defining the crime of apartheid as "inhumane acts . . . committed in the context of an institutionalized regime of systematic oppression and domination by one racial group over any other racial group or groups and committed with the intention of maintaining that regime"). A claim premised on apartheid may be cognizable under the ATS. *See e.g. Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 260 (2d Cir. 2007) (vacating the district court's dismissal of the plaintiffs' ATS claims for aiding and abetting apartheid); *see also* Restatement (Third) of Foreign Relations § 702, cmt. i ("Racial discrimination is a violation of customary law when it is practiced systematically as a matter of state policy, e.g., apartheid in the Republic of South Africa."). We assume, without deciding, that a claim akin to apartheid would be cognizable under the ATS, but the complaint in this case does not allege such a claim.

## V.   CONCLUSION

The district court's order on prudential exhaustion is **AFFIRMED**. The district court's dismissal of the claims for racial discrimination and crimes against humanity is **AFFIRMED**. The dismissal of the claims for genocide and war crimes is **REVERSED**. The case is **REMANDED** to the district court for further proceedings on the claims of genocide and war crimes.

**AFFIRMED** in part; **REVERSED** and **REMANDED** in part. Each party to bear its own costs.

REINHARDT, Circuit Judge, concurring:

I concur fully in the results of the majority opinion but disagree with a limited part of its reasoning, contained in Parts II.C and IV.B.3, regarding aiding and abetting.[1] I would look to domestic rather than international law in analyzing this issue. I also join Part II of Judge McKeown's opinion, which clarifies that domestic law predominantly governs the issue of corporate liability.

The applicability of domestic law to resolve questions under the ATS is hardly a novel matter. International law "takes no position on whether its norms may be enforced by civil actions for compensatory damages," leaving that question "to be separately decided by each nation." *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 153 (2d Cir. 2010) (Leval, J., concurring in the judgment); *see also Doe v. Exxon Mobil Corp.*, No. 09-7125, 2011 WL 2652384, at *31 (D.C. Cir. July 8, 2011); *Kadic v. Karadzic*, 70 F.3d 232, 246 (2d Cir. 1995) ("The law of nations . . . leaves to each nation the task of defining the remedies that are available for international law violations."); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 778 (D.C. Cir. 1984) (Edwards, J., concurring) ("[T]he law of nations never has been perceived to create or define the civil actions to be made available by each member of the community of nations."). Domestic law therefore governs how international norms are enforced under the ATS.

## I.   Aiding and Abetting

I continue to adhere to the view that in determining the scope of third-party tort liability under the ATS, we are required to "look to traditional civil tort principles embodied in federal common law, rather than to evolving standards of international law." *Doe v. Unocal Corp*, 395 F.3d 932, 965

---

[1] I also disagree with some of the reasoning in Part IV.C, concerning crimes against humanity.

(9th Cir. 2002) (Reinhardt, J., concurring), *vacated*, 395 F.3d 978. Both the majority and Judge Pregerson err in looking to the decisions of ad hoc criminal tribunals (such as the ICTY and ICTR) and to the Rome Statute of the International Criminal Court, rather than to established doctrines of our own tort law.

I agree, instead, with the reasoning of Judge Hall's concurring opinion in *Khulumani v. Barclay Nat. Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007). As Judge Hall writes, "*Sosa* at best lends Delphian guidance on the question of whether the federal common law or customary international law represents the proper source from which to derive a standard of aiding and abetting liability under the [ATS]." *Id.* at 286 (Hall, J., concurring). The appropriate resolution is to rely on our own law.

Like Judge Hall, I would apply the federal common law aiding and abetting standard of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which relied on *Restatement (Second) of Torts* § 876(b); *see also Sarei v. Rio Tinto, PLC*, 487 F.3d 1193, 1202 (9th Cir. 2007), *vacated*, 499 F.3d 923 (citing *Restatement* §§ 876-77 as among "well-settled theories of vicarious liability under federal common law").[2] This standard provides that for a defendant to incur liability, "(1) the party whom the defendant aids must perform a wrongful act that

---

[2]As the *Unocal* majority noted, the *Restatement* standard is "similar" to the international-law aiding and abetting standard applied in that case. 395 F.3d at 951, *vacated*, 395 F.3d 978; *see also Exxon Mobil*, 2011 WL 2652384, at *19. My disagreement with the aiding and abetting theory in *Unocal* arose from the majority's decision to derive that theory from international law. While my *Unocal* opinion argued for the application of agency, joint venture, or reckless disregard as theories of third-party liability that are well-established in federal common law, I have no objection to any other theory of third-party liability derived from federal common law—only those that arise from "evolving standards of international law, such as" the pronouncements of an "ad hoc international criminal tribunal." 395 F.3d at 965 (Reinhardt, J., concurring).

causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation." *Halberstam*, 705 F.2d at 477.

Plaintiffs have adequately alleged Rio Tinto's liability under this standard. For this reason, I agree with the majority's decision to reverse the district court's dismissal of the war crimes claim.

## II. Corporate Liability

For similar reasons, I would look to domestic law to determine whether a corporation may be held liable under the ATS for its violation of the law of nations. I join Part II of Judge McKeown's opinion, which ably explains why corporations cannot be immune from liability for genocide or war crimes. I therefore concur in the majority's holding that corporations may be held liable under the ATS. Domestic law abides no distinction between corporate and individual tort liability, *see, e.g.*, *The Philadelphia, Wilmington, and Baltimore R.R. Co. v. Quigley*, 62 U.S. 202, 210 (1858), and this rule is just as clear in the ATS context as in any other.

## III. Conclusion

The ATS is a jurisdictional statute, enabling the federal courts to hear claims for a handful of torts with "definite content and acceptance among civilized nations." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004). The role of international law is to specify these torts. The role of domestic law is to prescribe the means of their enforcement. I therefore disagree with the majority to the extent that it relies on international law in deciding the question of aiding and abetting, and I would place a more explicit emphasis on domestic law in the resolution of the corporate liability issue. I concur fully, however, in the result.

PREGERSON, Circuit Judge, concurring in part and dissenting in part, with whom RAWLINSON, Circuit Judge, joins:

For the reasons stated by the majority, I agree that we must reverse the district court's dismissal of Plaintiffs' claims for genocide and war crimes. I write separately, however, to express my disagreement with three points considered by that opinion. First, I believe that *knowledge* rather than *purpose* is the appropriate *mens rea* standard for aiding and abetting liability for war crimes claims under the Alien Tort Statute, and there is no reason for us to pass on holding so. Second, I believe that the alleged food and medical blockade qualifies as a crime against humanity and a war crime under customary international law, and therefore, we have jurisdiction to hear those claims under the Alien Tort Statute. Third, I believe we have jurisdiction under the Alien Tort Statute to decide Plaintiffs' systematic racial discrimination claims because there is a *jus cogens* norm against systematic racial discrimination. Moreover, because I believe that Plaintiffs have alleged facts sufficient to support their claims for crimes against humanity, war crimes, and systematic racial discrimination, I would reverse the district court's dismissal of those claims.

## I.   Aiding and Abetting Liability

I agree with the majority that there is universal recognition of aiding and abetting liability for war crimes under international law. Maj. op. at 19372-73. I disagree, however, with the majority's decision to acknowledge only a *mens rea* standard of "purposive action in furtherance of a war crime," reserving for another day a decision as to whether merely knowledge is sufficient. Maj. op. at 19373. I believe we can hold with confidence that *knowledge* that one is assisting unlawful activity is the applicable *mens rea* standard for aiding and abetting liability for war crimes because, as discussed below, such a standard reflects sufficiently universal customary international law.

As the majority acknowledges, the Nuremberg-era trials, the International Criminal Tribunal for the former Yugoslavia ("ICTY"), and the International Criminal Tribunal for Rwanda ("ICTR") have all required the *mens rea* of knowledge in aiding and abetting cases. In fact, "[t]he vast majority of international legal materials clearly prescribe knowledge as the *mens rea* requirement for aiding and abetting." *In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, 259 (S.D.N.Y. 2009) (citing *Prosecutor v. Furundzija*, Case No. IT-95-17/1, Trial Chamber Judgment, ¶ 245 (Int'l Crim. Trib. for the Former Yugoslavia Dec. 10, 1998)); *Prosecutor v. Vasiljevic*, Case No. IT-98-32-A, Appeals Judgment ¶ 102 (Int'l Crim. Trib. for the Former Yugoslavia Feb. 25, 2004) ("In the case of aiding and abetting, the requisite mental element is knowledge that the acts performed by the aider and abettor assist the commission of the specific crime of the principal."); *Prosecutor v. Akayesu*, Case No. ICTR-96-4-T, Trial Chamber Judgment, ¶ 545 (Sept. 2, 1998) ("[A]n accused is liable as an accomplice to genocide if he knowingly aided or abetted or instigated one or more persons in the commission of genocide, while knowing that such a person or persons were committing genocide, even though the accused himself did not have the specific intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such."); *Prosecutor v. Tadic*, Case No. IT-94-1-T, Trial Chamber Judgment, ¶¶ 674, 692 (Int'l Crim. Trib. for the Former Yugoslavia May 7, 1997) (requiring knowing participation or "a conscious decision to participate" via the provision of substantial assistance); *United States v. Flick*, 6 Trials of War Criminals Before the Nuernberg Military Tribunals 1217 (1952) ("One who knowingly by his influence and money contributes to the support [of a violation of the law of nations] must, under settled legal principles, be deemed to be, if not a principal, certainly an accessory to such crimes."); *United States v. Ohlendorf*, 4 Trials of War Criminals Before the Nuernberg Military Tribunals 569-70 (1949) (convicting for war crimes and crimes against humanity an individual who had provided a list of communists to his superiors because he was, at mini-

mum, "aware that the people listed would be executed when found"); *Trial of Bruno Tesch (The Zyklon B Case)*, 1 Law Reports of Trials of War Criminals 101 (1947) (finding accessory liability for murder because "the accused knew that the gas was to be used for the purpose of killing human beings"); *Draft Code of Crimes Against the Peace and Security of Mankind*, [1996] 2 Y.B. Int'l L. Comm'n., ch. 2, arts. 2(3)(d), 17, 18, 20, U.N. Doc. A/CN.4/SER.A/1996/Add.1 (Part 2); *Doug Cassel, Corporate Aiding and Abetting of Human Rights Violations: Confusion in the Courts*, 6 Nw. U. J. Int'l Hum. Rts. 304, 314 (2008) ("[T]he majority of the post-World War II case law, the case law of the ICTY and the ICTR, the [International Law Commission] Draft Code, and group crimes under [Article 25(3)(d)] of the [Rome Statute of the International Criminal Court], requires that those who aid and abet merely have *knowledge* that they are assisting criminal activity.").

Despite the foregoing multitude of international sources uniformly concluding that knowledge is the applicable *mens rea*, the majority principally relies on the Rome Statute of the International Criminal Court (the "Rome Statute") as the basis for a purpose *mens rea* standard. Maj. op. at 19372-73. But not every provision of the Rome Statute was intended to reflect customary international law. *See* David Scheffer and Caroline Kaeb, *The Five Levels of CSR Compliance: The Resiliency of Corporate Liability under the Alien Tort Statute and the Case for a Counterattack Strategy in Compliance Theory*, 29 Berkeley J. Int'l L. 334, 348 (2011); *see also Doe v. Exxon Mobil Corp.*, No. 09-7125, 2011 WL 2652384, at *18 (D.C. Cir. July 8, 2011) (citing *Prosecutor v. Germain Katanga & Mathieu Ngudjolo Chui*, Case No. ICC-01/14/01/07, Decision on the Confirmation of Charges, ¶¶ 507-08 (Sept. 30, 2008)). Moreover, the Rome Statute was never intended to supersede, constrain or limit existing customary international law, including the universal knowledge *mens rea* standard—any deviations from customary international law should be viewed as specific only to cases heard

under the jurisdiction of the International Criminal Court ("ICC"). *See* Brief of Amici Curiae International Law Scholars in Support of Plaintiffs-Appellants at 16-18 (Feb. 18, 2010); *In re S. African Apartheid Litig.*, 617 F. Supp. 2d at 261 n.176 ("A derogation in the Rome Statute from customary international law 'is considered a *lex specialis* in relation to the general principle' rather than a modification of customary international law." (quoting Paola Anna Pillitu, *European 'Sanctions' Against Zimbabwe's Head of State and Foreign Minister: A Blow to Personal Immunities of Senior State Officials?*, 1 J. Int'l Crim. Just. 453, 457 n.18 (2003))); Mohamed M. El Zeidy, *Critical Thoughts on Article 59(2) of the ICC Statute*, 4 J. Int'l Crim. Just. 448, 454 (2006) (noting that detailed arrest procedures in the Rome Statute are not drawn from customary international law and are therefore specific to the ICC); *see also Doe*, 2011 WL 2652384, at *18 (noting that the Rome Statute itself acknowledges that it was not meant to affect or amend existing customary international law where the Rome Statute specifically provides that it is not to " 'be interpreted as limiting or prejudicing in any way existing or developing rules of international law' " (quoting Rome Statute, art. 10)).

After apparently assuming that the entirety of the Rome Statute necessarily reflects customary international law, the majority then erroneously interprets Article 25(3)(c) as establishing a purpose *mens rea* standard for all allegations of aiding and abetting liability under the Rome Statute.[1] Maj. op. at 19372-73. In so holding, the majority overlooks other Rome

---

[1]Despite the majority's implication that Article 25(3)(c)'s "purpose" language describes a specific intent standard—and, thus, that the required *mens rea* is subject to dispute—Article 25(3)(c) may simply be an alternative statement of the knowledge standard. *See* Scheffer & Kaeb, *The Five Levels of CSR Compliance, supra,* at 334, 355 ("The "purpose" language stated the de minimus and obvious point, namely, that an aider or abettor purposely acts in a manner that has the consequence of facilitating the commission of a crime . . . ."); Brief of Amici Curiae International Law Scholars in Support of Plaintiffs-Appellants at 20-21 (Feb. 18, 2010) ("[The purpose] language has yet to be construed by the ICC and may be interpreted to be consistent with customary international law, which does not contain a specific intent requirement. In the absence of a specific intent requirement, a perpetrator must *act* intentionally, but must only be aware of the likely *outcome*.").

Statute provisions delineating a knowledge *mens rea* standard for aiding and abetting liability. Article 30 establishes that the default *mens rea* standard for crimes under the Rome Statute is *knowledge* that a circumstance exists or a consequence will occur in the ordinary course of events. Consistent therewith, Article 25(3)(d) requires only a *mens rea* of *knowledge* when an actor aids or abets a crime committed *by a group* with a common purpose. Consequently, even if the Rome Statute were an appropriate source for determining the *mens rea* standard, Article 25(3)(d)'s knowledge standard would apply, where, as here, Plaintiffs allege international crimes carried out by a group with a common purpose.[2] *See* Rome Statute art. 25(3)(d); Brief of Amici Curiae International Law Scholars in Support of Plaintiffs-Appellants at 19 (Feb. 18, 2010); *accord Doe*, 2011 WL 2652384, at *18 (asserting that Article 25(3)(d) and its knowledge *mens rea* would apply where "[the defendant-corporation] is alleged to have aided and abetted [the nation's] military forces, which in turn are alleged to have committed violations of the law of nations against [the plaintiffs]").

> Under the Rome Statute—and under customary international law—there is no difference between amorality and immorality. One who substantially assists a violation of the law of nations is equally liable if he or she desires the crime to occur or if he or she knows it will occur and simply does not care.

---

[2]The majority cites Judge Katzmann's concurrence in *Khulumani v. Barclay National Bank Limited*, 504 F.3d 254, 268-77 (2d Cir. 2007), in support of the proposition that the *mens rea* standard may be purpose. Maj. op. at 19372. Like the majority, however, Judge Katzmann's analysis incorrectly assumes that the entirety of the Rome Statute reflects customary international law. Judge Katzmann also fails to address the significance of the knowledge *mens rea* standards in Articles 30 and 25(3)(d). Moreover, Judge Katzmann's concurrence fails to consider multiple Nuremberg tribunal convictions for aiding and abetting based on a knowledge *mens rea*. *See Doe*, 2011 WL 2652384, at *19.

*In re S. African Apartheid Litig.*, 617 F. Supp. 2d at 262.

For the foregoing reasons, I conclude that knowledge is the applicable *mens rea* standard for aiding and abetting liability.

## II.  The Food and Medical Blockade

Under customary international law, a complaint alleging crimes against humanity requires an allegation of a widespread or systematic attack directed against a civilian population and a prohibited act. *See, e.g.*, Rome Statute, art. 7, ICTY Statute, art. 5; ICTR Statute, art. 3. Prohibited acts include those listed explicitly in the statues defining crimes against humanity, as well as acts that would fit in the more general category of "other inhumane acts." *Id.* The majority concludes that Plaintiffs' complaint does not state a claim for crimes against humanity arising from the food and medical blockade because a food and medical blockade is not explicitly listed as a prohibited act in the relevant statutes, and the majority was unable to locate other sources of international law identifying a food and medical blockade as an "other inhumane act." Maj. op. at 19376-77 (citing Rome Statute, art. 7(k); ICTY Statute, art. 5(I); ICTR Statute art. 3(I)). Thus, the majority concludes that we do not have jurisdiction to hear Plaintiffs' asserted crimes against humanity claims because there is no specific, universal, and obligatory international norm against a food and medical blockade. *See Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) (holding that to be the basis for an Alien Tort Statute claim, international norms must be specific, universal, and obligatory). I disagree. As pled in the complaint, Plaintiffs have adequately alleged, under the specific facts of this case, that the food and medical blockade constituted murder and torture, both of which are listed as specific crimes against humanity in each of the relevant international statutes. *See* Rome Statute, art. 7(a), (f); ICTY Statute, art. 5(a), (f); ICTR Statute art. 3(a), (f).

Plaintiffs' complaint alleges that Rio Tinto supported and encouraged Papua New Guinea's blockade that "prevented medicine, clothing and other essential items from reaching the people of Bougainville, [and as a result], [h]ospitals were forced to close, women died needlessly in childbirth and young children died from easily preventable diseases." Compl. ¶ 12. Furthermore, the complaint alleges that the blockade caused the death of more than 10,000 Bougainvilleans, including more than 2,000 children in the first two years of the siege.[3] Compl. ¶¶ 12, 196.

Under international law "[i]t can be said that the accused is guilty of murder if he or she[,] engaging in conduct which is unlawful, intended to kill another person or to cause this person grievous bodily harm, and [ ] caused the death of that person." *Prosecutor v. Kupreskic, et al.*, IT-95-16-T, Trial Chamber Judgment, ¶ 560 (Int'l Crim. Trib. for the Former Yugoslavia Jan. 14, 2000). Under this standard, Plaintiffs have adequately alleged murder, a prohibited act under various international statues. *See* Rome Statute, art. 7(a); ICTY

---

[3]The people of Bougainville were essential to the Allied victory in the Bougainville Campaign during World War II. *See* John M. Rentz, Historical Branch, Headquarters, U.S. Marine Corps, *Bougainville and the Northern Solomons* 131 (1946); Jon T. Hoffman, U.S. Marine Corps Reserve, *From Makin to Bougainville: Marine Raiders in the Pacific War* 37 (1995). The victory, in turn, was key to eventual Allied air and naval supremacy in the Solomon Islands. Rentz, at 29-30.

During the campaign, the Bougainvilleans risked their own lives time and time again to aid the Allied cause. Bougainvilleans helped the Australian coastwatchers monitor Japanese military movements across the island. Harry A. Gailey, *Bougainville, 1943-1945: The Forgotten Campaign* 35 (1991). Because the Bougainvilleans were familiar with the island terrain, they were able to stealthily navigate the jungles and swamps, serving as guides to the Allied troops and gathering intelligence on Japanese military camps. Rentz, at 11, 17-18, 74; Gailey, at 58; Henry I. Shaw, Jr. & Douglas T. Kane, Historical Branch, G-3 Division, Headquarters, U.S. Marine Corps, Isolation of Rabaul 174 (1963). Many brave Bougainvilleans and Allied troops lost their lives in the fight to secure the island of Bougainville. *See* Rentz, at 140.

Statute, art. 5(a); ICTR Statute art. 3(a). Moreover, the complaint alleges that the food and medical blockade "foreseeably resulted in the killing of natives, caused serious bodily harm, [and] was deliberately calculated to destroy plaintiffs." Compl. ¶ 213. Such a blockade that denies essential goods and services, for the purpose of causing death or grievous bodily harm to thousands of people, qualifies as a widespread and systematic attack against a civilian population. *See, e.g.*, Rome Statute, art. 7, ICTY Statute, art. 5; ICTR Statute, art. 3; *see also* Rome Statute, art. 7(2)(a) ("'Attack directed against any civilian population' means a course of conduct involving the multiple commission of [specific prohibited acts including murder and torture] against any civilian population, pursuant to or in furtherance of a State or organizational policy to commit such attack."). Thus, the food and medical blockade pled as a crime against humanity satisfies *Sosa's* jurisdictional requirement, *see Sosa*, 542 U.S. at 732, and Plaintiffs have alleged sufficient facts to state a claim.

Plaintiffs further allege that "the medical blockade violates the Torture Convention, as pain and death were intentionally inflicted for the purpose of punishing people for having closed the mine, and intimidating and coercing them into moving away from the mine and dropping their opposition." Compl. ¶¶ 212, 214. One Rio Tinto official is alleged to have said, during a discussion regarding the devastating effects of the blockade, that the blockade should be continued to "starve the bastards out [so the people] will come around." Compl. ¶ 192.

The right to be free from torture "is fundamental and universal, a right deserving of the highest status under international law, a norm of *jus cogens*." *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 717 (9th Cir. 1992) (surveying and collecting various cases, statutes and scholarly articles). Torture is defined under international law as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a per-

son for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind . . . .

The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 23 I.L.M. 1027, 1465 U.N.T.S. 85 ("Torture Convention"). This well-defined *jus cogens* norm satisfies *Sosa's* specific, universal and obligatory requirement. *See Sosa*, 542 U.S. at 732; *see also In re Estate of Ferdinand Marcos, Human Rights Litig. (Marcos II)*, 25 F.3d 1467, 1475 (9th Cir. 1994) (holding that jurisdiction under the Alien Tort Statute was proper because there is a *jus cogens* norm against torture). Therefore, Plaintiffs have adequately stated an Alien Tort Statute claim for torture as a crime against humanity under international law because, consistent with the requirements of the Torture Convention, Plaintiffs allege that Rio Tinto intentionally caused severe injury and death to coerce and punish the people of Bougainville.

Even if the food and medical blockade did not constitute a crime against humanity, such an intentional deprivation of essential supplies would still constitute a war crime. *See* Compl. ¶¶ 49, 56. Food and medical blockades are outlawed by the Fourth Geneva Convention, which, as the majority acknowledges, provides well-recognized definitions of war crimes and is "sufficiently specific, obligatory, and universal to give rise to a cause of action under the [Alien Tort Statute]." *See* Maj. op. at 19369 ("War crimes are defined primarily by the Geneva Conventions, to which the United States, along with at least 180 nations, is a party and which constitute part of customary international law." (citing the Torture Convention, S. Exec. Rep. 101-30, at 15 (1990))); *id.* ("[T]he Geneva Conventions, to which the United States and virtually all other countries are Parties . . . generally reflect customary

international law." (quoting the Torture Convention, S. Exec. Rep. 101-30, at 15 (1990))).

Specifically, Article 23 of the Fourth Geneva Convention requires that during conflicts, nations "shall allow the free passage of all consignments of medical and hospital stores," and "shall likewise permit the free passage of all consignments of essential foodstuffs, clothing and tonics intended for children under fifteen, expectant mothers and maternity cases." Fourth Geneva Convention Relative to the Protection of Civilian Persons in Time of War, art. 23, Oct. 21, 1950, 75 U.N.T.S. 287. Additionally, Article 17 provides that nations involved in conflict "shall endeavor to conclude local agreements for the removal from besieged or encircled areas, of wounded, sick, infirm, and aged persons, children and maternity cases, and for the passage of . . . medical personnel and medical equipment on their way to such areas." *Id.* at art. 17. Because, as previously discussed, Plaintiffs allege that the food and medical blockade did not permit the free passage of essential foodstuffs and medical supplies, Plaintiffs adequately state a claim for war crimes in violation of Articles 17 and 23 of the Fourth Geneva Convention.[4]

## III.   Systematic Racial Discrimination

"[A]ny doctrine of superiority based on racial differentiation is scientifically false, morally condemnable, socially unjust and dangerous, and [ ] there is

---

[4]My view that the Plaintiffs have adequately alleged that the food and medical blockade was a crime against humanity and a war crime is grounded on the operative facts of this case. Here, we are dealing with allegations that the blockade's purpose was to stop the free flow of essential food and medicine to a civilian population in an effort to—according to statements allegedly made by a Rio Tinto official—"starve the bastards out." This case does not present a situation in which a blockade is instituted to stop the entry of weapons of war or materials, funds, or other items that could otherwise aid efforts of the blockaded country or territory to make war.

no justification for racial discrimination, in theory or
in practice, anywhere . . . ."

International Convention on the Elimination of All Forms of
Racial Discrimination Preamble, Dec. 21, 1965, 5 I.L.M. 352,
660 U.N.T.S. 195 ("Racial Discrimination Convention").

I believe that there is a *jus cogens* norm prohibiting system-
atic racial discrimination, and that because the norm is *jus
cogens*, our federal courts necessarily have jurisdiction under
the Alien Tort Statute. I do not agree with the majority's con-
clusion that the international prohibition against systematic
racial discrimination does not satisfy *Sosa's* requirement that
an international norm must be specific, universal, and obliga-
tory to be cognizable under the Alien Tort Statute. *See Sosa*,
542 U.S. at 732.

First, many courts agree that there is a *jus cogens* norm pro-
hibiting systematic racial discrimination. *See Siderman de
Blake v. Republic of Argentina*, 965 F.2d 699, 717 (9th Cir.
1992) (noting that the Restatement "identif[ies] jus cogens
norms prohibiting genocide, slavery, murder or causing disap-
pearance of individuals, prolonged arbitrary detention, and
systematic racial discrimination") (citing *Restatement (Third)
of Foreign Relations Law of the United States*, § 702 cmt. n
(1987)); *Comm. of U.S. Citizens in Nicaragua v. Reagan*, 859
F.2d 929, 941 (D.C. Cir.1988) (same)*; Beanal v. Freeport-
McMoRan, Inc.*, 969 F. Supp. 362, 371 (E.D. La.1997) (rec-
ognizing that systematic racial discrimination is "actionable
as violative of the law of nations"), *aff'd*, 197 F.3d 161 (5th
Cir. 1999).

Second, because there is a *jus cogens* norm against system-
atic racial discrimination, I believe there is necessarily federal
court jurisdiction under the Alien Tort Statute. As the major-
ity notes, a *jus cogens* norm is defined as a norm that is
accepted and recognized by the international community of
states as a whole, "from which no derogation is permitted."

Maj. op. at 19358 (quoting *Siderman de Blake*, 965 F.2d at 714 (quoting Vienna Convention on the Law of Treaties art. 53, May 23, 1969, 8 I.L.M. 679, 1155 U.N.T.S. 331)). In contrast to customary international law, which is "derive[d] solely from the consent of states, the fundamental and universal norms constituting *jus cogens* transcend such consent." *Siderman de Blake*, 965 F.2d at 715. Further, international laws and agreements that contravene *jus cogens* norms are considered void. *Id.* at 715-16 ("*[J]us cogens* [norms] 'prevail over and invalidate international agreements and other rules of international law in conflict with them.' " (quoting *Restatement (Third)* § 102 cmt. k and citing Vienna Convention on the Law of Treaties art. 53, May 23, 1969, 8 I.L.M. 679, 1155 U.N.T.S. 331)). *Jus cogens* norms "enjoy the highest status within international law." *Id.* at 715 (quoting *Comm. of U.S. Citizens Living in Nicaragua*, 859 F.2d at 940). In sum, *jus cogens* norms represent fundamental components of the ordered international community, and *jus cogens'* status at the top of the hierarchy of international law is beyond question. Thus, "a jus cogens violation is, by definition, a violation of [a] specific, universal, and obligatory international norm[ ]." *Doe I v. Unocal Corp.*, 395 F.3d 932, 945 n.15 (9th Cir. 2002) (internal quotation marks omitted)*; see also Siderman de Blake*, 965 F.2d at 715-16; *Alvarez-Machain v. United States*, 266 F.3d 1045, 1050 (9th Cir. 2001) ("[A] *jus cogens* violation satisfies the specific, universal, and obligatory standard . . . ." (internal quotation marks omitted)); Joel Slawotsky, *The New Global Financial Landscape: Why Egregious International Corporate Fraud Should Be Cognizable under the Alien Tort Claims Act*, 17 Duke J. Comp. & Int'l L. 131, 150 (2006). Consequently, once a norm is determined to be *jus cogens*, it necessarily satisfies *Sosa's* jurisdictional test. *See Marcos II*, 25 F.3d at 1475 (holding that jurisdiction under the Alien Tort Statute was proper because there is a *jus cogens* norm against torture); *In re Estate of Ferdinand E. Marcos Human Rights Litig. (Marcos I)*, 978 F.2d 493, 500 (9th Cir. 1992) ("Under international law, any state that engages in

official torture violates *jus cogens*. We therefore conclude that the district court did not err in founding jurisdiction on a violation of the *jus cogens* norm prohibiting official torture." (internal citations and quotations omitted)).

The majority argues that Plaintiffs' systematic racial discrimination claim is based solely on the Racial Discrimination Convention. The majority then concludes that the systematic racial discrimination claim must be dismissed, because, in the majority's view, the Racial Discrimination Convention is not specific and obligatory, as required under *Sosa*.[5] Maj. op. at 19379-80. I read Plaintiffs' complaint more broadly, however. In addition to noting the *jus cogens* status of the prohibition against systematic racial discrimination—which, again, I believe is sufficient for federal court jurisdiction under the Alien Tort Statute—the Plaintiffs' complaint also cites the International Covenant on Civil and Political Rights, the Universal Declaration of Human Rights, and the International Covenant on Economic, Social and Cultural Rights, Compl. ¶¶ 60-61, all of which are international agreements prohibit-

---

[5]The majority concludes that because the Racial Discrimination Convention is not self-executing, it cannot provide support for an Alien Tort Statute claim. Maj. op. at 19378-79. I disagree. "Whether a treaty that embodies [a norm of customary international law] is self-executing is relevant to, but is not determinative of, [the] question" whether the norm permits Alien Tort Statute jurisdiction. *Khulumani*, 504 F.3d at 284 (Katzmann, J., concurring). Thus, international agreements that are not self-executing or that have not been executed by federal legislation, such as the Racial Discrimination Convention, can properly be consulted as evidence of the current state of customary international law. *See Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 176-77 (2d Cir. 2009). Moreover, plaintiffs "need not . . . cite a portion of a specific treaty or another United States statute in order to establish a cause of action [under the Alien Tort Statute] . . . ." *Papa v. U.S.*, 281 F.3d 1004, 1013 (9th Cir. 2002). Rather, in determining the boundaries of the Alien Tort Statute, plaintiffs (and courts) should follow the Supreme Court's guidance in *Sosa* and look to the entire corpus of international law, including treaties, executive and legislative acts, judicial decisions, international custom, and the works of jurists and commentators. *See* 542 U.S. at 734 (quoting *The Paquete Habana*, 175 U.S. 677, 700 (1900)).

ing racial discrimination. *See* International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171; Universal Declaration of Human Rights, G.A. Res. 217III (A) U.N. Doc. A/RES/217 III (Dec. 10, 1848); International Covenant on Economic, Social and Cultural Rights, Dec. 16, 1966, 993 U.N.T.S. 3.

Having determined that Plaintiffs have cleared their jurisdictional hurdle, I further conclude that Plaintiffs' factual allegations adequately state a claim for systematic racial discrimination. Plaintiffs' complaint alleges that all of the human rights abuses were the "direct consequence of Rio Tinto's deliberate policy of systematic racial discrimination." Compl. ¶ 238. For example, Plaintiffs allege that, because Rio Tinto "regarded the native people as inferior," Rio Tinto committed the following unlawful acts: Rio Tinto encouraged and supported the food and medical blockade that resulted in the deaths of thousands of people; Rio Tinto housed mine workers in "slave-like conditions"; Rio Tinto established a "differential wage system[ ]" whereby indigenous Bougainvillean workers were paid significantly less than white workers performing similar work; Rio Tinto relocated villagers to make way for mining operations and housed them in "intolerable" and "apartheid-like conditions"; and Rio Tinto treated the environment "with wanton disregard," polluting at levels that "would not have occurred in an area populated by Caucasians." *See* Compl. ¶¶ 168-71, 173, 175, 237-39, 244.

Additionally, because systematic racial discrimination violates a *jus cogens* norm only when it is committed as a matter of state policy, Plaintiffs must adequately allege either direct state action or action by a private party under color of law. *See Restatement (Third)*, § 702 cmts. i & n. Plaintiffs have met their burden. Plaintiffs' complaint alleges that the numerous violations were carried out under color of law because the Papua New Guinea government had a significant stake in the mining operation. Compl. ¶ 111. Therefore, Plaintiffs allege, all of "Rio [Tinto's] actions were done with the concurrence

and authority of the [Papua New Guinea] government." *Id.* For example, Plaintiffs allege that the government "allowed Rio [Tinto] to exercise the power of eminent domain and to dispossess the native people of Bougainville whenever and wherever Rio [Tinto] decided to do so." *Id.* The Plaintiffs' factual allegations, taken together, adequately allege that Rio Tinto violated the *jus cogens* norm against systematic racial discrimination under color of law. Thus, because the federal courts have jurisdiction over Plaintiffs' systematic racial discrimination claim, and Plaintiffs have made sufficient factual allegations, I would allow their claim to proceed.

**Conclusion**

The human rights violations alleged by Plaintiffs are matters of universal concern. Rio Tinto's alleged actions resulted in the destruction of the natural environment and the tragic deaths of many thousands of indigenous people on the island of Bougainville. For the reasons discussed above, I conclude that *knowledge* rather than *purpose* is the appropriate *mens rea* standard for aiding and abetting liability for war crimes claims under the Alien Tort Statute. Furthermore, I conclude that Plaintiffs' claims for (1) crimes against humanity and war crimes based on the food and medical blockade, and (2) systematic racial discrimination, may be heard in the United States federal courts pursuant to the Alien Tort Statute. Therefore, the district court's dismissal of these claims must be reversed.

---

McKEOWN, Circuit Judge, concurring in part and dissenting in part, joined as to Part II by Judges REINHARDT and BERZON:

The Alien Tort Statute ("ATS"), albeit short on words, is a perplexing statute. Given the ink spilled in many judicial

opinions, concurrences, and dissents, as well as scholarly arti-
cles, this brevity has not netted clarity.

Nonetheless, despite the many novel issues in this case, a
few defining principles emerge.

Under the ATS, the federal courts have jurisdiction over
claims for torts in violation of the law of nations. The law of
nations is equally clear that genocide and war crimes are *jus
cogens* violations of international law wherever they occur
and whoever commits those crimes, whether an individual,
group, corporation, or government. Importantly, one defining
feature of the universal, specific, and obligatory norms pro-
hibiting genocide and war crimes is the focus of those prohi-
bitions on the identities of the *victims* of those crimes, as
opposed to the identities of the perpetrators.

I concur in the majority's holding that the ATS may give
rise to tort actions based on extraterritorial conduct by corpo-
rations. I am flattered that the majority has adopted some of
my language regarding these issues. However, I write sepa-
rately because it is important to emphasize that the federal
common law and the history of tort liability in domestic law
provide essential support for both the extraterritorial reach of
claims under "the law of nations" and corporate liability
under those causes of action. Further, in my view, Sarei has
not stated a claim for genocide or war crimes. I would remand
to the district court to consider whether amendment is proper
and therefore respectfully dissent from Parts IV(A)(3) and
IV(B)(4) of the majority opinion.

## I.   Cʟᴀɪᴍs Uɴᴅᴇʀ "Tʜᴇ Lᴀᴡ ᴏꜰ Nᴀᴛɪᴏɴs" Eɴᴄᴏᴍᴘᴀss Eхᴛʀᴀᴛᴇʀʀɪᴛᴏʀɪᴀʟ Cᴏɴᴅᴜᴄᴛ.

I agree with the result the majority reaches—that claims
based on occurrences abroad may give rise to an ATS suit—
but write separately to highlight the historical predicate for
this conclusion. As the D.C. Circuit recently explained,

because the ATS is jurisdictional only, the underlying cause of action, not the statute, is given extraterritorial effect in suits in which the tort alleged occurred abroad. *See Doe v. Exxon Mobil Corp.*, ___ F.3d ___, No. 09-7125, 2011 WL 2652384, at *8 (D.C. Cir. July 8, 2011) ("The question here is not whether the ATS applies extraterritorially but instead whether the common law causes of action that federal courts recognize in ATS lawsuits may extend to harm to aliens occurring in foreign countries."). The D.C. Circuit aptly noted that the ATS is a purely jurisdictional statute and is thus analogous to 28 U.S.C. § 1331—the statute creating federal question jurisdiction. *Id.* at *8. When suits are brought in federal court under federal question jurisdiction, we inquire not whether § 1331 applies extraterritorially but instead whether the cause of action applies extraterritorially. *See Morrison v. Nat'l Australia Bank, Ltd.*, 130 S. Ct. 2869, 2881-86 (2010) (examining whether the cause of action under § 10(b) of the Securities and Exchange Act and SEC Rule 10b-5 extends extraterritorially); *see also Doe*, 2011 WL 2652384, at *8 (noting that when an individual brings suit under the Torture Victim Protection Act of 1999 (TVPA), Pub. L. No. 102-256, 106 Stat. 73, the question is whether the TVPA's cause of action extends extraterritorially and not whether the jurisdictional grant, § 1331, extends extraterritorially). I view the majority's reference to extraterritorial application of the ATS as shorthand for whether the cause of action in an ATS suit encompasses conduct overseas. Although the ATS is jurisdictional, it cabins the source of the cause of action by reference to "the law of nations," and for that reason I adopt the majority's shorthand and refer to the extraterritorial application of the statute for the remainder of this opinion.

The majority appropriately concludes that the absence of specific language in the statute establishing extraterritorial effect is not a barrier to extraterritorial application of the ATS both because the statute has other indicia of extraterritorial applicability and because the statute itself does not provide the cause of action. *See* Maj. op. at 19334-35. The Supreme

Court underscored this principle in its most recent pronounce-ment on extraterritoriality. In *Morrison*, the Court held that a "clear indication of an extraterritorial application" may be found even in the absence of specific statutory language indi-cating Congress intended the statute to apply extraterritorially. 130 S. Ct. at 2883. The historical context of the ATS, accord-ing to the majority, provides abundant indication that the jurisdictional grant was intended to include claims alleging violations of the law of nations occurring outside of the United States. Maj. op. at 19334-36. The history of the ATS, and particularly its ties to piracy, are "strong indications that Congress intended the Act to apply outside the United States." Maj. op. at 19338-39.

At the time of its enactment, the ATS was intended to encompass conduct both within and beyond the United States, including both crimes against foreign ambassadors in the United States and piracy. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 715-17 (2004) ("It was this narrow set of violations of the law of nations [violation of safe conducts, infringement of the rights of ambassadors, and piracy], admitting of a judi-cial remedy and at the same time threatening serious conse-quences in international affairs, that was probably on minds of the men who drafted the ATS with its reference to tort."). An opinion by Attorney General Bradford in 1795—a mere six years after adoption of the ATS—confirms this interpreta-tion. Giving the opinion its most logical reading, Bradford apparently concluded that the ATS may give rise to suits based on conduct occurring abroad—not only on the high seas, but even within the borders of other countries.[1] *See* Breach of Neutrality, 1 Op. Att'y Gen. 57, 58-59 (1795).

---

[1]Like the majority in *Doe v. Exxon*, I read the Attorney General's opin-ion to conclude that the criminal jurisdiction of the federal courts was lim-ited in the case of piracy to acts committed on the high seas but that the civil jurisdiction was not so limited, and that the courts could provide a forum for a tort suit arising from incidents within the territorial bounds of Sierra Leone. 2011 WL 2652384, at *8. The Supreme Court's reference

Because the ATS targeted violations of the law of nations at home and abroad and did so by providing the law of nations —an *international* body of law—as the source of the cause of action, both the international focus and the nature of the harm (violations of the law of nations generally and piracy specifically) signal congressional understanding that the ATS's jurisdictional grant extends to torts committed outside of the United States.

Following *Morrison*, the Eleventh Circuit reiterated that extraterritoriality may derive from the international nature of the harm addressed by the statute, among other factors. *See United States v. Belfast*, 611 F.3d 783, 811 (11th Cir. 2010) ("intent[ ] [of extraterritorial applicability] of course may appear on the face of the statute, but it may also be 'inferred from . . . the nature of the harm the statute is designed to prevent,' from the self-evident 'international focus of the statute,' and from the fact that 'limit[ing] [the statute's] prohibitions to acts occurring within the United States would undermine the statute's effectiveness.' " (quoting *United States v. Plummer*, 221 F.3d 1298, 1310 (11th Cir. 2000)). This same principle applies to the ATS.

Further, "[c]ommon law courts of general jurisdiction regularly [have] adjudicate[d] transitory tort claims between individuals over whom they exercise personal jurisdiction, *wherever* the tort occurred." *Filartiga v. Pena-Irala*, 630 F.2d 876, 885 (2d Cir. 1980) (emphasis added). In holding that the ATS applies extraterritorially, the Second Circuit recited the history of American and British courts adjudicating extraterritorial tort claims. *See id.* (citing *Lord Mansfield in Mostyn v.*

---

in *Sosa* supports this interpretation. *See Sosa*, 542 U.S. at 721 (summarizing the inquiry submitted to Bradford as "whether criminal prosecution was available against Americans who had taken part in the French plunder of a British slave colony *in Sierra Leone*," and concluding Bradford advised that "a federal court was open for the prosecution of a tort action growing out of the episode." (emphasis added)).

*Fabrigas*, 1 Cowp. 161 (1774); *McKenna v. Fisk*, 42 U.S. (1 How.) 241, 248 (1843); *Dennick v. R.R. Co.*, 103 U.S. 11, 26 (1880); *Slater v. Mexican Nat'l R.R. Co.*, 194 U.S. 120 (1904)). Similarly, the D.C. Circuit concluded that "[e]xtraterritorial application of the ATS would reflect the contemporaneous understanding that, by the time of the Judiciary Act of 1789, a transitory tort action arising out of activities beyond the forum state's territorial limits could be tried in the forum state." *Doe*, 2011 WL 2652384, at *8. Indeed, "[i]t is not extraordinary for a court to adjudicate a tort claim arising outside of its territorial jurisdiction." *Filartiga*, 630 F.3d at 885.

Taken together, the language of the statute, the historical context, and the nature of the harm encompassed by "the law of nations," supply the necessary "clear indication" that the ATS's jurisdictional grant over torts in violation of the law of nations includes within its ambit at least some conduct occurring outside of the United States. *See Morrison*, 130 S. Ct. at 2883.

## II. THE ATS MAY GIVE RISE TO CORPORATE LIABILITY.

I join the majority's invocation of corporate liability under the ATS: "[t]he ATS contains no . . . language and has no . . . legislative history to suggest that corporate liability was excluded and that only liability of natural persons was intended." Maj. op. at 19340. At the turn of the Twentieth Century, no less than the Attorney General acknowledged that corporations could be liable under the ATS. *See* 26 Op. Atty. Gen. 250, 252-53 (1907) (opining that the ATS provided a mechanism through which to hold a U.S. corporation liable for violating provisions of the Convention Between the United States of America and the United States of Mexico Touching the International Boundary Line Where it Follows the Bed of the Rio Colorado (Nov. 2, 1884)). Thus, the view that ATS liability extends to a corporation that commits a tort in violation of the law of nations is one that has held sway for, at the very

least, nearly half of the statute's existence, and nothing before that time suggests a contrary position.

Jurists and scholars debate whether we look to international or domestic law to determine whether a corporation may be sued under the ATS. *See Doe*, 2011 WL 2652384, at *21 ("corporate liability differs fundamentally from the conduct-governing norms at issue in *Sosa*, and consequently customary international law does not provide the rule of decision"); *id.* at *55-56 (Kavanaugh, J., dissenting in part) (looking to international law and concluding corporate liability may not lie under the ATS); *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 127-31 (2d Cir. 2010) (concluding international law does not provide for corporate liability); *id.* at 175 (Leval, J., concurring) (noting international law leaves the provision of civil remedies to the discretion of individual states); *Mara Theophila, "Moral Monsters" Under the Bed: Holding Corporations Accountable for Violations of the Alien Tort Statute after Kiobel v. Royal Dutch Petroleum Co.*, 79 FORDHAM L. REV. 2859 (2011) (summarizing the debate as to the law determining corporate liability under the ATS). The source of this split is *Sosa*'s holding that the ATS is jurisdictional only but that "federal courts should not recognize private claims *under federal common law for violations of any international law norm* with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted." 542 U.S. at 732 (emphasis added).

An international norm is the sine qua non of an ATS suit, yet the tort cause of action is defined by customary international law as it has been incorporated into the federal common law. *See Sosa*, 542 U.S. at 724 ("The [ATS] . . . is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability . . . ."). Because the common law, with its incorporation of international law, provides the cause of action, I would hold that courts should first look to the common law to see if

the corporate defendant is within the ambit of the cause of action. Concluding that federal common law provides a long and consistent history of corporate liability in tort, I would then look to international law to insure the corporate defendant is included within the law of nations' norm allegedly violated in a given suit. As to the amorphous line between a substantive offense under international law and other aspects of a cause of action under domestic law, I am cognizant that "Sosa at best lends Delphian guidance." *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 286 (2d Cir. 2007) (Hall, J. concurring); *see also Doe*, 2011 WL 2652384, at *22 (same). Without the international norm, there can be no ATS cause of action, so the threshold challenge is defining the norm. Does the norm include the identification of the defendant or is that a function of the cause of action? I submit in the case of corporate liability that this distinction makes no difference. International law admits to corporate liability, as does domestic law.[2]

In an effort to follow the limited guidance provided in *Sosa* and make sense of the ATS's jurisdictional grant, I would begin the domestic law analysis by returning to the basics of statutory interpretation. *See Ransom v. FIA Card Services*, 131 S.Ct. 716, 723-24 (2011) (instructing courts to begin with the plain language of the statute). The language of the statute, as the Supreme Court has told us, "by its terms does not distinguish among classes of defendants[.]" *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 438 (1989). The statute provides that the plaintiff must be an alien but it says nothing that would preclude corporate defendants. *See* 28 U.S.C. § 1350. Absent a subsequent or different statute or international law limiting the availability of a tort action

---

[2]The same challenge is inherent in determining standards for aiding and abetting liability. Like corporate liability, aiding and abetting liability is supported in both international and domestic law. I discuss aiding and abetting liability in detail in Section III(B) in connection with Sarei's war crimes claim.

against a certain defendant, the ATS allows an action in tort to lie against any defendant. *See Amerada Hess*, 488 U.S. at 438-39 (holding the Foreign Sovereign Immunities Act of 1976 barred ATS suits against foreign governments); *Bowoto v. Chevron*, 621 F.3d 1116, 1128 (9th Cir. 2010) (holding the TVPA limits liability to natural persons).

Although we know very little about the First Congress's intent in enacting the ATS, *see Sosa*, 542 U.S. at 718-19, the mainstream understanding of tort liability in the time frame surrounding the statute's enactment likely informed congressional action. *See Lane v. Pena*, 518 U.S. 187, 201 (1996) ("[C]ongressional intent with respect to a statutory provision must be interpreted in the light of the contemporary legal context."). The ATS is, after all, a grant of jurisdiction for actions in *tort*. 28 U.S.C. § 1350. In 1858, the Supreme Court reinforced the longstanding rule that "actions might be maintained against corporations for torts":

> [F]or acts done by the agents of a corporation, either *in contractu* or *in delicto*, in the course of its business, and of their employment, the corporation is responsible, as an individual is responsible under similar circumstances. At a very early period, it was decided in Great Britain, as well as in the United States, that actions might be maintained against corporations for torts; and instances may be found, in the judicial annals of both countries, suits for torts arising from the acts of their agents, of nearly every variety.

*The Philadelphia, Wilmington, and Baltimore R.R. Co. v. Quigley,* 62 U.S. 202, 210 (1858) (holding a corporation capable of "malice" and liable in tort for libel); *see also Conrad v. Pacific Ins. Co.*, 31 U.S. 262, 281-82 (1832) (holding a company liable for trespass); *Lake Shore & M. S. Ry. Co. v. Prentice*, 147 U.S. 101, 109 (1893) ("A corporation is doubtless liable, like an individual, to make compensation for any

tort committed by an agent in the course of his employment
. . . .").

The long and consistent tradition of corporate liability in
tort under the federal common law leaves no doubt that corpo-
rate liability is available under the ATS. *See Cook Cnty. of
Illinois v. Chandler*, 538 U.S. 119, 125 (2003) (recounting the
history of corporate personhood and the understanding at the
turn of the Nineteenth Century that corporations could sue
and be sued); *see also Doe*, 2011 WL 2652384, at *28 (stating
that "[c]orporate immunity . . . would be inconsistent with the
ATS because by 1789 corporate liability in tort was an
accepted principle of tort law in the United States" and
recounting the early history of corporate liability in tort under
the common law). That a tort claim may be available against
a corporation is, in fact, an unremarkable result. *See Chan-
dler*, 538 U.S. at 125-27 (discussing the history of corporate
personhood and liability and its continued vitality in the
absence of statutory restrictions). Instead, it would be remark-
able if corporations were exempt from liability under the
ATS.

Over the two hundred plus years of the statute's existence,
Congress has not amended the statute to preclude corporate
liability or otherwise abrogate federal courts' holdings in ATS
cases. Rather, "Congress . . . has not only expressed no dis-
agreement with [federal courts' holdings allowing ATS suits
for violations of customary international law] . . . , but has
responded . . . by enacting legislation [the TVPA] supple-
menting the judicial determination in some detail." *Sosa*, 542
U.S. at 73. Just as the Court found it significant that Congress
did not amend or supplant the ATS when it enacted the
TVPA, I find it significant that Congress did not amend the
ATS to preclude corporate liability when it adopted the
TVPA's clear restriction to natural person defendants. *See* 28
U.S.C. § 1350, note § 2(a) ("An *individual* who, under actual
or apparent authority, or color of law, of any foreign nation
. . . subjects an individual to torture, shall, in a civil action,

be liable for damages . . . .") (emphasis added); *see also Bowoto*, 621 F. 3d at 1128. In sum, there is *no* reason to believe that Congress intended anything but for the ATS to grant jurisdiction over claims against corporations for violations of the law of nations.

The availability of a tort action against a corporation under domestic law does not end the story. Because a claim under the ATS may lie only if the norm allegedly violated includes the named defendant within its ambit, we also must look to international law. *See Sosa*, 542 U.S. at 724. Here, my inquiry is the same as the majority's—that is, I would ask whether the international norm at issue excludes private corporate actors from its scope. *See* Maj. op. at 19339-40. The starting point of this inquiry is whether private or non-state actors fall within the international norms. Although the extent to which non-state actors are bound to abide by international law has varied over the centuries, in modern times many norms of international law include private actors within their ambit. *See Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 794 (D.C. Cir. 1984) (Edwards, J., concurring) (discussing shifts in scholarly and judicial understandings of private parties' responsibilities under international law from the Eighteenth Century through the late Twentieth Century).

Next it is important to recognize that the handful of international law violations that may give rise to an ATS claim are often restricted by the identity of the perpetrator, the identity of the victim, or the locus of events. Such restrictions are part and parcel of the norm and as a result could limit the availability of a cause of action under the ATS. For example, the international norm most frequently associated with the ATS—the prohibition on piracy—is limited in modern times by both the perpetrator's identity (a member of a private ship or private aircraft) and the locus of events (the high seas). *See* 18 U.S.C. § 1651; *see also* United Nations Convention on the Law of the Sea (UNCLOS), art. 101, *opened for signature* Dec. 10, 1982, 1833 U.N.T.S. 397 (entered into force Nov.

16, 1994).[3] In contrast, the prohibition on torture contains no restriction as to the locus of events but generally requires state action or state acquiescence—the scope of the prohibition is restricted to certain perpetrators. *See* 18 U.S.C. § 2340(1) ("'[T]orture' means an act committed by a person acting under the color of law . . . .").[4]

The two international prohibitions at issue in this case, as the majority details, are restricted in scope primarily by the identities of the *victims*. *See* Maj. op. at 19359-60 19371-72. Genocide is defined almost entirely based upon the identity of the victim—with no restrictions as to the identity of the perpetrator. *See Bosnia and Herzegovina v. Serbia*, 2007 I.C.J. 91, ¶ 167 (Feb. 26) (emphasizing the universal prohibition of genocide and its status as a binding norm upon both state and non-state actors). War crimes in violation of Common Article III are defined with reference to both the perpetrator (a party to the conflict, which necessarily includes both state and non-state actors in a non-international armed conflict) *and* the victim (a civilian). *See* Fourth Geneva Convention Relative to the Protection of Civilian Persons in Time of War, art. 3, Oct. 21, 1950, 75 U.N.T.S. 287.

The particularity of each norm highlights the importance of conducting a norm-specific inquiry as to each alleged violation of international law to determine whether there is juris-

---

[3]The United States has signed but not ratified UNCLOS. However, the convention's core provisions are generally accepted as customary international law. *United States v. Alaska*, 503 U.S. 569, 588, n. 10 (1992) ("[T]he United States has not ratified [the United Nations Convention on the Law of the Sea], but has recognized that its baseline provisions reflect customary international law[.]" (internal quotation marks and citation omitted)).

[4]The complaint alleges that Rio Tinto acted in concert with a state actor, rendering its conduct "under color of state law." Because genocide and war crimes do not require state action, it is unnecessary to consider whether a corporation may be liable for acting under "color of state law" in violating norms that do require state action.

diction under the ATS. *See* Maj. op. at 19340-41. The only remaining claims here are for genocide and war crimes— norms of international law that do not limit their scope by the corporate or private identity of the perpetrator. Consequently, there is no justification for exempting Rio Tinto from the reach of the ATS in this case.

In determining whether a norm of customary international law excludes corporate actors, I reject the notion that we must find an example of corporate liability in an international forum to satisfy *Sosa*. *See Flomo*, ___ F.3d ___, 2011 WL 2675924 (7th Cir. July 11, 2011), at *5 (noting that "one of the principal criticisms" of corporate *criminal* liability relies on the availability of *civil* remedies against a corporation in the event of "abhorrent" corporate conduct); *cf. Kiobel*, 621 F.3d at 132-37 (relying heavily on the lack of international criminal liability to support the holding that corporate liability may not lie under the ATS). Instead, the sole inquiry under international law is whether the norm allegedly violated extends to a private corporate actor. The Second Circuit's analysis of liability of non-state actors under international law in *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995), is illustrative here. In *Kadic*, the defendant argued that "acts committed by non-state actors do not violate the law of nations." *Id.* at 239 (internal quotation marks omitted). The Second Circuit rejected that argument, looking to piracy as "[a]n early example of the application of the law of nations to the acts of private individuals." *Id.* The court then proceeded to assess whether the international norms at issue in *Kadic* extended to private actors, concluding that the prohibitions of genocide and war crimes apply to state and non-state actors alike. *Id.* at 241-44. This approach is consistent with *Sosa*. *See* 542 U.S. at 733, n.20; *see also Doe*, 2011 WL 2652384, at *29 (noting some international treaties distinguish between natural and juridical persons whereas others do not).

*Kadic* was decided in 1995, before any individual had been held responsible for genocide in an international forum. *See*

*Prosecutor v. Akayesu*, Trial Chamber Judgment, ICTR-96-4-T (Sept. 2, 1998) (first case holding an individual liable for genocide at an international tribunal). Nonetheless, the court in *Kadic* had no trouble concluding that private actors may commit genocide under international law and, as a result, be held liable under the ATS for their transgressions. 70 F.3d at 241-42. The Second Circuit looked to the sources of the international prohibition on genocide, as does the majority, to identify whether non-state actors fall within the ambit of the prohibition. *See id.* The proper inquiry is not whether a corporation has been *held liable* under international law, it is whether a corporation *is bound to abide* by the international norm at issue. *See Sosa*, 542 U.S. at 733 n.20 (noting courts must consider "whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued"); *see also Flomo*, 2011 WL 2675924, at *3 ("There is always a first time for litigation to enforce a norm; there has to be.").

Although the ATS grants jurisdiction over actions in tort, criminal cases are instructive to the extent they articulate customary international law—but criminal cases are not a limitation on tort liability. *See Sosa*, 542 U.S. at 734-38 (concluding the international norm prohibiting arbitrary detention is insufficiently universal, specific, and obligatory to give rise to an ATS suit without reference to international criminal trials or the absence thereof); *see also id.*, 542 U.S. at 762-63 (Breyer, J. concurring) (noting "consensus as to universal criminal jurisdiction itself suggests that universal tort jurisdiction would be no more threatening" and that "universal criminal jurisdiction necessarily contemplates a significant degree of civil tort recovery as well"). In sum, the jurisprudence of international criminal tribunals is informative as to the content of the norm but the absence of relevant criminal jurisprudence is not particularly instructive in identifying proper defendants in a *civil* suit. *See Flomo*, 2011 WL 2675924, at *5 (discussing the shortcomings of relying on international criminal law in determining rules of civil liability).

Of note, the majority explains that international law has not consistently precluded corporate criminal liability—at Nuremburg the prosecution apparently believed corporations could be criminally liable for violations of the law of nations but chose instead to focus on natural person defendants as a matter of strategy. *See* Maj. op. at 19364; *see also* Jonathan A. Bush, *The Prehistory of Corporations and Conspiracy in International Criminal Law: What Nuremburg Really Said*, 109 COLUM. L. REV. 1094, 1104-1130 (2009).[5] Notably, one judgment at Nuremburg was explicit that corporations can violate international law, concluding that "[w]here private individuals, *including juristic persons*, proceed to exploit the military occupancy by acquiring private property against the will and consent of the former owner, such action, not being expressly justified . . . , is in violation of international law . . . ." *Kiobel*, 621 F.3d at 180 (Leval, J., concurring) (quoting VIII Trials of War Criminals Before the Nuernberg Military Tribunals (1952)). The majority also correctly notes that various Nazi organizations were designated "criminal" by the Nuremburg Military Tribunal. Maj. op. at 19364.

International criminal trials are but one means of remedying violations of international law—they are not the only means of enforcement nor the only source of customary international law. The judgments of international criminal tribunals provide useful insight as to the scope of customary international law's prohibitions of certain conduct—such as genocide and war crimes. *See Doe*, 2011 WL 2652384, at *14 n.17 ("Crimes and torts frequently overlap. In particular, most crimes that cause definite losses to ascertainable victims are also torts . . . [In] a much earlier era of Anglo-American law,

---

[5]The Rome Statute for the International Criminal Court restricts the tribunal's jurisdiction to natural persons. Art. 25(1), July 17, 1998, 2187 U.N.T.S. 3. The Rome Statute is, however, just one source of international law, and it speaks only to criminal, not civil, liability. *See id.*, art. 10 (noting the Rome Statute does not necessarily codify existing customary international law).

. . . criminal and tort proceedings were not distinguished." (internal quotation marks and citations omitted)). However, because the judgments of international criminal tribunals are rendered in *criminal* rather than *civil* trials, they must be used with caution in the ATS context and should not be invoked as a limiting factor regarding the capacity of defendants.

Finally, it bears noting that the incorporation of customary international law into domestic tort suits is not unique to the ATS. Federal courts acting in admiralty jurisdiction have long imposed corporate liability for torts under general maritime law, thus recognizing that federal common law often incorporates norms of international law. *See The Amiable Nancy*, 16 U.S. 546, 558 (1818) (holding, without further delineation, "owners of [a] privateer" liable for tort); *The "Scotland"*, 105 U.S. 24, 27-30 (1881) (holding corporate owner of a private ship liable but noting U.S. statute regarding shipowner liability narrowed general maritime law's rules of liability in 1851). General maritime law is analogous to modern customary international law in that its core is a small body of international common law that is obligatory on all states and that has been incorporated into federal common law. *See Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 206 (1996) (referring to general maritime law as "a species of judge-made federal common law"); *see also* David J. Bederman, *Law of the Land, Law of the Sea: The Lost Link Between Customary International Law and the General Maritime Law*, 51 VA. J. INT'L L. 299, 303-22 (2011) (describing connection between customary international law and general maritime law, particularly "[i]n the early legal history of the United States"). This history of corporate liability under general maritime law provides further support for the holding that corporate liability may lie under the ATS for at least some violations of customary international law.

The language of the ATS, the federal common law of tort liability at the time the statute was enacted, and the scope of the international prohibitions of genocide and war crimes, all

point to the conclusion that a corporation may be subject to liability under the international norms prohibiting genocide and war crimes.

### III.  SAREI HAS NOT SUFFICIENTLY STATED CLAIMS FOR GENOCIDE AND WAR CRIMES.

I agree with the majority's analysis of the international law prohibitions on genocide and war crimes, but I cannot join its conclusion that the claims survive dismissal. I would remand to the district court with instructions to dismiss these two claims but to consider whether leave to amend should be granted.

The logic supporting the requirement that an international norm must be "definable" or specific to give rise to an ATS claim is that federal courts must have standards to draw upon in adjudicating such claims. *See Sosa*, 542 U.S. at 732, *citing favorably In re Estate of Marcos Human Rights Litigation*, 25 F.3d 1467, 1475 (9th Cir. 1994). When a claim relies on a specific and obligatory international norm, and the traditional sources of international law provide us with a clear definition of prohibited conduct, we are obligated to adhere to that definition in measuring the allegations set forth in the complaint. As to whether a claim meets pleading requirements, we look to domestic law, or in this case more specifically to the Supreme Court's delineation of pleading standards in *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).

### A.  GENOCIDE

The complaint includes allegations of killing and serious bodily harm that are sufficient to infer the existence of genocidal acts—what it lacks are allegations that plaintiffs belong to a protected group. The essential components of a genocide claim are: (1) genocidal acts, such as murder; (2) targeting a protected group; (3) with intent to destroy that protected group in whole or in part. *See* Convention on the Prevention

and Punishment of the Crime of Genocide ("Genocide Convention"), art. II, Dec. 9, 1948, S. Exec. Doc. O, 81-1 (1949), 78 U.N.T.S. 277; *see also* Maj. op. at 19359-60.

Authoritative sources have interpreted the definition of a protected group narrowly. The majority notes that the ICJ has held that a "protected group" under the Genocide Convention "must have particular positive characteristics—national, ethnic[ ], racial or religious—and not the lack of them." Maj. Op. at 19366; *see Bosnia and Herzegovina v. Serbia*, 2007 I.C.J. 91, ¶¶ 193-196 (Feb. 26). Thus "Bosnian Muslims" constitute a protected group under the Convention but a group defined in the negative ("non-Serbs") does not constitute a protected group. *Id.* ("[T]he crime requires an intent to destroy a collection of people who have a particular group identity. It is a matter of who those people are, not who they are not."). Similarly, one Trial Chamber Judgment at the International Criminal Tribunal for the Former Yugoslavia found that "the Genocide Convention does not protect all types of human groups. Its application is confined to national, ethnic[ ], racial or religious groups." *Prosecutor v. Krstic*, Case No. IT-98-33-T, Judgment, ¶¶ 554-59 (Aug. 2, 2001) (rejecting the Prosecution's attempt to define the protected group as "Bosnian Muslims of Srebrenica" or "Bosnian Muslims of Eastern Bosnia," and holding geographical limitations are relevant to whether a significant part of the group was targeted but may not be used to define the protected group).[6]

The majority acknowledges this narrow definition of a protected group under international law, but then goes on to hold that "residents of Bougainville constitute a protected group." Maj. op. at 19367. Here, I must part ways with the majority. This protected group suffers from precisely the shortcoming the ICTY identified with the prosecution's effort to define the

---

[6]The Trial Chamber's Judgment defining the protected group was unchanged by the Appeals Chamber Judgment. *Prosecutor v. Krstic*, Case No. IT-98-33-A, Appeals Chamber Judgment, ¶ 15 (Apr. 19, 2004).

Bosnian Muslims of Eastern Bosnia as "the protected group" —the group is defined not by nationality or ethnicity but instead by geography. *See Krstic*, Case No. IT-98-33-T, at ¶¶ 554-59.

Here, the complaint defines individual plaintiffs as "resident[s] of Bougainville" and not as belonging to any specific national, ethnic, racial, or religious group. In its description of the "war crimes class," plaintiffs' complaint includes "victims and survivors of the Bougainville conflict." The paragraph alleging genocide under Count I refers in passing to "natives." The complaint refers repeatedly to "Bougainvilleans." In addition, the complaint describes land ownership on a "clan" basis—leaving unstated whether "Bougainvilleans" is an umbrella term including multiple protected groups or a single racial or ethnic group. This ambiguity in the complaint renders the allegations insufficient. In fact, the allegations closely resemble arguments rejected by the ICJ and the ICTY to define a protected group for purposes of genocide based upon what a group is not or the geographic range in which individuals were targeted. The majority is content to conclude the complaint establishes "ethnic and racial traits sufficient to make Bougainvilleans a protected group," but in my view the complaint's failure to specify a protected group to which "Bougainvilleans" belong is a deficiency that warrants dismissing the claim—defining the protected group is the essential first step to making an allegation that defendants acted with the specific intent to destroy that group. *See* Genocide Convention, art. II; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n.3 (2007) (plaintiffs must in the complaint "provid[e] not only fair notice of the nature of the claim, but also grounds on which the claim rests" (internal quotation marks and citation omitted)).

## B.  War Crimes

Rio Tinto's purported role in the commission of war crimes is difficult to ascertain from the complaint. The complaint is

a jumble of facts and conclusory statements that do not allege
a coherent theory of Rio Tinto's involvement in the alleged
war crimes. The complaint fails to tell the basic story of who,
what, where and when with respect to the war crimes claims,
and Rio Tinto's role is amorphous at best.[7] The majority fails
to take heed of the Supreme Court's recent reminder that "for-
mulaic recitations of the elements" of a claim and "naked
assertions devoid of further factual enhancement" are insuffi-
cient to survive a motion to dismiss. *Iqbal*, 129 S. Ct. at 1949,
1951 (internal quotation marks and alterations omitted).

The majority holds that the international norm prohibiting
war crimes includes within its proscription aiding and abetting
the commission of war crimes,[8] just as the international norm

---

[7]It is also unclear where the crimes against humanity claim ends and
where the war crimes claim begins. *See* Maj. op. at 19373-74 (relying on
allegations supporting the crimes against humanity claim to conclude the
complaint adequately alleges war crimes).

[8]It bears noting that aiding and abetting, like corporate liability, raises
the question whether the mode of liability is part and parcel of the conduct
regulated by the international norm or more akin to a cause of action that
should be analyzed under federal common law. *Compare Doe*, 2011 WL
2652384, at *21-22 (distinguishing between "conduct-governing norms"
and "the technical accouterments to a cause of action" (internal quotation
marks and citation omitted)) *and Khulumani*, 504 F. 3d at 264-77 (Katz-
mann, J. concurring) (looking to international law to define aiding and
abetting liability) *with id.* at 285-91 (Hall, J., concurring) (looking to fed-
eral common law to define accessorial liability). I believe much of this
debate boils down to the difficulty in deciphering where the conduct-
regulating international norms end and the remedy-specific standards of
domestic law begin. Aiding and abetting is not necessarily tied up in the
international norm; it arguably fits comfortably within the framework of
a cause of action—the legal theory of relief. *See Cent. Bank of Denver,
N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173-78 (1994)
(discussing the scope of the "private . . . cause of action" under Rule 10b-
5 and concluding that it does not include an "aiding and abetting cause of
action"). I do not resolve this conundrum here because even under the
knowledge standard dictated by domestic law, Sarei's complaint is defi-
cient. Under domestic law, aiding and abetting requires more than knowl-
edge of relevant facts alone; it also requires an affirmative act of aiding,

includes corporations within its ambit. Maj. op. at 19363-66. To the extent the international norm requires purposive action in furtherance of a war crime to establish aiding and abetting liability, the complaint fails to allege the necessary purpose to survive the motion to dismiss.[9] I would therefore reverse and remand to the district court for consideration of whether leave to amend is proper.

The complaint adequately alleges that war crimes were committed in Bougainville, ostensibly by the PNG government. However, the very language of the complaint underscores its frailties. Rio Tinto's role in the war crimes and the timing of those crimes (particularly as related to Rio Tinto's alleged actions supplying equipment to the PNG forces) remains untethered to purposive action. At best the complaint

counseling, commanding, inducing or procuring another to commit each element of the crime, in this case murder in violation of the law of nations. *See, e.g.*, Ninth Circuit Model Criminal Jury Instructions 5.1 (2010) ("Aiding and Abetting"), available at http://207.41.19.15/web/sdocuments.nsf/crim.

[9]I am cognizant that most international tribunals have employed a knowledge mens rea in assigning aiding and abetting liability for war crimes. *See Tadic*, IT-94-1-A at ¶ 229(iv); *see also* James Morrissey, *Presbyterian Church of Sudan v. Talisman Energy, Inc.: Aiding and Abetting Liability Under the Alien Tort Statute*, 20 Minn. J. Int'l L. 144, 158-67 (2011). However, I agree with the majority and with the Second Circuit that the Rome Statute's imposition of the narrower and more exacting standard of purpose reflects a lack of uniformity as to the imposition of aiding and abetting liability based on knowledge alone. *See* Maj. op. at 19373-74; *see also Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009). There is no dispute that aiding and abetting the violation of the law of nations is prohibited under international law. But there is no uniform agreement on the full scope of what conduct qualifies as aiding and abetting; at a minimum, however, there is universal agreement that purposive conduct to aid and abet the commission of a war crime violates the law of nations. The minimum core of conduct universally and specifically prohibited by international law includes purposively aiding and abetting the commission of a war crime, and such action therefore gives rise to an ATS suit under *Sosa*. *See* 542 U.S. at 732.

alleges facts giving rise to an inference that Rio Tinto had knowledge of war crimes committed by PNG forces, but missing is the purposive action the majority holds is required to establish aiding and abetting liability. *See* Maj. op. at 19373-75; *see also Talisman*, 582 F.3d at 259. As a result, I dissent from the majority's holding that the complaint establishes the requisite plausibility to survive the motion to dismiss. *See Iqbal*, 129 S. Ct. at 1949 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks and citation omitted)); *see also Twombly*, 550 U.S. at 570.

A few examples are illustrative of the difficulties with the complaint. The allegations support an inference of mere knowledge on Rio Tinto's part that Bougainville *residents* might be injured or killed as a result of military action taken by PNG in the context of an ongoing conflict and related to the reopening of Rio Tinto's mining operations on Bougainville. Such an allegation is not surprising, nor particularly illuminating, in light of the ongoing conflict between the PNG and the militants, who were also residents of the island. Missing is the link between Rio Tinto and the PNG's alleged war crimes—the murder of *civilians*. Intent to harm, particularly in the context of an ongoing conflict, is not equivalent to intent to further murder in violation of the Geneva Conventions. *See Iqbal*, 129 S. Ct. at 1948 (in the context of discrimination, purposeful action "requires more than intent as volition or intent as awareness of consequences." (internal quotation marks and citation omitted)).

Another shortcoming relates to the allegations of "assistance" to the PNG. "[A]ssistance to the abuses of a government [which] was merely incidental to a proper business purpose" does not give rise to ATS liability for aiding and abetting a violation of the law of nations. *Kiobel v. Royal Dutch Petroleum Co.*, ___ F. 3d ___, 2011 WL 338048 at *7 (2d Cir. Feb. 4, 2011) (No. 06-4800-CV, 06-4876-CV) (order

denying petition for rehearing en banc) (Leval, J., dissenting from denial of rehearing en banc). In my view, this case is akin to the unsuccessful ATS suit outlined in *Talisman*. *See* 582 F.3d at 262. There, the Second Circuit held that Talisman did not aid and abet war crimes even if it provided substantial assistance in the form of upgraded airstrips or roads for military use, because there was no evidence that Talisman intended to "aid atrocities" and particularly because the company apparently had a "legitimate need to rely on the military for defense." *Id.* The situation here, at least as currently pled in the complaint, is not dissimilar. It is not alleged that Rio Tinto intended for the war crime of murder to be committed. *See Prosecutor v. Tadic*, Case No. IT-94-1-A, Judgment (July 15, 1999), ¶ 229(iv) (distinguishing between the knowledge *mens rea* which requires only "knowledge that the acts performed by the aider and abettor assist the commission of a specific crime by the principal," from the *mens rea* of purpose, which requires "intent to perpetrate the crime"); *see also Twombly*, 550 U.S. at 556 ("parallel conduct" is insufficient to establish unlawful agreement in the context of conspiracy).

The pleading inadequacies are not inconsequential as they go to the heart of the international norm violations. I therefore respectfully dissent from Part IV(B)(4) of the majority opinion.

## IV.  CONCLUSION

This appeal once again takes us into uncharted ATS waters. The alleged actions include horrific human rights violations, and I do not hesitate to apply the *jus cogens* norms prohibiting genocide and war crimes to corporations given the truly *universal* nature of those prohibitions. Here, however, the nature of those human rights violations and Rio Tinto's role in them are insufficiently articulated under the pleading standards required by the Supreme Court. I would remand, with instructions for the district court to dismiss the genocide and war

crimes claims and consider whether leave to amend is appropriate.

BEA, Circuit Judge, concurring in part and dissenting in part, with whom KLEINFELD and CALLAHAN, Circuit Judges, join, and with whom Judge IKUTA, Circuit Judge, joins as to all but Part III:

The last time this case was before us, the en banc court remanded to the district court to "determine in the first instance whether to impose an exhaustion requirement" on plaintiffs' claims under the Alien Tort Statute ("ATS").[1] *Sarei v. Rio Tinto PLC*, 550 F.3d 822, 832 (9th Cir. 2008) ("*Rio Tinto III*"). In determining whether such an exhaustion analysis was required, our *Rio Tinto III* plurality opinion ("Plurality opinion") instructed the district court first to consider and balance two factors: (1) the strength of the nexus, if any, between the United States and the acts and omissions alleged in the complaint—the less nexus, the more reason for exhaustion, and (2) the gravity of the violations alleged, namely whether the claims implicated "matters of universal concern"—the more grave the violations, the less reason for exhaustion. *Id.* at 831.

Then, if this two-factor balancing test weighed in favor of imposing such an exhaustion requirement, the plurality opinion instructed the district court it should then perform the traditional two-part exhaustion analysis. That analysis would require the district court to consider: (1) whether the foreign plaintiffs had local remedies where the alleged torts occurred

---

[1]"Exhaustion Requirement" meant plaintiffs would be first required to sue defendant in the courts of Papua-New Guinea, where they alleged the defendant did what they claim hurt them. Only after pursuing their legal remedies there—or proving such pursuit was futile—could plaintiffs attempt to use U.S. courts.

and had exhausted them, and, if not, (2) whether any exhaustion requirement is excused because local remedies are ineffective, unobtainable, unduly prolonged, inadequate, or otherwise futile to pursue. Were the district court to find the balance of "nexus" versus "matters of universal concern" weighed *against* such an exhaustion requirement for a given claim, then that claim could proceed without any consideration to exhaustion of local remedies.

In our remand order, we specifically instructed the district court to consider and weigh *both* factors in the prudential exhaustion framework—nexus and universal concern— regardless the strength or weakness of either factor. Even if the district court were to find that plaintiffs' claims implicated matters of universal concern, "simply because universal jurisdiction *might* be available, does not mean that we should exercise it." *Id.* Instead, the plurality opinion stated that "in ATS cases where the United States "nexus" is weak, courts should carefully consider the question of exhaustion, particularly *but not exclusively*—with respect to claims that do not involve matters of 'universal concern.' " *Id.* (emphasis added). That meant that no matter how clear it was that a claim *did* involve matters of "universal concern," the district court should still balance against that ground for dispensing with exhaustion an evaluation of what nexus, if any, existed between the violation claimed and our country.

Nonetheless, the district court—ostensibly purporting to apply the plurality opinion's framework—summarily concluded that no exhaustion analysis was required because plaintiffs' allegations were of such a "heinous" nature that they stated "matters of universal concern." *Sarei v. Rio Tinto PLC*, 650 F. Supp. 2d 1004, 1031 (C.D. Cal. July 31, 2009) ("*Rio Tinto IV*"). This "heinous" finding apparently applied indistinctly to each of four claims: genocide, war crimes, crimes against humanity (by blockade of medical supplies), and racial discrimination. *Id.* at 1032. The district court made no finding that any of such claims was more "heinous" than

another, nor implicated "matters of universal concern" to a great extent. Likewise, the district court did not state whether any one, or any combination of less than four of the allegations, were sufficient to implicate "matters of universal concern."

Then, without discussion of any facts which may have proved the presence or extent of a nexus—"weak," "strong," or otherwise—between such allegations of "heinous" acts and the U.S., the district court simply found that the "heinous" acts outweighed the "weak nexus" to the U.S. *Id.* at 1031. Here, the district court erred by skipping an essential step: it should have determined whether there was *any* nexus at all between the acts alleged and the United States. As discussed below, that should have been determinative for imposing the exhaustion requirement, resulting in dismissal of the complaint.

And now we have an additional problem with the district court's action—a problem which ineluctably requires reversal and remand: this court's present majority opinion knocks out two of the four allegations which the district court found all stated "matters of universal concern."[2] Do the remaining two allegations (war crimes and genocide) outweigh the considerations of lack of—or even weakness of—nexus? It is not for us to say, under the mandate of the earlier plurality opinion. It is for the district court to determine. Even if we find no error in the district court's original determination that consideration of the allegations outweighed the consideration of nexus, we now have a different balance to be weighed: fewer *valid* allegations than before, but the same nexus, or lack

[2]The majority opinion holds that the international law norms identified by the district court against racial discrimination and crimes against humanity arising out of the blockade of medical supplies are not sufficiently "specific, universal or obligatory" under *Sosa v. Alvarez-Machain,* 542 U.S. 692, 732 (2004). I agree with the majority opinion on both of these issues.

thereof. A new balance must be struck, and it must be struck by the district court.

## I.    Failure properly to consider "nexus"

The district court defined its terms so as to predetermine the outcome of the prudential exhaustion requirement it was ordered to carry out. The district court defined the "spectrum" on which to measure the nexus between the claims and the United States as running from "weakest" to "strongest," instead of running from "no nexus" to "strong nexus." It assumed there *was* at least *some* nexus.

But there was no such nexus. This case involves a so-called "Foreign-cubed suit"[3]: a *foreig*n plaintiff suing a *foreign* defendant for alleged torts which occurred entirely on *foreign* soil. The only connection the plaintiffs can identify between their causes of action and the United States is that Rio Tinto, a British corporation, does business in the U.S. These business activities may provide a sufficient basis for the exercise of personal jurisdiction by a federal court over Rio Tinto. *See, e.g.*, *Pennoyer v. Neff*, 95 U.S. 714 (1878); *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945). But that was not the issue to be determined on remand; "nexus" was. By "nexus" was meant whether Rio Tinto's alleged acts of genocide and war crimes in Papua-New Guinea—approximately 4,300 miles southwest of Hawaii, our state closest to Papua-New Guinea —had *any* connection with the United States. Rio Tinto's only alleged connections with the U.S. were its operations and assets in this country—which operations and assets are not even claimed to be in any way related to the acts of genocide and war crimes alleged by the plaintiffs as culpable conduct of Rio Tinto. Thus, there simply is *no* nexus between the acts complained of in this action and the United States. In fact, in this era of globalization, it is indeed difficult to imagine a suit

---

[3]*Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869, 2894 n.11 (Stevens, J., concurring).

where the United States would have *less* of an interest or connection to the facts underlying the complaint.

Of course, by self-defining the low range of the nexus spectrum as "weak nexus," the district court was able to mischaracterize the nexus in this case as "weak" instead of inexistent. To support this implausible factual finding, the district court relied on the plurality opinion's unexplained statement that, based on appearances—not examined evidence—plaintiffs' allegations "lack[ed] a significant United States 'nexus.' " *Rio Tinto III*, 550 F.3d at 831. But a district court's unexplained reliance on tentative, unreasoned appellate dicta cannot take the place of reasoned analysis based on proof, particularly where every fact and inference to be drawn from the record suggests that there is *no* nexus at all between the plaintiffs' claims and the United States. *See United States v. Hinkson*, 585 F.3d 1247, 1251 (9th Cir. 2009) (en banc), *cert. denied*, ___ S.Ct. ___, 2011 WL 1457546 (Apr 18, 2011).

From that factual error, let us go to the legal error. Having implausibly found that the United States has a "weak" nexus to the suit when in fact no such nexus exists, the district court misapplied the balancing test set forth in the remand order. The plurality opinion stated that "where the United States "nexus" is weak, courts should carefully consider the question of exhaustion, particularly—*but not exclusively*—with respect to claims that do not involve matters of 'universal concern.' " *Rio Tinto III*, 550 F.3d at 831 (emphasis added). In other words, the district court should be especially solicitous of imposing an exhaustion requirement when the nexus is weak and the claims do not implicate matters of universal concern. But it should weigh the nexus issue even where the matters *are* of "universal concern."

The district court's opinion provides no basis for us to review that any such balancing took place. In fact, in her 31-page opinion, the district court dedicated only one sentence to her purported balancing of the nexus and universal concern

factors. This one sentence consists of a conclusory assertion that the "weak nexus" between the plaintiffs' claims and the United States "is outweighed by the 'heinous' nature of the allegations on which the claims are based." *Rio Tinto IV*, 650 F. Supp. 2d at 1031.

Nor did the district court try to reconcile its new rule exempting allegations of "heinous" conduct of universal concern from the exhaustion requirement with the remand order's statement that mere universal jurisdiction for a claim is *not* itself a sufficient condition for exempting exhaustion. *See Rio Tinto III*, 550 F.3d at 831. Perhaps worst of all, the only authority the district court cited for her conclusion that characterizing acts as "heinous" suffices to outweigh the weakness or inexistence of any nexus between the "heinous" acts and the United States is Judge Reinhardt's dissent in *Rio Tinto III* —which dissent opposed imposition of *any* exhaustion requirement, prudential, mandatory, or in between, for *any* claims brought under the ATS and which dissent performed *no* balancing or weighing of "nexus" versus "matters of universal concern." Much as we may respect and value a dissent, it is not Ninth Circuit precedential authority.

Under the abuse of discretion standard, we must defer to reasonable applications of multi-factor balancing tests. But where the district court fails to perform the prescribed balancing test, detail how it weighed the relevant factors, or otherwise explain its conclusion, such deference is inapplicable. *See Solis v. Cnty. of Los Angeles*, 514 F.3d 946, 958 (9th Cir. 2008) (reversing because the district court failed to consider a relevant factor or provide an adequate explanation for its decision, rendering meaningful appellate review impossible). To uphold a district court's ruling which directly flouts our instructions is to encourage instability in our law.

## II.   Majority opinion requires a remand

As noted, the majority opinion determines that allegations of "crimes against humanity" (per blockade) and of "racial

discrimination" do not constitute claims sufficiently specific, universal, and obligatory so as to violate *jus cogens* (customary international law). Therefore, such allegations do not implicate "matters of universal concern."

Given this result, the district court's failure to articulate the ordered balancing between "nexus" and "matters of universal concern" makes now mandatory a remand for a new determination of prudential exhaustion. We cannot tell from the district court's opinion if any of the allegations of the complaint found valid by the majority opinion were, by themselves or in conjunction, sufficiently "heinous" as to outweigh the lack of nexus, or whether it was the other allegations in some combination, or in total which outweighed the lack of nexus. Perhaps now, with the allegations of "crimes against humanity" and "racial discrimination" knocked out, the remaining allegations will not outweigh the lack of nexus. Either way, a remand is in order.

## III. Mandatory exhaustion required

Because I find that our mandate to exercise prudential exhaustion was not carried out, I do not want to be understood to have abandoned the view that exhaustion of local remedies is mandatorily required by "the law of nations." It is not solely a matter of judicial prudence to require such exhaustion. The incorporation of substantive international law (the law of nations) into the ATS necessarily incorporates not just the traditional causes of action recognized by the law of nations, but also the traditional limitations placed on those rights by customary international law. One of those well-established limitations is exhaustion of local remedies. *Rio Tinto III*, 550 F.3d at 833 (Bea, J., concurring); *see also* Jose E. Alvarez, *14th Annual Herbert Rubin and Justice Rose Luttan Rubin International Law Symposium: A Bit on Custom*, 42 N.Y.U. J. Int'l L. & Pol. 17, 72 (2009) (recognizing exhaustion of local remedies as one of the "fundamental rules of customary international law").

Mandatory exhaustion analysis is not simply a historical remnant or an administrative or procedural rule. As recognized by legal scholars and our courts, the exhaustion requirement plays a critical role in American foreign relations by preventing our judiciary from interjecting itself into ongoing international disputes or interfering with domestic matters of sovereign nations.[4] Because a mandatory exhaustion requirement is supported by the Supreme Court's holding and language in *Sosa*,[5] by the language and purpose of the ATS, and by customary international law, I continue to believe that there should be mandatory exhaustion analysis for all claims raised under the ATS in federal court.

## IV.  Conclusion

I believe the district court erred in applying the rules of prudential exhaustion as ordered by us in *Rio Tinto III*'s plurality opinion; but even if I am wrong on that, our majority opinion now requires a remand and a new application of prudential exhaustion. I also believe plaintiffs' claims are barred by the mandatory exhaustion provisions of the law of nations. For both these reasons, I respectfully dissent.

---

[4]Judge Kleinfeld's fine dissent explains that the ATS was passed precisely for this reason: to prevent international conflict between the United States and other sovereign nations by providing foreign plaintiffs (namely, Ministers and ambassadors) with a cause of action in federal court for torts committed against them on U.S. soil, at a time—shortly after our Revolutionary War—when most states did not permit foreigners to sue Americans in tort.

[5]The Court noted that, in determining the availability of relief in federal courts for violations of customary international law, it would "certainly consider" whether "the claimant must have exhausted any remedies available in the domestic legal system, and perhaps in other forums such as international claims tribunals." *Sosa*, 542 U.S. at 733 n.21.

KLEINFELD, Circuit Judge, dissenting, with whom BEA and IKUTA, Circuit Judges, join:

I respectfully dissent.

"[T]here must be some rule of law to guide [a] court in the exercise of its jurisdiction."[1] The complaint in this case seeks damages and an injunction against Rio Tinto, a British-Australian corporation, for wrongs against people in Bougainville, Papua New Guinea.[2] Now that our court has adopted universal jurisdiction to grant tort damages for violations by foreigners against foreigners in foreign lands of "the law of nations," in a plethora of opinions that cannot agree on what the "law of nations" prohibits, we on the Ninth Circuit now exercise jurisdiction over all the earth, on whatever matters we decide are so important that all civilized people should agree with us.

---

[1]*Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165 (1803).

[2]The claims are: (1) crimes against humanity amounting to genocide, by encouraging the Papua New Guinea government in their blockade of Bougainville; (2) war crimes, by cooperating with Papua New Guinea in violence against civilians; (3) violating the universal right to life by appropriating land, emitting toxic mine waste, and otherwise damaging the environment of Bougainville; (4) discriminating by race, in that these wrongs were committed with a mentality of regarding Bougainvilleans as inferior because of the color of their skin, and Rio Tinto hired numerous outsiders and paid them more than Papua New Guineans; (5) engaging in cruel, inhuman, and degrading treatment of the people of Bougainville; (6) violating international rights to a healthy environment; (7) engaging in a systematic pattern of these violations of human rights; (8) negligently manufacturing and disposing of tailings, chemicals, and toxic effluents; (9) creating a public nuisance to health; (10) creating a private nuisance by impairing the use of Bougainvilleans' land; (11) strict liability for using defective technology for mining, leading to pollution; (12) injunctive relief to remedy the environmental harms; and (13) entitlement to the costs of medical monitoring for those exposed to the pollutants. This is a class action, seeking certification of a "War Crimes Class," an "Environmental Right to Life Class," and a "Medical Monitoring Class."

We have no such jurisdiction. The majority claims it under a 1789 statute passed by the First Congress that conferred tort jurisdiction on the new federal courts for torts in violation of the "law of nations." That statute was intended to enable our courts to address wrongs done in the United States to foreigners and wrongs done outside any foreign state's territory. Here is the statute:

> The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.[3]

The statute does not say "in the United States or in any foreign state." The majority reads it as though it does.

The majority errs in claiming jurisdiction because:

(1) the statute does not say that it applies within the territory of other states and its historical context shows that its purpose was to afford a remedy for wrongs committed within the United States;

(2) the reference to the "law of nations" does not imply applicability within other countries, and such application would itself violate the law of nations;

(3) the inference of such application from the phrase "the law of nations" is prohibited by Supreme Court holdings that statutes do not apply extraterritorially unless they say so or clearly so imply; and

---

[3]28 U.S.C. § 1350. In its original, materially similar language, the statute provided that federal courts "shall . . . have cognizance, concurrent with the courts of the several States, or the circuit courts, as the case may be, of all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States." 1 Stat. 80, ch. 20, § 9(b) (1789).

(4) jurisdiction over piracy on the high seas does not imply jurisdiction over wrongs committed within the territory of a foreign state.

The consequences of the majority's claim are a new imperialism, entitling our court, and not the peoples of other countries, to make the law governing persons within those countries. Our court now asserts entitlement to make law for all the peoples of the entire planet.

The Alien Tort Statute does not so empower us. It was promulgated to enable foreigners to sue for violations in America of a narrow set of norms, where failure to vindicate the wrongs might embroil our weak, new nation in diplomatic or military disputes. The wrongs were to ambassadorial officials in the United States, and piracy, sometimes by Americans. There are three classes of territory, not two, for purposes of law of nations analysis: territory within the United States; territory outside the United States and outside any other state; and territory outside the United States and within another state. Both the last two are extraterritorial, but the law of nations differs as between them. Piracy occurs within the second class. Jurisdiction has always extended extraterritorially to the high seas, not because piracy was more heinous than other crimes, but because imposition of any state's law could offend no other state's governance of its own territory.

Advocates of universal jurisdiction see themselves as demonstrating enlightened open-mindedness to international law norms; instead, universal jurisdiction violates the most long-established, central and fundamental principle of the law of nations: "equality of sovereignty," as it is called, meaning each sovereign's authority over its subjects in its own territory equals that of other sovereigns within their respective territories, and excludes other sovereigns' authority within that sovereign's territory. Whether this is always a good rule as a matter of policy is debatable, but whether it is historically the most fundamental rule of the law of nations is not.

Our case is by Papua New Guineans, against a British-Australian company, for wrongs allegedly committed in Bougainville in connection with the civil war between Papua New Guinea and the people of Bougainville. Justice Stevens would describe this type of lawsuit, where foreign plaintiffs sue foreign defendants for wrongs committed in foreign countries, as a "foreign-cubed" action. The complaint seeks class action certification, equitable relief, and compensatory and punitive damages against Rio Tinto. Every single wrong claimed by the plaintiffs is alleged to have occurred in Bougainville, either by Rio Tinto or by the government of Papua New Guinea acting with the encouragement of Rio Tinto. The injunction sought would be an order by an American district judge compelling environmental and other remedial action by Rio Tinto in Bougainville. No relationship is alleged between any of the wrongs claimed, or the remedies sought, and any American citizen or the United States.

The Governments of the United Kingdom of Great Britain and Northern Ireland, and of the Commonwealth of Australia, argue as amici that "it is a bedrock principle of international law that each sovereign nation is equally entitled to prescribe laws and to adjudicate claims regarding those persons within its sovereign territory."[4] They are correct. They made substantially the same argument as amici before the Supreme Court in *Morrison v. National Australia Bank*.[5] The Supreme Court

---

[4]Brief of the Governments of the United Kingdom of Great Britain and Northern Ireland and the Commonwealth of Australia as Amici Curiae in Support of the Defendants-Appellees/Cross-Appellants at 5 (Nos. 02-56256, 02-56390, 09-56381); *see also* John H. Herz, *Rise and Demise of the Territorial State*, 9 World Pol. 473, 480-81 (1957) ("[O]nly to the extent that it reflected their territoriality and took into account their sovereignty could international law develop . . . . [S]overeign units must know in some detail where their jurisdictions end and those of other units begin; without such standards, nations would be involved in constant strife over the implementation of their independence.").

[5]*Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869, 2885-86 (2010); *see also* Brief of the United Kingdom of Great Britain and Northern Ire-

accepted it.[6] Scholarship in other countries has supported this British and Australian view, and criticized overweening American claims.[7]

## I. Historical Context.

The First Congress passed the Alien Tort Statute to deal with domestic violations of the law of nations that created risks for our foreign relations, and perhaps our new nation's continued existence. The problem was not that some far-away wrongdoer might violate the law of nations in some other country, but that violations had occurred and would occur

land as Amicus Curiae in Support of Respondents at 2, *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869 (2010) (No. 08-1191) ("The risk of infringing upon the sovereignty of other nations is a particular concern with respect to . . . cases involving foreign purchasers, a foreign issuer, and alleged harm suffered in transactions on a foreign securities exchange (so-called 'foreign-cubed' securities cases)."); Brief of the Government of the Commonwealth of Australia as Amicus Curiae in Support of the Defendants-Appellees at 1-2, *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869 (2010) (No. 08-1191) (arguing that Australia "is opposed to overly broad assertions of extraterritorial jurisdiction over aliens arising out of foreign disputes, because such litigation can interfere with national sovereignty and result in legal uncertainty").

[6]*See Morrison*, 130 S. Ct. at 2886-88.

[7]See, e.g., *Arrest Warrant of 11 Apr. 2000* (Dem. Rep. Congo v. Belg.), 2002 I.C.J. 3, 38, 44 (Feb. 14) (separate opinion of Pres. Guillaume); *R v. Bartle, ex parte Pinochet Ugarte*, [2000] 1 A.C. 61 (H.L.) 79 (Lord Slynn of Hadley, dissenting) (appeal taken from Q.B. Div'l Ct.) (U.K.), reprinted in 37 I.L.M. 1302, 1312-13 (1998) ("It does not seem to me that it has been shown that there is any State practice or general consensus let alone a widely supported convention that all crimes against international law should be justiciable in National Courts on the basis of the universality of jurisdiction . . . . That international law crimes should be tried before international tribunals or in the perpetrator's own state is one thing; that they should be impleaded without regard to a long-established customary international law rule in the Courts of other states is another. . . . The fact even that an act is recognised as a crime under international law does not mean that the Courts of all States have jurisdiction to try it . . . . There is no universality of jurisdiction for crimes against international law . . . .").

within the United States that could, if unremedied, cause diplomatic or military hostility by other nations. We had just signed a peace treaty with Great Britain after a War of Independence we barely won. We could ill afford diplomatic problems with the British, who bordered us on the north, the Spanish, who then bordered us on the south and west,[8] or the French, whose support had been essential to our independence.[9]

Given our precariousness, the First Congress was concerned that American, not foreign, violations of the law of nations might "afford *just* causes of war,"[10] a war we likely could not win. The law of nations established that the state in which it was violated must afford a remedy, or else the victim state was entitled to take "reprisal" for "denial of justice" by the state in which the wrong occurred. Thus, if, say, a French consul's right was violated in Philadelphia, and American courts afforded no remedy, then France was entitled to reprisal, which could even include war. This problem is not confined to the eighteenth century. For example, in the Don Pacifico affair of 1850, a mob in Athens wrecked a British subject's house, and when his claim for compensation from the Greek government was resisted, the British fleet was ordered to Greece to compel monetary settlement.[11] The Iranian government's refusal to remedy the hostage crisis of 1979 to 1981 is a recent example.

The Federalist Papers justified creation of federal courts in part because "denial of justice" for violation of the law of nations would justify "reprisal." Federalist 80 by Hamilton explained that a federal judiciary needed jurisdiction over

---

[8]The statute preceded France's reacquisition of the territory from Spain and preceded the Louisiana purchase.

[9]The Federalist No. 3, at 14-15 (John Jay) (Jacob E. Cooke ed., 1961).

[10]*Id.* at 16.

[11]James Renwick, *The Life and Work of Gladstone* 30-31 (1905); *See* Alwyn V. Freeman, *The International Responsibility of States for Denial of Justice* 1, 19-20 (1938).

matters "which involve the PEACE" because "[t]he union will undoubtedly be answerable to foreign powers for the conduct of its members. And the responsibility for an injury ought ever to be accompanied with the faculty of preventing it" since "the denial . . . of justice" is "classed among the just causes of war."[12]

Two specific violations of the law of nations within the United States compelled immediate promulgation of the Alien Tort Statute in 1789.[13] In the Marbois affair of 1784, a French national had assaulted a French consul in Philadelphia.[14] Interference with an ambassador or consul violates the law of nations, and failure to afford protection or a remedy would entitle France to a "reprisal" against the United States.[15] France lodged a diplomatic protest with the United States because the affray, on American soil, was an American responsibility. Our Articles of Confederation government lacked a national judiciary, and had to rely on Pennsylvania state courts to provide a remedy. The national government had no means of assuring that those state courts would.[16]

This problem arose again in 1787, shortly after the Constitutional Convention in Philadelphia. A New York City constable entered a Dutch diplomat's residence with a warrant for one of the diplomat's domestic servants. The Dutch government protested the violation of its sovereignty.[17] This viola-

---

[12]*The Federalist No. 80*, at 534-36 (Alexander Hamilton) (Jacob E. Cooke ed., 1961).

[13]*See Sosa v. Alvarez-Machain*, 542 U.S. 692, 716-17 (2004).

[14]*Respublica v. De Longchamps*, 1 Dall. 111, 111-12 (Pa. 1784); Letter from Thomas Jefferson to Charles Thomson (May 21, 1784), *reprinted in* IV *The Works of Thomas Jefferson* 363 (Paul Leicester Ford ed. 1894).

[15]*See* E. de Vattel, *The Law of Nations or the Principles of Natural Law Applied to the Conduct and to the Affairs of Nations and of Sovereigns*, bk. IV, §§ 80-82, at 371-72 (photo. reprint 1993) (Charles G. Fenwick trans., Carnegie Inst. of Wash., 1916) (1758).

[16]*See Sosa*, 542 U.S. at 717.

[17]*Id.*

tion of the law of nations in New York complicated our relations with the Netherlands.[18]

These violations of the law of nations occurred on American soil. That is why they required an American response to head off reprisals.[19] As Justice Stevens explained in the oral argument in *Sosa*, the "only [relevant law of nations violations the First Congress] knew about had taken place in the United States" and "[t]hey certainly would not have been concerned about an assault on the — say, the English ambassador in Paris by a Frenchman."[20]

Because these violations of the law of nations took place on American soil, American sovereignty allowed, and the law of nations required, the United States to provide an adequate means of redress.[21] The Alien Tort Statute afforded a remedy

_____

[18]*See* 34 *Journals of the Continental Congress, 1774-1789*, at 109 (Roscoe R. Hill ed., 1937).

[19]Vattel, *The Law of Nations*, bk. II, § 350, at 230 (noting that "reprisals should only be resorted to *when justice can not be otherwise obtained.* . . . Justice may be refused in several ways: (1) By an outright denial of justice or by a refusal to hear the complaints of a State or of its subjects or to allow the subjects to assert their rights before the ordinary tribunals" (emphasis added)); *see also* H.W. Halleck, *International Law*, ch. XII, § 11, at 297 (photo. reprint 2000) (1861) (noting how, in situations like those described by Vattel, "the government of the injured [foreigner] may . . . demand justice, and if it be refused, resort to reprisals . . . . Subjects must submit to the authority of the law, however great the injustice, but foreigners are under no such obligation, for their own state may, by force, compel the execution of justice on their behalf").

[20]Transcript of Oral Argument at 40 (Question of Justice Stevens), *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) (No. 03-339), *available at* http://www.supremecourt.gov/oral_arguments/argument_transcripts/03-339.pdf; *cf. Doe v. Exxon Mobil Corp.*, No. 09-7125, slip op. at 12, ___ F.3d ___, 2011 WL 2652384, at *51 (D.C. Cir. July 8, 2011) (Kavanaugh, J., dissenting) ("It would be very odd to think that the Congress of 1789 wanted to create a federal tort cause of action enforceable in [a] U.S. court for, say, a Frenchman injured in London.").

[21]*See* William Blackstone, 4 *Commentaries* *67-68 ("But where the individuals of any state violate this general law [of nations], it is then the

necessary to assure peace when the law of nations was violated within the United States.[22] The nation's security would be at risk if the state courts failed to provide appropriate remedies for violations of the law of nations occurring within their jurisdictions.[23] "The concern was that U.S. citizens might

interest as well as duty of the government, *under which they live to animadvert upon them with becoming severity, that the peace of the world may be maintained.* For in vain would nations in their collective capacity observe these universal rules, if private subjects were at liberty to break them at their own discretion, and involve the two states in a war. *It is therefore incumbent upon the nation injured, first, to demand satisfaction and justice to be done on the offender by the state to which he belongs; and, if that be refused or neglected, the sovereign then avows himself an accomplice or abettor of his subject's crime, and draws upon his community the calamities of foreign war.*" (emphasis added)); *see also De Longchamps*, 1 Dall. at 117 (paraphrasing Blackstone, "You then have been guilty of an atrocious violation of the law of nations; you have grossly insulted gentlemen, the peculiar objects of this law (gentlemen of amiable characters, and highly esteemed by the government of this State) in a most wanton and unprovoked manner: And *it is now the interest as well as duty of the government, to animadvert upon your conduct with a becoming severity, such a severity as may tend to reform yourself, to deter others from the commission of the like crime, preserve the honor of the State, and maintain peace with our great and good Ally, and the whole world.*" (emphasis added)); Vattel, *The Law of Nations*, bk. II, §§ 343, 347-50; Letter from Thomas Jefferson to James Madison (May 25, 1784), *reprinted in* IV *The Works of Thomas Jefferson* 365 (Paul Leicester Ford ed. 1904).

[22]John M. Rogers, *The Alien Tort Statute and How Individuals "Violate" International Law*, 21 Vand. J. Transnat'l L. 47, 47 (1988) ("Congress meant to grant federal jurisdiction over cases in which an individual has committed a tortious act in the United States which, if unredressed, would result in international legal responsibility on the part of the United States.").

[23]Thomas H. Lee, *The Safe-Conduct Theory of the Alien Tort Statute*, 106 Colum. L. Rev. 830, 881 (2006) ("[S]uit in domestic court for tort remedies by an alien against the one who injured his person or property was mainly a political expedient premised on the host sovereign's hope that if the alien received a speedy and fair remedy, the other sovereign might not be informed of, or act upon, the safe-conduct breach, diminishing the risk that the offended sovereign would exercise its lawful right to make war.").

engage in incidents that could embroil the young nation in war and jeopardize its status or welfare in the Westphalian system. Similarly, foreign violators, if sufficiently linked to the United States, could create an incident threatening the United States's peace."[24]

The Alien Tort Statute enables alien plaintiffs to file civil actions in federal district courts, thereby providing for federal jurisdiction regardless of whether state courts would entertain the claims. It does not say that such torts give rise to federal jurisdiction despite the absence of any American nexus — that is, when the torts are committed in other countries by and against aliens. There is no reason why it would say this, since violations of the law of nations abroad and between foreigners would have given rise to no risk of "reprisals" against the United States.

## II. The Law of Nations Prohibits Jurisdiction Over "Foreign-Cubed" Torts.

*Murray v. Schooner Charming Betsy* held in 1804 that a statute must be construed if possible to comply with, rather than violate, the law of nations.[25] "An act of Congress ought never to be construed to violate the law of nations if any other possible construction remains."[26] So, in that case, a federal

---

[24]*Ali Shafi v. Palestinian Auth.*, 642 F.3d 1088, 1099 (D.C. Cir. 2011) (Williams, J., concurring); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 783 (D.C. Cir. 1984) (Edwards, J., concurring) ("There is evidence . . . that the intent of [the Alien Tort Statute] was to assure aliens access to federal courts to vindicate any incident which, if mishandled by a state court, might blossom into an international crisis.").

[25]*Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804).

[26]*Id.*; *see also Serra v. Lappin*, 600 F.3d 1191, 1198 (9th Cir. 2010) (noting how "the purpose of the *Charming Betsy* canon is to avoid the negative 'foreign policy implications' of violating the law of nations" (quoting *Weinberger v. Rossi*, 456 U.S. 25, 32 (1982))); *United States v. Corey*, 232 F.3d 1166, 1179 n.9 (9th Cir. 2000) (highlighting how, under the doctrine, "[c]ourt[s] interpret[ ] . . . [a] statute so as to avoid embroiling the nation in a foreign policy dispute unforeseen by either the President or Congress").

law prohibiting commerce with France or its possessions was held not to apply to a Danish-owned vessel trading with and in a French possession, despite its literal applicability.[27] Because *Charming Betsy*, like our case, was "foreign-cubed," the rule of construction made the statute inapplicable.[28]

The *Charming Betsy* canon barred jurisdiction based on the most fundamental principle of the law of nations: "equality of sovereignty."[29] Equality of sovereignty requires that every sovereign is to be treated as the equal of every other in its entitlement to govern persons within its own territory.[30] "Under international law, a state has . . . sovereignty over its territory,"[31] which "implies a state's lawful control over its territory generally *to the exclusion of other states*, authority to govern in that territory, and authority to apply law there."[32] It means that Papua New Guinea, not the United States, is enti-

---

[27]*Charming Betsy*, 6 U.S. (2 Cranch) at 120-21.

[28]*Id.*; Curtis A. Bradley, *The Charming Betsy Canon and Separation of Powers: Rethinking the Interpretive Role of International Law*, 86 Geo. L.J. 479, 489 (1998) ("[C]ourts often invoke the *Charming Betsy* canon as a reason for construing ambiguous statutes as not having extraterritorial effect.").

[29]*See* Robert H. Jackson, *Quasi-States: Sovereignty, International Relations, and the Third World* 6 (1990) ("The *grundnorm* of such a political arrangement (sovereign statehood) is the basic prohibition against foreign intervention which simultaneously imposes a duty of forbearance and confers a right of independence on all statesmen.").

[30]*See, e.g.*, Louis Henkin, *International Law: Politics and Values* 29 (1995); *Developments in the Law — Extraterritoriality*, 124 Harv. L. Rev. 1226, 1280 (2011) ("Traditionally, a state may exercise prescriptive jurisdiction over only three types of conduct: conduct that takes place within its territory, conduct of its nationals, and foreign conduct meant to have an effect within its territory or directed against its security. Any other application of a state's domestic law abroad is considered a violation of international law; states are supposed to respect each other's exclusive authority to regulate behavior within their territorial boundaries." (citations omitted)).

[31]*Restatement (Third) of Foreign Relations Law* § 206(a) (1987).

[32]*Id.* at § 404 cmt. b.

tled to govern conduct by non-Americans in Papua New Guinea, just as the United States may govern in the fifty U.S. states.[33] What little authority there is for one world state to impose a law having effect in another has generally been limited to circumstances where the conduct affects its own citizens or interests.[34]

This bedrock principle stems from the settlement of the Thirty Years' War by the Peace of Westphalia in 1648. The purpose of the principle is to reduce pretexts for wars.[35] The principle of equal sovereignty compels the corollary that one sovereign cannot exercise authority over conduct within another sovereign's territory.[36] As Chief Justice Marshall

---

[33]*See Restatement (Third) of Foreign Relations Law* pt. IV, ch. 1, introductory note at 235 (1987) ("International law has long recognized limitations on the authority of states to exercise jurisdiction to prescribe in circumstances affecting the interests of other states."); *Restatement (Second) of Foreign Relations Law* § 8 (1965) ("Action by a state in prescribing or enforcing a rule that it does not have jurisdiction to prescribe or jurisdiction to enforce, is a violation of international law . . . .").

[34]*See id.* at § 402; *cf.* U.N. Charter art. 2. para. 7 ("Nothing contained in the present Charter shall authorize the United Nations to intervene in matters which are essentially within the domestic jurisdiction of any state . . . ."); William R. Slomanson, *Fundamental Perspectives on International Law* § 5.1, at 240 (6th ed. 2011).

[35]At the core of Westphalian sovereignty are the twin legal principles of *rex est imperator in regno suo* ("the king rules as an emperor in his own realm"), see Daniel H. Nexon, *Discussion: American Empire and Civilizational Practice*, in *Civilizational Identity* 112 (Martin Hall & Patrick Thaddeus Jackson eds., 2007), and *cuius regio, eius religio* ("each king determines the religion of his realm"), which were the fundamental bases of international law in the eighteenth century. *See* James Mayall, *World Politics* 14-16 (2000); Kalevi J. Holsti, *Peace and War* 34-35 (1991).

[36]*Island of Palmas* (Neth. v. U.S.), 2 R.I.A.A. 829, 838 (Perm. Ct. Arb. 1928) ("Sovereignty in the relations between States signifies independence. Independence in regard to a portion of the globe is the right to exercise therein, to the exclusion of any other State, the functions of a State. The development of the national organisation of States during the last few centuries and, as a corollary, the development of international law, have established this principle of the exclusive competence of the State in regard to its own territory . . . ."); *cf. also Corfu Channel* (U.K. v. Alb.), 1949 I.C.J. 4, 35 (Apr. 9) ("Between independent States, respect for territorial sovereignty is an essential foundation of international relations.").

wrote in *The Antelope*: "No principle of general law is more universally acknowledged, than the perfect equality of nations . . . . It results from this equality, that no one can rightfully impose a rule on another. Each legislates for itself, but its legislation can operate on itself alone."[37] *The Schooner Exchange v. McFaddon* held that the "full and absolute territorial jurisdiction being alike the attribute of every sovereign, [it is] incapable of conferring extra-territorial power . . . ."[38]

*Sosa v. Alvarez-Machain* reaffirms the vitality of this principle by confirming the continuing authority of Vattel's *The Law of Nations* as an authoritative source for determining the intent of the Alien Tort Statute.[39] Vattel is an authority because the First Congress relied on him.[40] Vattel states that "sovereignty carries with it a right . . . over all property, public, common, and private; it is the right of sovereign control over all parts of the territory belonging to the Nation . . . . Whatever takes place there is subject to his authority."[41] The point emphasized repeatedly by jurists and scholars is that, in the absence of a clear congressional declaration to the contrary, federal courts should not "pretend[ ] to be the *custos morum* of the whole world."[42]

---

[37]*The Antelope*, 23 U.S. (10 Wheat.) 66, 122 (1825).

[38]*The Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 137 (1812).

[39]*Sosa v. Alvarez-Machain*, 542 U.S. 692, 714-16, 723-24 (2004).

[40]*See U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 462 n.12 (1978) (citing 1 J. Kent, *Commentaries on American Law* 18 (1826)) ("The international jurist most widely cited in the first 50 years after the Revolution was Emmerich de Vattel."); *see also Restatement (Third) of Foreign Relations Law*, pt. I, ch. 1, reporters' note at 21 (1987).

[41]*See, e.g.*, E. de Vattel, *The Law of Nations or the Principles of Natural Law Applied to the Conduct and to the Affairs of Nations and of Sovereigns*, bk. I, § 245, at 96 (photo. reprint 1993) (Charles G. Fenwick trans., Carnegie Inst. of Wash., 1916) (1758).

[42]*United States v. the La Jeune Eugenie*, 2 Mason 409, 26 F. Cas. 832, 847 (C.C.D. Mass. 1822) (No. 15,551) (Story, J.).

Recently, some advocacy groups have found receptiveness in Europe toward universal jurisdiction over unpopular foreign officials accused of war crimes and other offenses against the law of nations.[43] But even such aggressive claims as the recently-stayed case in Spain against former U.S. executive officials for alleged war crimes in Guantanamo and Iraq are criminal prosecutions, not private tort cases.[44] These criminal cases depend on decisions by government prosecutors and their supervisors, who may, unlike private plaintiffs, be subject to their governments' judgments about diplomatic consequences. And despite these aggressive assertions of judicial power, there is no consensus that universal jurisdiction exists for private civil claims.[45] The majority's assertion of universal jurisdiction over private claims, unlike executive branch decisions, can embroil our country in diplomatic and military disputes entirely unchecked by the elected branches of our government.

In the United States, the source of this new judicial aggressiveness is our sister circuit's decision in *Filartiga v. Pena-Irala*.[46] *Filartiga* held that a Paraguayan permanent resident

---

[43]*See, e.g.*, *Guatemala Genocide Case*, STC, Sept. 26, 2005 (S.T.C. No. 237/2005, § II) (Spain).

[44]*See, e.g.*, Juzgado Central de Instrucción N 6, Audiencia Nacional, Madrid (Spanish High Court), decision (auto) of 13 April 2011, Preliminary Investigations (diligencias previas) 134/09-N (Spain), at 1.

[45]*Compare Arrest Warrant of 11 Apr. 2000*, 2002 I.C.J. at 77 (joint separate opinion of Higgins, Kooijimans, and Buergenthal, JJ.); *Jones v. Kingdom of Saudi Arabia*, [2006] UKHL 26, paras. 20, 22, [2007] 1 A.C. 270, 286-87 (Lord Bingham of Cornhill) (appeal taken from Eng.); *Bouzari v. Islamic Republic of Iran* (2004), 71 O.R.3d 675, paras. 93-94 (Can. Ont. C.A.) (rejecting a foreign-cubed civil case for torture by Iranian agents, noting that "[t]he peremptory norm of prohibition against torture does not encompass the civil remedy contended for by the appellant"), *with Ferrini v. Repubblica Federale di Germania*, Cass., sez. un., 11 mar. 2004, n.5044, para. 9 (It.), *reprinted in* 87 Rivista di Diritto Internazionale 539, 546 (2004); *Prefecture of Voiotia v. Federal Republic of Germany*, Areios Pagos [A.P.] [Supreme Court] 11/2000 (Greece).

[46]*Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980).

alien living in the United States could sue another Paraguayan also living in the United States for torture in Paraguay. The language in *Filartiga* most supportive of the majority's decision in the case at bar is this assertion of a broad principle: "It is not extraordinary for a court to adjudicate a tort claim arising outside of its territorial jurisdiction."[47] *Filartiga*, unlike our majority, immediately qualifies this broad principle in the next sentence: "A state or nation has a legitimate interest in the orderly resolution of disputes among those within its borders . . . ,"[48] as plaintiff and defendant were in that case. *Filartiga* further qualifies its decision by giving effect to Paraguayan law.

*Filartiga*, though, does invite the broader reading our majority gives it, by quoting (out of context) as its chief authority for such universal jurisdiction two sentences from *Mostyn v. Fabrigas*[49] in 1774, saying that actions may be brought in England "though the matter arises beyond the seas." The Second Circuit overlooked the rest of *Mostyn*. The case arose in Minorca, one of the Balearic Islands in the Mediterranean, which had become a British possession in 1713. Mostyn sued the Governor General of Minorca, a British official, for wrongfully beating and falsely imprisoning him. Central to *Mostyn*'s reasoning was that Minorca was ceded to the Crown of Great Britain by the Treaty of Utrecht.[50] The case turned on whether the governor general had abused "the authority delegated to him by the King's letters patent."[51] Lord Mansfield wrote that "the Privy Council determines all cases that arise in "the plantations [such as the American colonies], in Gibralter, or Minorca, in Jersey, or Guernsey."[52]

---

[47]*Id.* at 885.

[48]*Id.*

[49]*Mostyn v. Fabrigas*, 98 Eng. Rep. 1021, 1027, 1 Cowp. 161 (K.B. 1774) (on appeal from Court of Common Pleas) (Lord Mansfield).

[50]*Id.* at 1022.

[51]*Id.* at 1028.

[52]*Id.*

Thus, the case was not foreign-cubed at all. It was not a case arising offshore, but within the British Empire against a British official.[53] *Slater v. Mexican National Railroad Co.* cites *Mostyn* in holding that a Texan may sue for an injury in Mexico by a Colorado company.[54] There is nothing foreign-cubed about *Mostyn* or *Slater*. Congress has subsequently expressly conferred universal jurisdiction on American courts for torture abroad,[55] vitiating any question about whether the *Filartiga* result stands, but Congress has not conferred universal jurisdiction for the torts to which our majority applies it.[56]

Judges of the International Court of Justice,[57] British law lords, and jurists around the world have lamented the aggressive claims to rule the world by courts claiming universal jurisdiction. "It is not for a national court to 'develop' international law by unilaterally adopting a version of that law which, however desirable, forward-looking and reflective of values it may be, is simply not accepted by other states."[58]

---

[53]*Id.* at 1030.

[54]194 U.S. 120, 126-27 (1904).

[55]*See* Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

[56]I recognize that the reasoning of *Filartiga* has recently been followed, I think mistakenly, by the majority in *Doe v. Exxon Mobil Corp.*, No. 09-7125, ___ F.3d ___, 2011 WL 2652384 (D.C. Cir. July 8, 2011), and by the Seventh Circuit in *Flomo v. Firestone Natural Rubber Co., LLC*, 643 F.3d 1013 (7th Cir. 2011). Although I disagree with such reasoning, both decisions provide inadequate support for the plaintiffs in this case, because neither was foreign-cubed.

[57]*Arrest Warrant of 11 Apr. 2000* (Dem. Rep. Congo v. Belg.), 2002 I.C.J. 3, 77 (Feb. 14) (joint separate opinion of Higgins, Kooijimans, and Buergenthal, JJ.) ("Under the Alien Tort [Statute], the United States . . . has asserted a jurisdiction both over human rights violations and over major violations of international law, perpetrated by non-nationals overseas. . . . While this unilateral exercise of the function of guardian of international values has been much commented on, *it has not attracted the approbation of States generally*." (emphasis added)).

[58]*Jones v. Kingdom of Saudi Arabia*, [2006] UKHL 26, para. 63, [2007] 1 A.C. 270, 298 (Lord Hoffman) (appeal taken from Eng.).

Though *Filartiga* and its recent companions claim to embrace international law, they defy its most fundamental principle, equality of sovereignty. Imposition of putative international norms in foreign-cubed cases by American courts is "contrary to customary international law."[59] American judges purporting to implement customary international law have not addressed these criticisms from judges in other countries.

Congress has never given us "a clear mandate" for the wrongs alleged in the complaint before us.[60] *Sosa* did not open the door to our unconsented entry. The Court suggested that there may be some international norms that violate the law of nations in addition to piracy, safe conducts, and assaults against ambassadors, but warned courts to be cautious in creating new claims.[61] *Filartiga* argues for jurisdiction over torture in a foreign state partly on the grounds that torture violates Paraguayan law, and mistakenly analogizes torturers to pirates.[62] But the plaintiffs here do not plead that Rio Tinto violated Papua New Guinean law. We have absolutely no indication in the record or in the majority decision of how the sovereign state of Papua New Guinea interprets its laws as applied to Rio Tinto's activities. We do not even have a clear decision on who is the sovereign authority in the relevant area, since that is a delicate matter between the government of Papua New Guinea and the newly autonomous government of Bougainville.

The Second Circuit now acknowledges that "the class of crimes subject to universal jurisdiction traditionally included

---

[59]*Id.* at paras. 58, 99 (echoing the criticism of Judges Higgins, Kooijimans, and Buergenthal of the International Court of Justice by characterizing Filartiga as "a unilateral extension of jurisdiction by the United States").

[60]*Sosa v. Alvarez-Machain*, 542 U.S. 692, 728 (2004).

[61]*Id.* at 730.

[62]*Filartiga v. Pena-Irala*, 630 F.2d 876, 890 (2d Cir. 1980).

only piracy."[63] The only wrong the First Congress could have possibly contemplated as providing for universal jurisdiction would have been piracy.[64] But imaginative speculation about how legislators in 1789 may have felt about piracy cannot expand the Alien Tort Statute's reach to entirely foreign disputes that bear no relation whatsoever to piracy.[65] Twenty-first-century preferences regarding universal jurisdiction and war crimes do not shed light on the congressional intent underlying an eighteenth-century statute.[66]

---

[63]*United States v. Yousef*, 327 F.3d 56, 104 (2d Cir. 2003).

[64]*United States v. Layton*, 509 F. Supp. 212, 223 (N.D. Cal. 1981) ("[Universal] jurisdiction had its origins in the special problems and characteristics of piracy. It is only in recent time that nations have begun to extend this type of jurisdiction to other crimes."); *compare Restatement (Second) of Foreign Relations Law* § 404 (1965) (including piracy as the only universally cognizable offense), *with Restatement (Third) of Foreign Relations Law* § 404 (1987) (listing several other offenses, such as war crimes, the slave trade, and apartheid, as "universal"); *see also R v. Bow St. Metro. Stipendiary Magistrate, ex parte Pinochet Ugarte (No. 3)*, [2000] 1 A.C. 147 (H.L.) (appeal taken from Q.B. Div'l Ct.) (U.K.), *reprinted in* 38 I.L.M. 581 (1999) (holding that it was the United Kingdom's ratification of the Convention Against Torture in 1988 that allowed for the acts of torture committed under Pinochet to be extraditable offenses, and not necessarily a *jus cogens* peremptory norm before the date of the convention's ratification).

[65]*Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909 (9th Cir. 2011), takes this mistaken course by conflating the intentions of the First Congress's drafting of the Alien Tort Statute in 1789 with that of the 102nd Congress in 1992, codifying *Filartiga*'s result in the Torture Victim Protection Act of 1991. *Contra United States v. Price*, 361 U.S. 304, 313 (1960) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.").

[66]*See Minor v. Mechanics Bank of Alexandria*, 26 U.S. (1 Pet.) 46, 64 (1828) ("But no general rule can be laid down upon this subject, further than that that exposition ought to be adopted in this, as in other cases, which carries into effect the true intent and object *of the legislature in the enactment*." (emphasis added)); *see also* John O. McGinnis, *Foreign to Our Constitution*, 100 Nw. U. L. Rev. 303, 307 n.22 (2006) ("[D]efenders of the use of contemporary international law want to use evolving standards of an international law that has grown in scope to become a kind of local municipal law and changed in nature from natural to positive law. In this respect, modern international law does not resemble the law of nations known to the Framers.").

### III. Absence of Affirmative Intent Clearly Expressed.

*Sosa* adds another reason why courts must be especially restrained in expanding the meaning of the "law of nations": the political nature of the concerns raised. *Sosa* holds that there is a "high bar to new private causes of action for violating international law, for the potential implications for the foreign relations of the United States of recognizing such causes should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs."[67] Therefore, courts are required to be especially careful to not disregard the principle of equal sovereignty when interpreting statutes.[68]

Because of the delicacy of potential disruption of foreign relations, the rule is that a statute may be given extraterritorial effect only if Congress provides "clear expression" of an "affirmative intent." "For us to run interference in such a delicate field of international relations there must be present the affirmative intention of the Congress clearly expressed. It alone has the facilities necessary to make fairly such an important policy decision where the possibilities of international discord are so evident . . . ."[69]

Of course, as with most principles, there are exceptions. The new heights of inhumanity achieved by Germany from 1933 to 1945 compelled a new look at the Westphalian principle.[70] The law of nations, as currently understood, does indeed

---

[67] *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004).

[68] *See Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 146-47 (1957). In fact, the very hint of a federal court exercising universal jurisdiction in the early nineteenth century complicated our nation's diplomacy with France. *See United States v. the La Jeune Eugenie*, 2 Mason 409, 26 F. Cas. 832, 840-41 (C.C.D. Mass. 1822) (No. 15,551) (Story, J.).

[69] *Benz*, 353 U.S. at 147.

[70] Arguably, though, the Nuremberg trials were consistent with equality of sovereignty, because, having destroyed the German government and replaced it with government by the Allies, the Allies were sovereign in Germany after the war.

allow interference with another nation's sovereignty to prevent certain wrongs, such as genocide and slavery.[71] Even for genocide and slavery, the decision whether to afford remedies rests with the executive and legislative branches. Our government may, consistently with the law of nations, remedy such violations, but that does not imply equal authority in the courts, in the absence of clear expression by the political branches to confer that authority. Sometimes the political organs of government make political decisions to do nothing, as with genocide in Rwanda and slavery in the Sudan in recent years. The bedrock principle of equality of sovereignty is not an absolute prohibition on government violation of another country's sovereignty, but it does impose a strong presumption against inferring judicial authority from a statute not clearly expressing an intent to confer it. The Court has characterized this presumption against extraterritoriality as "[t]he presumption that United States law governs domestically but does not rule the world . . . ."[72]

That the law of nations may be violated is necessary but not sufficient for jurisdiction. Even assuming that the presumption against extraterritoriality is rebuttable and that the complaint sufficiently pleads violations of the law of nations by Rio Tinto, we still lack the clear expression of an affirmative intent by Congress sufficient to enable the judiciary to act in violation of the principle of equal sovereignty. "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree."[73] Consequently, even if the law of nations, the General Assembly of the United Nations, and the United Nations Security Council were to authorize

---

[71]*See Restatement (Third) of Foreign Relations Law* § 404 (1987).

[72]*Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007).

[73]*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *See, e.g.*, *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 696 (2006).

"all necessary measures"[74] against Papua New Guinea and Rio Tinto for depredations in Bougainville (which they have not), a federal court would still need a congressional grant of jurisdiction under Article III to join the crusade. That grant of jurisdiction is lacking in this case, because the Alien Tort Statute does not clearly express an intent that it should be applied within the territory of another sovereign nation where there is no American connection.

*Morrison* reaffirms the long-standing canon of construction against implied extraterritoriality: "When a statute gives no clear indication of an extraterritorial application, it has none."[75] Since the Alien Tort Statute gives no such "clear indication," it has no application to "foreign-cubed" cases such as this one. The statute does not say or imply "wherever such violation may occur." The authority of American courts does not generally extend to all heinous wrongs committed by anyone, against anyone, anywhere in the world. That is so even if the wrongs are so heinous that no civilized person could think them tolerable, and even if the wrongs violated the law of nations and could justify a legislative and executive decision to remedy them.

Ambiguous statutory language is not enough to get around *Morrison*'s "bright line rule"[76] and the *Charming Betsy* canon

---

[74]S.C. Res. 1973, ¶ 4, U.N. SCOR, 66th Year, U.N. Doc. S/RES/1973, at 3 (Mar. 17, 2011).

[75]*Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869, 2878 (2010); *see Smith v. United States*, 507 U.S. 197, 203-04 (1993); *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 173-74 (1993); *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 109 (1991); *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991); *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21-22 (1963); *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 146-47 (1957); *United States v. Spelar*, 338 U.S. 217, 222 (1949); *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949); *United States v. Bowman*, 260 U.S. 94, 97-98 (1922).

[76]*Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 32 (2d Cir. 2010) (per curiam).

of construction. *F. Hoffman-LaRoche Ltd. v. Empagran S.A.*[77] holds that federal courts should "ordinarily construe[ ] ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations."[78] In *Hoffman-LaRoche*, the statute could be read to apply in favor of class-action plaintiffs alleging anticompetitive conduct by foreign companies affecting foreign purchasers. But the Court held that it could not be read to apply extraterritorially.[79] Likewise, even though the Alien Tort Statute does not expressly prohibit application to foreign-cubed wrongs, we may not apply it "to foreign conduct insofar as that conduct causes independent foreign harm and that foreign harm alone gives rise to the plaintiff's claim . . . ."[80] The majority acts contrary to *Sosa*, *Morrison*, and *Hoffman-LaRoche*.

We can see from other statutes what "clear indication[s]" of extraterritorial application look like. The Torture Victim Protection Act of 1991 gives the district courts jurisdiction over aliens' claims for torture and extrajudicial killing. The clearly expressed intent that it apply extraterritorially is its requirement of exhaustion of remedies "in the place in which the conduct giving rise to the claim occurred."[81] This is "a clear mandate . . . providing authority that 'establish[es] an unambiguous and modern basis for' federal claims of torture and extrajudicial killing."[82] *Sosa* goes out of its way to reject

---

[77]*F. Hoffman-LaRoche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004).

[78]*Id.*; *see also ARC Ecology v. U.S. Dep't of Air Force*, 411 F.3d 1092, 1102-03 (9th Cir. 2005) ("[A]ccepting the appellants' broad interpretation of the statute would be the equivalent of forcing the United States to encroach on the territory and affairs of another sovereign.").

[79]*F. Hoffman-LaRoche*, 542 U.S. at 174.

[80]*Id.* at 165.

[81]Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

[82]*Sosa v. Alvarez-Machain*, 542 U.S. 692, 728 (2004) (quoting H.R. Rep. No. 102-367, pt. 1, p.3 (1991)).

any general implication that "other norms that already exist or may ripen in the future into rules of customary international law" provide a basis for jurisdiction over lawsuits: "Congress as a body has done nothing to promote such suits."[83]

Likewise, the Foreign Corrupt Practices Act prohibits foreign companies listed on an American stock exchange from "corruptly do[ing] any act outside the United States" in furtherance of foreign bribery.[84] The language "outside the United States" plainly and expressly provides for extraterritorial application. No such language suggesting extraterritorial application was included in the Alien Tort Statute. Congress has from time to time amended the Alien Tort Statute, but has refrained from adding any expression of an intent that it apply extraterritoriality.[85]

The majority infers a "clear indication" of applicability inside the territory of foreign countries from (1) jurisdiction over claims by non-citizens, (2) reference to the law of nations, which sounds international, and (3) applicability to piracy.[86] None of these support the inference. The first merely addresses claims arising from conduct within American territory, such as the assault by a French citizen against a French consul in Philadelphia in the Marbois affair. The second refers to the source of law, "the law of nations," not the location of the wrong. The third, piracy, is addressed below. There is no superfluity in granting a federal remedy for torts within the

---

[83]*Id.* In this respect, I disagree with the majority and its reliance on *Doe v. Exxon Mobil Corp.*, No. 09-7125, slip op., ___ F.3d ___, 2011 WL 2652384 (D.C. Cir. July 8, 2011). The defendant in that case was an American corporation. It was not a foreign-cubed case, as this one is.

[84]Foreign Corrupt Practices Act of 1977, 15 U.S.C. § 78dd-2.

[85]*See* Act of Mar. 3, 1911, ch. 231, § 24, 36 Stat. 1087, 1093 (1911); Rev. Stat. § 563 (1874).

[86]Maj. op. at 19335-36.

United States that state courts and federal courts might otherwise be unable to address.[87]

The advisory opinion by Attorney General William Bradford cited by Judge McKeown does not support a contrary view. Attorney General Bradford's opinion related to the Jay Treaty, so it concerned the Alien Tort Statute's treaty provision, not, as in this case, the "law of nations." And it spoke to Americans' actions abroad, not foreign-cubed cases such as this. The treaty required punishment of American citizens acting on commission from enemies of Great Britain (France) against British subjects.[88] Had federal courts denied alien plaintiffs a venue for the actions committed in violation of the law of nations by Americans abroad, the denial would have resulted in "denial of justice" justifying reprisals, which was what the First Congress intended to avoid.[89] Attorney General Bradford's opinion does not support federal jurisdiction under the Alien Tort Statute for foreign-cubed cases.[90]

To give a "clear indication" of extraterritorial application, the statute would have to address *where* the tort was committed. It merely addresses what may constitute the tort, and gives no indication, let alone a clear expression of one, that the federal courts were to wield their swords in foreign countries for wrongs having nothing to do with our new country. *Morrison* implicitly rejects the Second Circuit's "disregard of the presumption against extraterritoriality" and the misguided belief that it is "left to the court[s] to 'discern' whether Con-

---

[87]*Flomo v. Firestone Natural Rubber Co., LLC*, 643 F.3d 1013, 1019 (7th Cir. 2011), errs in this respect.

[88]*Compare Treaty of Amity, Commerce and Navigation, U.S.-Gr. Brit.*, arts. 21-22, 8 Stat. 116 ("Jay Treaty") (ratified on June 24, 1795), *with* 1 Op. Att'y Gen. 57, 58-59 (July 6, 1795).

[89]*See* Jay Treaty, 8 Stat. 116, art 22; Thomas H. Lee, *The Safe-Conduct Theory of the Alien Tort Statute*, 106 Colum. L. Rev. 830, 881 n.265 (2006).

[90]*See* Lee, *The Safe-Conduct Theory*, 106 Colum. L. Rev. at 881.

gress would have wanted the statute to apply" if a statute "is silent as to . . . extraterritorial application."[91]

## IV.  Piracy.

I have assumed for purposes of discussion that the complaint alleges violations of the law of nations, but do not mean to suggest that it really does. The Court held in *Sosa v. Alvarez-Machain* that "federal courts should not recognize private claims under federal common law [in the context of the Alien Tort Statute] for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when [the Alien Tort Statute] was enacted."[92] The Court delineated this "narrow set of violations"[93] as "Blackstone's three primary offenses: violation of safe conducts, infringement of the rights of ambassadors, and piracy."[94] Nothing like these three torts is pleaded. The Court left open the possibility of stepping out of this "narrow set,"[95] but cautioned that "[s]ince many attempts by federal courts to craft remedies for the violation of new norms of international law would raise risks of adverse foreign policy consequences, they should be undertaken, if at all, with great caution."[96] The required "great caution" is absent from the majority's invitation to class action tourists seeking to litigate entirely foreign wrongs.[97]

---

[91]*Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869, 2877-78 (2010).

[92]*Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004).

[93]*Id.* at 715.

[94]*Id.* at 724-25.

[95]*Id.* at 715; *see also id.* at 762 (Breyer, J., concurring).

[96]*Id.* at 727-28.

[97]*Cf. Ali Shafi v. Palestinian Auth.*, 642 F.3d 1088, 1094 (D.C. Cir. 2011) ("[T]he proposition advanced by the appellants before us could open the doors of the federal courts to claims against nonstate actors anywhere in the world alleged to have cruelly treated any alien. To recognize such a sweeping claim would hardly be consistent with the standards of caution mandated by the *Sosa* Court.").

One of the three violations of the law of nations laid down by Blackstone, as noted in *Sosa*, was piracy.[98] This is an extraterritorial wrong cognizable under the Alien Tort Statute. *Sosa* holds that Congress meant to include piracy in the statute because piracy gave rise to actionable private claims for violation of the law of nations in the eighteenth century.[99] That does not support an inference that other heinous conduct was included.

There are two kinds of extraterritoriality: conduct outside the territory of any state, and conduct outside our territory but within the territory of another state. Piracy, by definition, falls within the first, not the second, kind of extraterritoriality. It occurs outside the territory of any state, so any state can grant a remedy without impinging on the sovereignty of another state. Though some wrongs are as abhorrent as piracy, and some are considerably worse, that does not imply that wrongs as bad as or worse than piracy may be remedied when they occur in a foreign state. "[U]niversal jurisdiction is accepted in cases of piracy because piracy is carried out on the high seas, outside all State territory" so it is traditionally the "one case of universal jurisdiction."[100] The extraterritoriality of the wrong is why universal jurisdiction has always applied to piracy,[101] and why it is a *sui generis* exception to the presumption against extraterritoriality.[102]

---

[98]*Sosa v. Alvarez-Machain*, 542 U.S. 692, 715 (2004) (citing William Blackstone, 4 *Commentaries* *68).

[99]*Id.* at 719.

[100]*Arrest Warrant of 11 Apr. 2000* (Dem. Rep. Congo v. Belg.), 2002 I.C.J. 3, 37-38 (Feb. 14) (separate opinion of Pres. Guillaume).

[101]*See United States v. Shi*, 525 F.3d 709, 722-23 (9th Cir. 2008).

[102]*S.S. Lotus* (Fr. v. Turk.), 1927 P.C.I.J. (ser. A) No. 10, at 70 (Sept. 7) (Moore, J., dissenting) ("Piracy by law of nations, in its jurisdictional aspects, is *sui generis*. Though statutes may provide for its punishment, it is an offence against the law of nations; and as the scene of the pirate's operations is the high seas, which it is not the right or duty of any nation to police, he is denied the protection of the flag which he may carry . . . .").

Piracy was not, when the Alien Tort Statute was promulgated, and is not now, considered morally heinous beyond other crimes. It consists of robbery, kidnapping, murder, and related felonies committed on the high seas.[103] Blackstone said that piracy consists of "those acts of robbery and depredation upon the high seas which, if committed upon land, would have amounted to felony there."[104] "[P]irates have always been compared to robbers. The only difference between them is, that the sea is the theatre of action for the one, and the land for the other."[105] Piracy's defining characteristic is not its heinousness, but that it occurs outside any nation's sovereign territory.[106] All states have concurrent jurisdiction over piracy on the high seas, and no state has sovereignty over the high seas, so any state may act against pirates without violating the sovereignty of any other.[107]

The First Congress defined piracy in 1790, a year after promulgating the Alien Tort Statute, as "murder or robbery, or any other offence, which, if committed within the body of a county, would, by the laws of the United States, be punishable with death" as long as it was committed "upon the high seas,

---

[103]*United States v. Smith*, 18 U.S. (5 Wheat.) 153, 176 (1820) (quoting William Blackstone, 4 *Commentaries* *71, 73).

[104]William Blackstone, 4 *Commentaries* *72; *see also* 2 M.D.A. Azuni, *The Maritime Law of Europe*, ch. V, § 3, at 351 (William Johnson trans., Isaac Riley & Co., 1806) (1795).

[105]*Smith*, 18 U.S. (5 Wheat.) at 163 n.h.

[106]*Arrest Warrant of 11 Apr. 2000* (Dem. Rep. Congo v. Belg.), 2002 I.C.J. 3, 56 (Feb. 14) (declaration of Ranjeva, J.) ("[S]ince piracy by definition involves the pirates' denial and evasion of the jurisdiction of any State system, the exercise of universal jurisdiction enables the legal order to be re-established. . . . [T]he conferring of universal jurisdiction on national courts to try pirates and acts of piracy is explained by the harm done to the international system of State jurisdiction. The inherent seriousness of the offence has, however, not been deemed sufficient *per se* to establish universal jurisdiction.").

[107]*Smith*, 18 U.S. (5 Wheat.) at 176; *R v. Dawson*, 8 William III, 1696, 13 How. St. Tr. 451, 455.

or in any river, haven, basin or bay, out of the jurisdiction of any particular state."[108] The phrase "out of the jurisdiction of any state" is the critical element of the crime for purposes of extraterritorial applicability. The current version of this statute likewise criminalizes "piracy, as defined by the law of nations" when committed "on the high seas."[109]

That the location, and not the heinousness, is what justifies universal jurisdiction should be obvious even without knowledge of the traditional understanding that "piracy was listed as the only universally cognizable offense."[110] If a gang of Somalis takes control of a ship on the high seas, holding the ship, its crew, and its passengers for ransom, forcibly taking the passengers' property and killing its captain, they have committed piracy and federal courts in the United States may exercise criminal and civil jurisdiction.[111] Now suppose the very same Somali gang assembles in Rotterdam, takes over a Dutch factory, kills the factory manager, and holds the Dutch factory workers for ransom and takes their property. The law of nations provides for universal jurisdiction over the gang when they act on the high seas, but not when they act in Rotterdam. Despite committing the same crimes as when they were pirates on the high seas, the gang cannot be prosecuted in the United States for their crimes in Rotterdam. To do so would itself be an American violation of the law of nations, because our prosecution (which might include capital punishment, abhorred by the Dutch) would impinge on Dutch sovereignty.[112] "The courts of no country execute the penal laws of another."[113]

---

[108]1 Stat. 113, ch. 9, § 8 (1790).

[109]18 U.S.C. § 1651.

[110]Eugene Kontorovich, *The Piracy Analogy: Modern Universal Jurisdiction's Hollow Foundation*, 45 Harv. Int'l L.J. 183, 184 n.8 (2004).

[111]*See United States v. Shi*, 525 F.3d 709 (9th Cir. 2008).

[112]*See Arrest Warrant of 11 Apr. 2000* (Dem. Rep. Congo v. Belg.), 2002 I.C.J. 3, 43-44 (Feb. 14) (separate opinion of Pres. Guillaume).

[113]*The Antelope*, 23 U.S. (10 Wheat.) 66, 123 (1825).

## V. Injudicious Imperialism.

Our decision makes the Ninth Circuit the best place in the world to bring class actions against deep-pocket private defendants to recover compensatory and punitive damages and attorneys' fees for the evils so prevalent all over the world. This claim of supervisory authority over the entire planet is unwise as well as legally incorrect.

First, as has already been addressed, our decision has no support in the law of nations. On the contrary, our decision undermines it. Even the Second Circuit would dismiss this case.[114] When the District of Columbia Circuit faced some of the same questions for foreign-cubed human rights claims in *Tel–Oren v. Libyan Arab Republic*[115] and *Ali Shafi v. Palestinian Authority*,[116] all three judges on each panel agreed that the suit was properly dismissed for lack of jurisdiction, albeit on differing grounds. The fractured opinions when circuit courts, ours and others, address extraterritorial jurisdiction under the Alien Tort Statute are themselves strong evidence of the absence of any established body of useful precedent.[117] No other circuit has opened the door so wide as we now do for

---

[114]*Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 120 (2d Cir. 2010).

[115]*Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984).

[116]*Ali Shafi v. Palestinian Auth.*, 642 F.3d 1088 (D.C. Cir. 2011)

[117]*Compare id.* at 1092 ("In short, the *Tel-Oren* court . . . provided support for the proposition that torture claims against nonstate actors were not within the jurisdictional grant of the A[lien ]T[ort ]S[tatute]. . . . The relevant events between 1984 and today not only do not change our decision from the one entered in *Tel-Oren*, but support a continuation of that precedent."), *with Doe v. Exxon Mobil Corp.*, No. 09-7125, slip op. at 12-29, ___ F.3d ,___ 2011 WL 2652384, at *5-11 (D.C. Cir. July 8, 2011) (applying the Alien Tort Statute to nonstate actors for torture committed in Indonesia). The majority and Judge McKeown's reliance on *Doe*, Maj. op. at 19335, McKeown op. at 19399-19402, should be tempered by the fact that the defendant in that case, unlike the defendant in this case, was an American corporation.

private tort actions for wrongs by foreigners, to foreigners, in foreign lands. Our course is contrary to the "vigilant doorkeeping" that *Sosa v. Alvarez-Machain* requires.[118] We may use forum non conveniens in the future to limit the harm,[119] but we have no authority to exercise jurisdiction at all.

Second, the majority confuses what the United States may properly do under customary international law with what the First Congress gave American courts jurisdiction to do. The United States may, in accord with contemporary views of international law, act in other states' sovereign territory against many human rights violations, such as genocide.[120] Congress may have authority to confer universal jurisdiction over some foreign-cubed human-rights violations, and has done so with respect to torture.[121] It is careless error, though, to infer that anything the elected branches may do, a court has jurisdiction to do. Whether Congress may, consistently with the law of nations, grant universal jurisdiction to a federal court is a different question from whether it has done so. The majority misses that distinction.[122] In foreign affairs, the error is not only careless but dangerous.

---

[118]*Sosa v. Alvarez-Machain*, 542 U.S. 692, 729 (2004).

[119]*Loya v. Starwood Hotels*, 583 F.3d 656, 665-66 (2009) (affirming dismissal for forum non conveniens against an American plaintiff suing an American defendant); *cf. Bil'in (Vill. Council) v. Green Park Int'l Ltd.*, 2009 QCCS 4151 (Can. Qué. Sup. Ct.), para. 335, *aff'd*, 2010 QCCA 1455 (Can. Qué. C.A.) (dismissing a suit brought by residents of a village in the West Bank against a Canadian company constructing buildings there on forum non conveniens grounds because "the Plaintiffs have selected a forum having little connection with the Action in order to inappropriately gain a judicial advantage over the Defendants and where the relevant connecting factors, considered as a whole, clearly point to the [Israeli High Court of Justice] as the logical forum and the authority in a better position to decide").

[120]*Restatement (Third) of Foreign Relations Law* § 702 (1987).

[121]*See* Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note); *Restatement (Third)* § 404.

[122]*See Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869, 2885-86 (2010).

The Constitution gives the power to "define and punish" violations of the law of nations, and the power to define the jurisdiction of federal courts, to Congress.[123] That the United States government may properly act to stop genocide in a foreign country does not imply that a federal district court may enjoin foreign genocide and then send in the marshals to enforce the injunction by force, or award damages. Yet the complaint asks us to issue an injunction regulating environmental remediation in Papua New Guinea, and to award damages for claimed human-rights violations there, regardless of what the governments of Papua New Guinea or the United States would find appropriate.

Exercise of jurisdiction over alleged wrongs committed by foreigners against foreigners in a foreign country dangerously interferes with decisions properly made only by the political branches of our government. Such claims are properly classed as raising nonjusticiable political questions. *United States v. Palmer* holds that questions regarding the rights of a part of a foreign state seeking its independence are "delicate and difficult" and "such questions are generally rather political than legal in their character."[124] In the case before us, the claims arise out of a civil war in which Bougainville sought to secede from Papua New Guinea. *Palmer* held that such questions as are before us belong more properly to those "who can place the nation in such a position with respect to foreign powers as to their own judgment shall appear wise; to whom are entrusted all its foreign relations; than to a tribunal whose power as well as duty is confined to the application of the rule which the legislature may prescribe for it."[125]

The political branches may choose to take no action against terrible evils to preserve essential alliances, as they did with

---

[123]U.S. Const. art. I, § 8, cls. 9, 10.

[124]*United States v. Palmer*, 16 U.S. (3 Wheat.) 610, 634 (1818) (Marshall, C.J.).

[125]*Id.*

respect to the Soviet Union during World War II; to avoid entanglements that would cost blood and money despite the justice of the cause, as with the Rwandan genocide; to avoid giving offense to regimes whose votes are useful to us in the United Nations or whose disinvestment in treasury securities would damage our economy; and to avoid ejection of our military bases from foreign territory if we characterized their history in an offensive manner, as with the Armenian genocide by Turkey. These political decisions are not pretty, but they are an integral part of the management of foreign affairs, and this task is for good reasons not assigned to the judiciary.

Third, judicial decisions on entirely foreign matters are likely to be mistaken because of the inadequate reliability of factual determinations. American courts decide cases by applying general legal principles to highly particularized historical facts.[126] A just decision requires a reasonably high degree of accuracy in the factual determination. Papua New Guineans speak hundreds of languages, which few federal judges or certified translators in America are likely to know. Conduct there occurs in what is for us an extremely exotic context. Things that every Papua New Guinean knows are unknown to us, and we are likely to be excessively dependent on what one or a few anthropologists tell us. Nor are we likely to understand the Papua New Guinean factual, historical, and legal context, a necessity if we are to judge the right and wrong of conduct that occurred there. The incapacity of American courts to ascertain facts about what foreigners did to foreigners in a foreign land, combined with the amorphousness of the general principles of law to be applied, can only lead to unreliable, unpredictable, and unjust results.

And suppose the district court were to award judgment for a huge sum from Rio Tinto for distribution to the several Papua New Guinean classes designated in the complaint.

---

[126]*See* Kenneth Culp Davis, *Facts in Lawmaking*, 80 Colum. L. Rev. 931 938-42 (1980).

After we assign part of it to counsel as attorneys' fees, how shall the district court effectively and justly supervise distribution to the proper Papua New Guineans in proper amounts? Justice requires accuracy and fairness in dividing up the winnings, not just assigning the blame and imposing the losses. These foreign-cubed cases may generate publicity and settlements,[127] but the logistics of an actual trial and management of remedies in a federal district court are impracticable and not subject to just application.

Fourth, once we release the genie of universal jurisdiction from the bottle, we cannot control for whom the genie works its magic. Other countries with different values are likely to use universal jurisdiction against us. There could be a class action, perhaps in Papua New Guinea, brought by a Cherokee against descendants of those who obtained Cherokee land when President Jackson's administration forced their ancestors to leave their homes for the West. A foreign court could entertain a class action on behalf of African-Americans against American banks whose corporate ancestors profited from interest on loans for the purchase of American slaves. The law of nations provides no statute of limitations for universal offenses, so these class actions might well be cognizable in foreign courts.[128] Why should descendants of those who have suffered great wrongs in America limit themselves to largely unavailable American remedies when foreign courts may be more advantageous?

Universal jurisdiction has already been asserted, by Iran, for blasphemy. Here is the 1989 edict by the Ayatollah of Iran against Salman Rushdie:

---

[127]*See, e.g.*, *Doe I v. Unocal Corp.*, 395 F.3d 932 (9th Cir. 2002), *reh'g en banc granted*, 395 F.3d 978 (9th Cir. 2003), *dismissed*, 403 F.3d 708 (9th Cir. 2005).

[128]*See Restatement (Third) of Foreign Relations Law* § 404 cmt. a (1987) ("A universal offense is generally not subject to limitations of time.").

I inform all zealous Muslims of the world that the author of the book entitled The Satanic Verses—which has been compiled, printed, and published in opposition to Islam, the Prophet, and the Koran—and *all those involved* in the publication who were aware of its contents are *sentenced to death*.

I call upon all zealous Muslims to execute them quickly, *wherever they may be found*, so that no one else will dare to insult the Muslim sanctities. God willing, whoever is killed on this path is a martyr.

In addition, anyone who has access to the author of this book but does not possess the power to execute him should report him to the people so that he may be punished for his actions.[129]

Rushdie's blasphemy is constitutionally protected in the United States, but not in Iran, and not in numerous other countries.[130] Imposition of Iranian law on Rushdie in the United States would violate the most fundamental aspect of our sovereignty—our constitutional right to freedom of speech—but if we can exercise universal jurisdiction over what we imagine violates the law of nations, why not Iran? Though the traditional formulation limits the law of nations to the usage of "civilized communities"[131] or "civilized and Christian nations,"[132] those limitations are not likely to be persuasive to the excluded nations.

---

[129]Daniel Pipes, *Two Decades of the Rushdie Rules*, Commentary 31 (October 2010).

[130]Geert Wilders, a member of the Dutch Parliament, was prosecuted in the Netherlands for "insult[s] to a group of people because of their . . . religion," though he was acquitted after two years of litigation. Geert Wilders, Op-Ed, *In Defense of Hurtful Speech*, Wall St. J., June 24, 2011, at A13.

[131]*The Paquette Habana*, 175 U.S. 677, 711 (1900).

[132]*The Antelope*, 23 U.S. (10 Wheat.) 66, 75 (1825).

Fifth, and most important, our judicial exercise of jurisdiction with no American nexus is profoundly illegitimate. Papua New Guinea is a small country compared to ours, but a separate one entitled to be governed by its own people. Rio Tinto is a British-Australian company, properly governed by the laws of the United Kingdom and Australia, and, to the extent it acts in Papua New Guinea, by Papua New Guinea. When Congress passed the Alien Tort Statute in 1789, it would have been inconceivable that courts might use the statute to impose our notions of right and wrong on entirely foreign conduct in foreign lands, because our country was far too small and weak to risk provoking the hostility of any foreign power.[133] It is unimaginable that the First Congress meant to provide for tort suits in American courts by and against Frenchmen in case the French Revolution descended into the Terror, yet today's interpretation so construes the statute. The First Congress, remembering well our objection to British imposition of authority from across the Atlantic upon us, would not have thought it proper for federal courts to do the same to others across the Pacific.

The judicial imperialism inherent in the exercise of universal jurisdiction threatens harm to the very people meant to be helped. For example, there can be no serious question that apartheid in the former Union of South Africa was a terrible wrong and that eliminating it was a great accomplishment for justice. But when the Second Circuit opened the door to class actions for damages resulting from apartheid,[134] post-apartheid South African President Thabo Mbeki "consider[ed] it completely unacceptable that matters that are central to the future of our country should be adjudicated in foreign courts which

---

[133]Thomas H. Lee, *The Safe-Conduct Theory of the Alien Tort Statute*, 106 Colum. L. Rev. 830, 855 (2006) (describing how "the United States was the newest and weakest member of the Eurocentric world, and the Republic[ ] . . . would benefit from reciprocal treatment in the capitals of the more powerful and established European sovereigns").

[134]*Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007).

bear no responsibility for the well-being of our country . . . ."[135] Black South Africans had their own process for dealing with the great injustice of apartheid without destroying their country. Papua New Guinea and Bougainville have suffered through a ruinous civil war that lasted for nearly a decade. However they decide to work out their reconstruction and reconciliation, that delicate process should not be distorted by our heavy, ignorant, and foreign hand.

"[J]udges ought to be exposed to the society in which the consequences of their ruling will fall, as a control on the indifferent, the frivolous, and the rigid, and an assurance that decision is taken only in conditions of full investment."[136] When judges are not part of the society they judge, there is nothing to offset the temptation towards grandiose moral posturing, attractive to people who judge disputes in societies where they have no stake. Imposition of our own moral judgments onto foreigners in foreign lands is imperialism by courts instead of gunboats, and is just as wrong.

## Conclusion

Assaulting an ambassador unquestionably violates the law of nations and constitutes an actionable tort under the Alien Tort Statute. Perhaps some of the wrongs alleged in the complaint do as well, though the judges in the majority cannot agree on which ones. But a United States federal district court lacks jurisdiction to entertain a tort action even for so plain a violation of the law of nations as an assault on an Australian ambassador by a Papua New Guinean in Bougainville. Con-

---

[135]President Thabo Mbeki, Statement by President Thabo Mbeki to the National Houses of Parliament and the Nation of South Africa, on the Occasion of the Tabling of the Report of the Truth and Reconciliation Commission (Apr. 15, 2003)); *see also Khulumani*, 504 F.3d at 299-300 (Korman, J., dissenting).

[136]Joshua Kleinfeld, *Skeptical Internationalism: A Study of Whether International Law is Law*, 78 Fordham L. Rev. 2451, 2521 (2010).

gress has not provided for application of the Alien Tort Statute, conferring jurisdiction over "a tort only in violation of the law of nations," on torts committed by foreign nationals in foreign countries against foreign nationals.

This case calls for judicial humility. Instead, we arrogate to ourselves imperial authority over the whole world.

This case should be dismissed.

---

IKUTA, Circuit Judge, dissenting, joined by Judges KLEINFELD, CALLAHAN and BEA:

In its rush to announce which decisions of selected international tribunals, which unratified or unenforceable treaties, and which favorite academic theories create international law norms enforceable in federal courts, the majority has stumbled on the threshold question: whether the Alien Tort Statute (ATS) gives us jurisdiction over this particular suit at all. As it happens, this threshold is no mere doorsill but a formidable obstacle: in fact, the ATS gives us *no* authority to hear a case where an alien sues another alien. That is, Congress enacted the ATS under the authority of the foreign diversity clause, which provides that the federal judicial power extends to controversies between "a State, or the Citizens thereof, and foreign States, Citizens or Subjects," U.S. Const. art. III, § 2, cl. 1. This means that in enacting the ATS, Congress authorized federal courts to hear actions where an alien sues a U.S. citizen, but gave federal courts no authority to hear suits between two aliens. Because the majority sees fit to brush past these limitations and give itself unlimited authority to adjudicate suits between aliens for torts arising anywhere in the world, I respectfully dissent.[1]

---

[1]The majority is correct that neither party raised this jurisdictional issue. *See* Maj. op. at 19332. Its account is incomplete, however: five judges

I

The ATS provides that district courts have "original juris-
diction of any civil action by an alien for a tort only, commit-
ted in violation of the law of nations or a treaty of the United
States." 28 U.S.C. § 1350. To determine whether this lan-
guage gives a federal court authority to hear a suit between
two aliens, it is necessary to revisit basic principles of juris-
diction. In order for a federal court to have jurisdiction over
a suit, two criteria must be met: first, Congress must enact a
statute granting the court subject matter jurisdiction over that
category of suits;[2] and second, Congress's grant must be
within the scope of Article III. It is hornbook law that "Con-
gress may not expand the jurisdiction of the federal courts
beyond the bounds established by the Constitution." *Verlin-
den, B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 491 (1983).

Article III allows Congress to give federal courts authority
to hear cases that fall into roughly three categories: (1) cases
"arising under" the laws of the United States, U.S. Const. art.
III, § 2, cl. 1 ("all Cases . . . arising under this Constitution,
the Laws of the United States, and Treaties made, or which
shall be made, under their Authority"); (2) cases relating to a

_____

voted to request supplemental briefing on this issue, but in a surprising
and unprecedented decision, six judges voted against obtaining the parties'
input on this issue. Nevertheless, we must address this key jurisdictional
concern *sua sponte*, even without the benefit of the parties' briefing on
this issue. *See Travelers Indem. Co. v. Bailey*, 129 S. Ct. 2195, 2205-06
(2009) ("[Federal courts] are courts with authority, when parties are
brought before them in accordance with the requirements of due process,
to determine whether or not they have jurisdiction to entertain the cause
and for this purpose to construe and apply the statute under which they are
asked to act." (alteration in original) (quoting *Chicot Cnty. Drainage Dist.
v. Baxter State Bank*, 308 U.S. 371, 376 (1940)) (internal quotation marks
omitted)).

[2]There is only one exception to this rule, not applicable here: Article III
of the Constitution gives the Supreme Court original jurisdiction over
cases involving ambassadors and suits involving states as parties. *See* U.S.
Const. art. III, § 2, cl. 2.

specific subject matter, *see* U.S. Const. art. III, § 2, cl. 2 ("all Cases of admiralty and maritime Jurisdiction"); and (3) cases relating to specific parties, *see* U.S. Const. art. III, § 2, cl. 2 ("all Cases affecting Ambassadors, other public Ministers and Consuls; . . . Controversies to which the United States shall be a party; . . . between two or more States; between a State and Citizens of another State; between Citizens of different States; between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects").

As explained in detail below, the First Congress did not give federal courts authority to hear cases in the first category (cases "arising under" the "Laws of the United States") when it enacted the ATS, because it neither created a body of federal law nor authorized courts to do so, and international law is not itself part of the "Laws of the United States" for purposes of Article III. The second category (cases relating to admiralty and maritime law) is not applicable here. Rather, it is clear that in enacting the ATS, the First Congress gave courts authority only over cases in the third category: namely, cases between citizens and aliens. This conclusion finds strong support in the contemporaneous history and interpretation of the Constitution and the Judiciary Act of 1789, which created the ATS.

A

The structure for analyzing the scope of a congressional grant of jurisdiction is set forth in *Verlinden*, which considered a situation analogous to this one. In *Verlinden*, the Court considered whether Congress had exceeded the scope of Article III in enacting the Foreign Sovereign Immunities Act (FSIA), which, among other things, gives federal courts subject matter jurisdiction over actions by foreign plaintiffs against foreign sovereigns. 461 U.S. at 482, 491. *Verlinden* first considered whether the FSIA fell within the scope of the foreign diversity clause. The Court concluded that the foreign

diversity clause, which extends the judicial power only to cases between citizens and aliens, was "not sufficiently broad" to give Congress authority to enact the FSIA, *id.* at 482, since the foreign diversity clause does not authorize suits between two aliens.

Next *Verlinden* considered whether Congress's grant of subject matter jurisdiction in enacting the FSIA was within the scope of the "arising under" clause. The Court posited that if the FSIA were a "purely jurisdictional" statute, i.e., one that seeks to do "nothing more than grant jurisdiction over a particular class of cases," then Congress could not have conferred jurisdiction on federal courts pursuant to the "arising under" clause. *Id.* at 496 (quoting *The Propeller Genesee Chief v. Fitzhugh*, 53 U.S. (12 How.) 443, 451 (1852)). This reasoning is obviously correct: a "purely jurisdictional statute" granting jurisdiction over a particular class of cases does not make that particular class of cases arise under federal law any more than the diversity jurisdiction statute, 28 U.S.C. § 1332, makes a $100,000 breach of contract suit between a Massachusetts corporation and a Maine citizen "arise under" federal law. On the other hand, if Congress created a substantive body of federal law in enacting the FSIA, claims invoking that substantive body of law could "arise under" the FSIA, and federal courts could then hear FSIA cases between aliens under the "arising under" clause.

After examining the history and structure of the FSIA, the Court concluded that the FSIA did constitute a body of substantive federal law because: (1) the FSIA was not purely jurisdictional, but rather, "simply one part" of "a broad statutory framework governing assertions of foreign sovereign immunity," *Verlinden*, 461 U.S. at 496-97; (2) in enacting the FSIA, "Congress expressly exercised its power to regulate foreign commerce, along with other specified Article I powers," *id.* at 496-97; and (3) actions under the FSIA would require courts to apply the statute's substantive law regarding sovereign immunity, *id.* at 496-97. Given these three factors,

*Verlinden* concluded that an action against a foreign sovereign invoking the FSIA " 'arises under' federal law, within the meaning of Article III." *Id*. at 497. And because cases invoking the FSIA "arise under" federal law, federal courts have jurisdiction to hear FSIA suits between two aliens. *Id.*

Applying this three-factor analysis to the ATS, it is clear that Congress did not create a body of federal law when it enacted the ATS; rather the ATS falls on the purely jurisdictional side of the divide. First, *Sosa v. Alvarez-Machain* has told us that the ATS is a purely jurisdictional statute that does nothing but grant federal courts jurisdiction over a species of claims that incorporate "the law of nations." 542 U.S. 692, 713-14, 729 (2004).

Second, in enacting the ATS, Congress did not even purport to exercise its Article I power "to define offenses against the 'Law of Nations,' Art. I, § 8, cl. 10," *Verlinden*, 461 U.S. at 494 n.19, or, for that matter, exercise any of its enumerated Article I powers. *Verlinden* placed great importance on the fact that Congress expressly exercised its Article I foreign commerce powers in enacting the FSIA by setting forth a comprehensive scheme relating to foreign entities and codifying standards governing foreign relations as an aspect of substantive federal law. *Id.* at 496-97 & n.22. By contrast, in enacting the ATS, a single clause, Congress did not include anything similar. *See The Propeller Genesee Chief*, 53 U.S. at 451-52 (stating that the lack of congressional intent "to exercise [its] power to regulate commerce" was "evident" from the law's containing "no regulations of commerce").

Nor did Congress exercise its Article I powers in enacting the ATS by giving the courts authority to create a body of federal law. Although *Verlinden* did not address this manner of creating a substantive body of federal law, the Court held in *Textile Workers of America v. Lincoln Mills of Alabama,* that a facially jurisdictional statute can be a substantive exercise of Congress's Article I Commerce Clause power where Con-

gress intended the statute to authorize federal courts to fashion a body of federal law for a specific purpose. 353 U.S. 448 (1957). But this theory is inapplicable to the ATS: *Sosa* expressly rejected the view that the ATS was an "authority for the creation of a new cause of action for torts in violation of international law," 542 U.S. at 713, and contrasted the federal courts' limited authority to recognize certain pre-existing international norms pursuant to the ATS with the "express congressional authorization to devise a body of law directly" in *Lincoln Mills*, *id.* at 726.[3] *See also Mohammed v. Rumsfeld*, No. 07-5178, ___ F.3d ___, 2011 WL 2462851, at *9 n.25 (D.C. Cir. June 21, 2011) ("[T]he ATS is easily distinguishable from section 301(a) of the [LMRA]. Section 301(a) is part of an extensive statutory enactment and, although it speaks only to federal jurisdiction, other provisions of the LMRA establish substantive legal duties and rights. The ATS, by contrast, is a stand-alone grant of jurisdiction only." (citations omitted)).

Third, unlike the FSIA, the ATS is not a "comprehensive regulatory statute." *Verlinden*, 461 U.S. at 497. Rather than requiring courts to apply any congressionally enacted standards, as in the FSIA, the ATS merely authorizes courts to recognize certain already existing norms. *Sosa*, 542 U.S. at 732.

In sum, *Verlinden*'s three-factor analysis shows that Congress did not create substantive federal law in enacting the ATS, and, as a result, aliens bringing international law tort actions and claiming jurisdiction under the ATS do not, by

---

[3]*Sosa*'s holding that the ATS "gave the district courts 'cognizance' of certain causes of action . . . *not power to mold substantive law*," 542 U.S. at 713 (emphasis added), is reinforced by its consistent use of "recognize" and "entertain." *See, e.g.*, *id.* at 714 ("[F]ederal courts could entertain claims once the jurisdictional grant was on the books, because torts in violation of the law of nations would have been recognized within the common law of the time."); *id.* at 724 (First Congress "understood that the district courts would recognize private causes of action").

force of that statute, raise claims that "arise under" federal law for purposes of Article III jurisdiction.

B

As shown above, *Verlinden* eliminates the argument that international law tort suits between two aliens "arise under" the ATS, and thus forecloses one basis for federal courts to hear suits between aliens. It does not, however, address the related theory that Congress enacted the ATS on the understanding that it fell within the scope of Article III's "arising under" clause because the "law of nations" is part of the "Laws of the United States." This argument also fails. As explained below, neither the text of the Constitution nor historical evidence supports this theory, and Supreme Court decisions weigh against it.

The interpretation of the phrase "Laws of the United States" in Article III must begin with the language of the Constitution and the intent of the Framers, *see United States v. Woodley*, 751 F.2d 1008, 1009-10 (9th Cir. 1985) (en banc), and nothing in Article III or the Constitution as a whole implies that the reference to "Laws of the United States" in Article III included the "law of nations" within its scope. Indeed, the textual evidence strongly supports the opposite conclusion. Although the Framers used the term "law of nations" in the Constitution for certain purposes, *see, e.g.*, U.S. Const. art I, § 8 (giving Congress the power "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations"), the term is not included in Article III. We generally presume that the inclusion and omission of language in different sections of the same statute is intentional and purposeful, and for the same reason, we should not read "law of nations" into the Article III reference to "Laws of the United States." *Cf. Estate of Bell v. Comm'r*, 928 F.2d 901, 904 (9th Cir. 1991); *Ariz. Elec. Power Coop. v. United States,* 816 F.2d 1366, 1375 (9th Cir. 1987) ("When Congress includes a specific term in one sec-

tion of a statute but omits it in another section of the same Act, it should not be implied where it is excluded.").

The historical evidence also supports the presumption that the Framers intentionally omitted the "law of nations" from the scope of the judicial power established in Article III. For example, there were suggestions to draft the Constitution so as to extend the judicial power to claims arising under the law of nations, *see, e.g.*, *The Federalist No. 80* (proposing that the judicial power extend to "cases arising upon treaties and the laws of nations"), and delegates at the Constitutional Convention considered specific proposals to add such language, *see* 3 *Records of the Federal Convention of 1787* 604, 608 (Max Farrand ed., Yale 1911) (quoting the plan placed before the Convention by Charles Pinckney of South Carolina: "an Appeal shall be allowed from the judicial Courts of the several States in all Causes wherein Questions shall arise on the Construction of Treaties made by U.S.—or on the Law of Nations" (internal quotation marks omitted)); 2 *Records* at 157 (quoting the plan presented to the Convention by William Paterson of New Jersey: "the Judiciary [shall] have authority to hear and determine . . . all Cases . . . which may arise . . . on the Law of Nations, or general commercial or marine Laws"). Ultimately, however, the delegates chose not to include such a reference in the final draft of Article III, indicating a purposeful decision not to extend the judicial power to the full scope of the law of nations. Instead, they limited the judicial power to specific areas of international law, i.e., admiralty and ambassadors. J. Andrew Kent, *Congress's Under-Appreciated Power to Define and Punish Offenses Against the Law of Nations*, 85 Tex. L. Rev. 843, 938 n.418 (2007).

Taking this textual evidence as a whole, there is no support for an argument that the First Congress, a good number of whom had participated in the Constitutional Convention, *see* *Sosa*, 542 U.S. at 730; *Ames v. Kansas*, 111 U.S. 449, 464 (1884), understood international law to be part of the "Laws

of the United States." The Framers did not expressly include the "law of nations" in Article III, and the historical evidence weighs against a theory that the Framers implicitly included the "law of nations" in the distinct phrase, "Laws of the United States."

This reading is confirmed by a series of subsequent Supreme Court decisions establishing that cases presenting questions of international law do not arise under the laws of the United States for purposes of Article III. *See Caperton v. Bowyer*, 81 U.S. 216, 228 (1871) ("It is said that [the plea] involves a question of international law. If it does, this can give this court no jurisdiction. The law of nations is not embodied in any provision of the Constitution, nor in any treaty, act of Congress, or any authority, or commission derived from the United States."); *N.Y. Life Ins. Co. v. Hendren*, 92 U.S. 286, 286-87 (1875) (holding that the court lacked jurisdiction to hear a case involving "the general laws of war, as recognized by the law of nations applicable to this case," because "it [was] nowhere appearing that the constitution, laws, treaties, or executive proclamations, of the United States were necessarily involved in the decision"); *Am. Ins. Co. v. 356 Bales of Cotton*, 26 U.S. 511, 545 (1828) ("A case in admiralty does not, in fact, arise under the Constitution or laws of the United States.").[4] Rather, as the majority agrees,

---

[4]The majority does not dispute that admiralty law is a significant part of the law of nations, *see Sosa*, 542 U.S. at 715; *United States v. Flores*, 289 U.S. 137, 148 (1933), and that admiralty cases do not arise under the Laws of the United States, *see Bales of Cotton*, 26 U.S. at 545. These holdings support the conclusion that cases presenting questions of international law (such as admiralty cases) do not arise under the "Laws of the United States" for purposes of Article III. The majority attempts to refute this logic by arguing that admiralty law has been "carved out by the Supreme Court as special . . . for reasons wholly inapplicable to claims cognizable under the ATS." Maj. op. at 19351 (citing *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 359-80 (1959)). But *Romero*'s holding that Congress did not intend federal courts to hear admiralty law claims under § 1331, 358 U.S. at 378-80, did not overrule *356 Bales of*

the law of nations "was at the time part of the so-called general common law," which "was not federal law under the Supremacy Clause." 542 U.S. at 739 (Scalia, J., concurring in part and concurring in the judgment); Maj. op. at 19342-43.

Because the First Congress did not exercise its Article I powers to create substantive law and did not understand the law of nations to be part of the "Laws of the United States," it could not have enacted the ATS on the understanding that it fell within the scope of Article III's "arising under" clause. This conclusion does not, however, render the ATS unconstitutional. Congress's grant of jurisdiction to federal courts under the ATS was within the scope of a different provision of Article III: namely, the "foreign diversity clause," *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 485 n.6 (1983), which gives federal courts authority to hear cases alleging a tort in violation of the law of nations between a citizen and an alien.

## II

That the ATS gave federal courts jurisdiction to consider only suits for "torts committed in violation of the law of nations" brought by aliens against citizens, is well-supported and corroborated by the historical backdrop to Article III and the Judiciary Act, and confirmed by the Supreme Court's decision in *Mossman v. Higginson*, 4 U.S. (4 Dall.) 12 (1800). Contemporary Anglo-European legal principles provided that a country had no responsibility under the law of nations to adjudicate suits between two aliens arising abroad, but was obligated to redress injuries its citizens caused to aliens.

---

*Cotton*, and indeed sheds no light on whether admiralty law is part of the "Laws of the United States" for purposes of Article III's "arising under" clause. *See Verlinden*, 461 U.S. at 494 (noting thatthe "Court never has held that statutory 'arising under' jurisdiction is identical to Article III 'arising under' jurisdiction," despite the identical language in Article III and § 1331).

When the youthful United States enacted the ATS as part of its efforts to discharge these obligations, it had no intention of intruding in other nations' affairs, thereby giving them just cause for war. Within this historical context, the Supreme Court appropriately interpreted the First Congress's grant of jurisdiction to federal courts to hear actions involving aliens as limited to suits between aliens and citizens.

### A

A review of the legal doctrines prevailing at the time the United States came onto the international scene shows that the well-established rules of Anglo-European "law of nations" required (among other things) that nations provide a means for aliens to redress injuries they received at the hands of citizens. According to Emmerich de Vattel, the most cited scholar in post-Revolution America,[5] injuring a citizen of another nation was tantamount to harming the foreigner's sovereign, E. de Vattel, *The Law of Nations* bk. 2, ch. 6, §§ 71-72, at 136 (Charles G. Fenwick trans., Oceana Publications 1964) (1758) (all citations hereinafter are to bk. 2, ch. 6). Therefore, "a nation had a duty to prevent its citizens from harming not only ambassadors and public ministers whom it received, but *all* foreign citizens whom it admitted within its borders." Anthony J. Bellia Jr. & Bradford R. Clark, *The*

---

[5]*See U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 462 n.12 (1978) (citing 1 J. Kent, *Commentaries on American Law* 18 (1826)) ("The international jurist most widely cited in the first 50 years after the Revolution was Emmerich de Vattel."); Douglas J. Sylvester, *International Law as Sword or Shield? Early American Foreign Policy and the Law of Nations*, 32 N.Y.U. J. Int'l L. & Pol. 1, 67 (1999) (explaining that in the 2 decades after the Revolution, American judicial decisions cited to Pufendorf, 9; Grotius, 16; Bynkershoek, 25; and Vattel, a "staggering" 92 times). Indeed, in 1775, "Benjamin Franklin acknowledged receipt of three copies of a new edition, in French, of Vattel's *Law of Nations* and remarked that the book 'has been continually in the hands of the members of our Congress now sitting.' " *U.S. Steel Corp.*, 434 U.S. at 462 n.12 (italics added) (quoting 2 F. Wharton, *United States Revolutionary Diplomatic Correspondence* 64 (1889)).

*Alien Tort Statute and the Law of Nations*, 78 U. Chi. L. Rev. 445, 472-73 (2011) (footnote omitted) (emphasis added).

Because even the most developed country cannot prevent all harms to foreigners, *see* Vattel, § 73, at 136, an injury to an alien did not automatically constitute a violation of the law of nations unless the country approved and ratified the act of its citizen, *id.* § 74, at 136, either by authorizing it before, *id.* § 78, at 137, or, more relevant here, by failing to redress it after the fact, *id.* § 76, at 136-37; *see also* Blackstone, Commentaries *68 (stating that once the injured nation demanded "satisfaction and justice to be done on the offender," the failure of the "the state to which he belongs" to provide such relief rendered that state "an accomplice or abettor of [its] subject's crime," and drew it into "the calamities of foreign war"). Indeed, a sovereign's refusal to make amends did "no less a wrong" to the foreign citizen's nation "than if he injured [that Nation] himself," Vattel, § 72, at 136, and "gave the [harmed] nation just cause for war," Bellia & Clark, 78 U. Chi. L. Rev. at 477 & nn.159-60 (citing Vattel, Burlamaqui, Pufendorf, and Grotius). *See Sosa*, 542 U.S. at 715 ("An assault against an ambassador, for example, impinged upon the sovereignty of the foreign nation and if not adequately redressed could rise to an issue of war." (citing Vattel)); 1 U.S. Op. Atty. Gen. 566, 568-69 (1822) (advising the Secretary of State of his duty to deliver a Danish slave to the minister of Denmark on the ground that "any attempt on the part of the United States, or the individual citizens thereof under the sanction and protection of their government to interfere with Danish regulations [tolerating slavery] would be an invasion of the sovereignty of Denmark, and, if avowed and unredressed on our part, a just cause of war").

To avoid giving offense or creating a ground for the injured sovereign to declare war, England allowed aliens to sue citizens for injuries to their person or their personal property. An alien could bring a common law action in an English court against a British subject, Bellia & Clark, 78 U. Chi. L. Rev.

at 482 (listing assault, battery and false imprisonment among the available actions), and could even sue British subjects in an English court for acts of violence committed outside of England's territorial jurisdiction, *id.* at 483.

Suits between aliens for acts occurring in foreign countries raised a different issue, however. For one thing, nations had no duty to adjudicate them. *See id.* at 484 (explaining that "[u]nder the law of nations, nations declined to exercise jurisdiction over actions that were local to another nation"). For another, providing a forum might itself have offended a foreign sovereign. *See* Vattel, *Law of Nations*, bk. 2, ch. 4, § 54, at 131 ("It clearly follows from the liberty and independence of nations, that each has the right to govern itself as it thinks proper, and that no one of them has the least right to interfere in the government of another."). In fact, Vattel's explanation that unless permitted by treaty, a "sovereign has the right to treat as enemies those who undertake to interfere in its domestic affairs otherwise than by their good offices," *id.* § 57, at 132, dovetails neatly with Chief Justice Marshall's observation that "the perfect equality of nations" precludes any nation from "impos[ing] a rule on another," *The Antelope*, 23 U.S. (10 Wheat.) 66, 122 (1825).

Because adjudicating non-local suits between two aliens was neither required nor even encouraged by the law of nations, courts did not do it. *See, e.g.*, *Mostyn v. Fabrigas*, (1774) 98 Eng. Rep. 1021 (K.B.); 1 Cowp. 161 (Lord Mansfield citing the example of an action between two Frenchmen based on a fight in France as an example of a case arising "outside of the British "realm which ought not to be tried anywhere but in the country" where it arose); *Vernor v. Elvies* (1610), 11 Mor. Dict. of Dec. 4788 (Scot.) (the Scotch Court of Sessions refusing to hear a contract action between two Englishmen that arose entirely outside of Scotland).[6]

---

[6]Early decisions in the United States echoed this rule. *See Molony v. Dows*, 8 Abb. Pr. 316 (N.Y. Sup. 1859) ("[N]o case will be found in the

B

These principles were very much on the mind of the Framers and the members of the First Congress. Before the Constitution was enacted, the newly formed nation had difficulty meeting its obligation to redress violations of the law of nations. *See Sosa*, 542 U.S. at 716 ("The Continental Congress was hamstrung by its inability to 'cause infractions of treaties, or of the law of nations to be punished.' ") (quoting J. Madison, *Journal of the Constitutional Convention* 60 (E. Scott ed., 1893)). One significant concern was the inability of the federal government to redress injuries to aliens (primarily British nationals) by American citizens.[7] With an eye toward remedying these violations, thereby ensuring that the United States met its obligations under the law of nations, the Continental Congress enacted a resolution imploring states to pass laws protecting foreigners.[8] *See Sosa*, 542 U.S. at 716 (citing

_____

whole course of English jurisprudence in which an action for an injury to the person, inflicted by one foreigner upon another in a foreign country, was ever held to be maintainable in an English court."); *Willendson v. Forsoket*, 29 F. Cas. 1283, 1284 (D.C. Pa. 1801) (No. 17,682) (stating the general rule that courts ought "not to take cognizance of disputes between the masters and crews of foreign ships," and should instead refer "them to their own courts").

[7]In fact, some Americans even worried about acts of violence against British nationals. *See* Bellia & Clark, 78 U. Chi. L. Rev. at 501 (noting that the president of the Continental Congress, Elias Boudinor, feared that "postwar acts of violence by New York Whigs against the British were so extreme as possibly to 'involve us in another war' ").

[8]Although not directly relevant to the civil suits at issue here, the Marbois incident of May 1784, in which a French citizen assaulted the Secretary of the French Legion in Philadelphia, was also instrumental in highlighting the young nation's inability to redress criminal acts against ambassadors. While the perpetrator was ultimately prosecuted for a criminal violation of the law of nations in state court, *see Respublica v. De Longchamps*, 1 U.S. (1 Dall.) 111 (Pa. O.T. 1784), the incident prompted the French minister to threaten to leave Pennsylvania "unless the decision on Longchamps Case should give them full satisfaction." *Sosa*, 542 U.S. at 717 n.11 (quoting Letter from Samuel Hardy to Gov. Benjamin Harri-

21 Journals of the Continental Congress 1136-37 (G. Hunt ed., 1912)). Specifically, that resolution recommended that the States "authorise suits . . . for damages by the party injured, and for compensation to the United States for damage sustained by them from an injury done to a foreign power by a citizen." *Id.* (quoting 21 Journals of the Continental Congress at 1137) (ellipsis in original) (emphasis added) (internal quotation marks omitted).

Only one state (Connecticut) did so, however, *see* An Act to Prevent Infractions of the Law of Nations, reprinted in 4 *Public Records of Connecticut for the Year 1782*, 156-57 (Leonard W. Labaree ed., 1942), and it is likely that even its courts declined to exercise jurisdiction over suits between aliens. *See* Bellia & Clark, 78 U.Chi. L. Rev. at 492 (arguing that *Brinley v. Avery*, 1 Kirby 25 (Conn. Super. Ct. 1786), dismissed a claim between two aliens because "British courts had exclusive jurisdiction of a claim arising between British subjects in British territory").

Shortly thereafter, the Articles of Confederation yielded to the Constitution. Unlike its predecessor, the Constitution (specifically, Article III) provided the judicial power necessary to redress injuries that could otherwise give offense to foreign nations. First, the Framers vested the Supreme Court with original jurisdiction over "all Cases affecting Ambassadors, other public Ministers and Consuls." U.S. Const. art. III, § 2, cl. 2. Second, they authorized federal courts to hear "all Cases of admiralty and maritime Jurisdiction." *Id.* cl. 1. Third, they authorized federal courts to hear cases "between a State, or the Citizens thereof, and foreign States, Citizens or Subjects." *Id.*

---

son of Virginia, June 24, 1784, *in* 7 *Letters of Members of the Continental Congress* 558, 559 (E. Burnett ed., 1934)) (internal quotation marks omitted). In addition to enacting the ATS, Congress addressed these issues in the Judiciary Act, giving federal courts jurisdiction over acts involving ambassadors.

C

The First Congress addressed these same law of nations concerns in the Judiciary Act of 1789, which created lower federal courts and defined their jurisdiction. *See* Act of Sept. 24, 1789 (hereinafter "Judiciary Act"), ch. 20, § 13, 1 Stat. 73. In addition to giving the Supreme Court original jurisdiction over cases by or against ambassadors and other public ministers, Judiciary Act § 13, 1 Stat. at 80-81, and giving the district courts jurisdiction over admiralty and maritime cases, *id.* § 9, 1 Stat. at 77, Congress specified that courts could hear two types of civil cases where aliens were parties. Section 11 gave the circuit courts original jurisdiction over suits where an alien was involved and the amount in controversy exceeded $500. *Id.* § 11, 1 Stat. at 78 (granting the circuit courts "original," though non-exclusive, "cognizance . . . of all suits of a civil nature at common law or in equity, where the matter in dispute exceeds . . . five hundred dollars, and . . . an alien is a party"). This provision allowed British creditors owed significant sums by U.S. citizens to bring an action in federal court, thus addressing concerns about biased state courts reluctant to force their citizens to make good on debts owed to British subjects, in violation of the Paris Peace Treaty of 1783. *See* Definitive Treaty of Peace Between the United States and his Brittanic Majesty, art. IV, U.S.-G.B., Sept. 3, 1783, 8 Stat 80, 82 (providing that "creditors on either side, shall meet with no lawful impediment to the recovery of the full value in sterling money, of all bona fide debts heretofore contracted").

Section 9 (the ATS), meanwhile, conferred non-exclusive jurisdiction on the federal courts over "all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States," which gave aliens an additional vehicle for redressing certain torts against them where the damage did not meet the $500 jurisdictional limit of Section 11. *Id.* § 9, 1 Stat. at 77. Taken together, this series of jurisdictional grants represented a substantial step toward "vindi-

cat[ing] any incident which, if mishandled by a state court, might blossom into an international crisis." *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 782 (D.C. Cir. 1984) (Edwards, J., concurring).

D

In interpreting the First Congress's grant of jurisdiction in Section 11, the Supreme Court's brief analysis in *Mossman v. Higginson* directly addresses the jurisdictional interpretation required in this case. *See* 4 U.S. (4 Dall.) 12 (1800) (per curiam). *Mossman* involved an action under Section 11 by British merchants to foreclose their mortgage on certain property that had been seized by state commissioners and sold to third parties. First, the Court stated that Section 11 "can, and must, receive a construction, consistent with the constitution." *Id. Mossman* then noted that Section 11 gave federal courts "cognizance of suits 'where an alien is a *party*,' " but because "the legislative power of conferring jurisdiction on the federal Courts, is, in this respect, confined to suits *between citizens and foreigners*," the Court had to interpret Section 11 so as to limit it to cases between aliens and citizens. *See id.* (emphasis in original) ("[W]e must so expound the terms of the law, as to meet the case, 'where, indeed, an alien is one party,' but a citizen is the other."). There was no alternative, the Court explained, because there was no other source of subject matter jurisdiction: neither the Constitution nor Congress had given courts jurisdiction over the suit's specific subject matter. *Id.* ("Neither the constitution, nor the act of congress, regard, on this point, the subject of the suit, but the parties."). Because the proceedings below did not state that the defendants (the third party owners of the mortgaged property) were citizens, and because the identity of the parties was "indispensable to the exercise of jurisdiction," the Court quashed the writ of error.[9]

---

[9]Lower courts had likewise earlier interpreted Section 11 as being limited to suits between an alien and a citizen. *See Fields v. Taylor*, 9 F. Cas. 41 (C.C.D. Mass. 1799) (No. 4777) (federal circuit court refusing to exer-

Although the Supreme Court never had occasion to interpret the jurisdictional scope of Section 9,[10] *Mossman*'s analysis is equally applicable to that section. Like Section 11, Section 9 gives federal courts jurisdiction over suits where an alien is a party. And like Section 11, neither the Constitution nor Congress gave federal courts an alternative source of jurisdiction for torts "in violation of the law of nations." As explained in Part I, ATS does not give federal courts jurisdiction to hear international law claims between two aliens pursuant to the "arising under" clause, because the ATS itself is a purely jurisdictional statute that does not make suits between two aliens "arise under" federal law, and because international law is not itself substantive federal law. Because the ATS "can, and must, receive a construction[ ] consistent with the constitution," *id.*, federal courts have only one choice: they must, under *Mossman*, interpret Section 9's grant of jurisdiction over international law claims as limited to cases between aliens and citizens.[11] *See id.* Accordingly, we

---

cise § 11 jurisdiction over a claim between two British subjects on notes executed in England); *Walton v. McNeil*, 29 F. Cas. 141 (C.C.D. Mass. 1794) (No. 17,134) (federal circuit court refusing to exercise jurisdiction over suit by one Quebec inhabitant against another on a promissory obligation arising in Canada).

[10]There are only two cases interpreting Section 9 contemporaneously, and neither case addressed the question whether the ATS granted jurisdiction over suits between aliens, *see Bolchos v. Darrel*, 3 F. Cas. 810 (No. 1,607) (D.S.C. 1795); *Moxon v. The Fanny*, 17 F. Cas. 942 (No. 9,895).

[11]The D.C. Circuit has recognized that this construction more faithfully reflects the First Congress's intent than does the majority's alternative interpretation that Congress gave courts jurisdiction over suits between aliens. *See, e.g.*, *Doe v. Exxon Mobil Corp.*, No. 09-7125, ___ F.3d ___, 2011 WL 2652384, at *51 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("It would be very odd to think that the Congress of 1789 wanted to create a federal tort cause of action enforceable in U.S. court for, say, a Frenchman injured in London."); *id.* at *10 (majority) ("[I]n deeming 'very odd' that the First Congress would be interested in protecting 'a Frenchman injured in London,' the dissent ignores that the calculus can change where a U.S. citizen is a cause of the harm." (internal citation omitted)).

lack jurisdiction over plaintiffs' suit against Rio Tinto.[12]

## III

The majority tacitly agrees that the First Congress understood that the law of nations, as part of the general common law, "was not federal law in either the jurisdiction-conferring or supremacy-clause sense." Maj. op. at 19344 (quoting William A. Fletcher, *International Human Rights in American Courts*, 93 Va. L. Rev. in Brief , 2 (2007) (internal quotation marks omitted)). Likewise, it agrees that the First Congress authorized federal courts to *recognize* pre-existing international law norms, but not to *create* a body of federal law, as in *Lincoln Mills*. *See* Maj. op. at 19344 ("[T]he ATS was enacted to provide jurisdiction to hear claims brought pursuant to causes of action *that already existed at common law*." (emphasis added)). Necessarily, then, the majority must agree that the First Congress was acting within the scope of Article III's foreign diversity clause when it granted federal courts jurisdiction over international tort cases.

That should be the end of the analysis, because our authority to hear cases begins and ends with the scope of the congressional grant of jurisdiction. It is well-established that only Congress "has the constitutional authority to define the jurisdiction of the lower federal courts." *Keene Corp. v. United States*, 508 U.S. 200, 207 (1993). And only Congress has the authority to expand the scope of federal jurisdiction it has granted. *See id.* at 207 ("[O]nce the lines are drawn, limits upon federal jurisdiction . . . must be neither disregarded nor evaded." (second alteration in original) (internal quotation

---

[12]Because I conclude that Congress did not give us jurisdiction to hear cases between two aliens, I agree with Judge Kleinfeld that the ATS does not confer universal jurisdiction on the federal courts. I also agree with Judge Bea that the district court misapplied the standard we set out in *Sarei v. Rio Tinto, PLC*, 550 F.3d 822 (9th Cir. 2008) (en banc), regarding prudential exhaustion.

marks omitted)). In the absence of congressional action, the judiciary's extension of its own authority "runs contrary to the established principle that the jurisdiction of the federal courts is carefully guarded against expansion by judicial interpretation, and conflicts with the authority of Congress under Art. III to set the limits of federal jurisdiction." *Stonebridge Inv. Partners v. Scientific Atlanta*, 552 U.S. 148, 164-65 (2008) (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 746 (1979) (Powell, J., dissenting)) (brackets, citation, and internal quotation marks omitted).

But instead of staying within the jurisdictional boundaries created by Congress in enacting the ATS, the majority contends that the scope of federal court jurisdiction under the ATS has, without any congressional action whatsoever, expanded over time and today extends to claims between two aliens. The majority theorizes that: (1) *Sosa* must be read "to permit courts to develop the federal common law by incorporating into it certain claims that derive from norms of international law," Maj. op. at 19347; (2) such federal court pronouncements then "*become* federal common law," Maj. op. at 19347; (3) "claims premised on federal common law arise under the law of the United States," Maj. op. at 19344-45 (citing *Illinois v. City of Milwaukee*, 406 U.S. 91, 100 (1972)); and therefore, (4) federal courts have jurisdiction to hear claims invoking international law norms because such claims "arise under the federal common law," Maj. op. at 19350. In sum, the majority contends that after *City of Milwaukee*, "judicially created federal rule[s] based on international norms," *Sosa*, 542 U.S. at 745 n.* (Scalia, J., concurring in part and concurring in the judgment), do arise under the "Laws of the United States" for purposes of Article III, and therefore the ATS gives us authority to hear such claims.

But the majority's ahistorical theory leaps over a crucial step: whether Congress intended the ATS to give us such authority. Because the First Congress enacted the ATS within

the scope of the foreign diversity clause, our jurisdiction extends no further. It is therefore irrelevant whether after *City of Milwaukee*, Congress *could* have enacted the ATS within the scope of the Article III "arising under" clause so as to give federal courts jurisdiction over international law tort suits between aliens. Congress did not do so in 1789, and no subsequent congressional act has modified the ATS to authorize courts to hear such claims.

Absent such a statutory grant of authority, federal courts lack jurisdiction over international law tort suits between aliens. As previously explained, the "constitutional power" to decide a case "is merely the first hurdle that must be overcome in determining that a federal court has jurisdiction over a particular controversy." *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 372 (1978). The second, and equally significant, hurdle is congressional authorization, "[f]or the jurisdiction of the federal courts is limited not only by the provisions of Art. III of the Constitution, but also by Acts of Congress." *Id.* And Congress has provided no such grant of jurisdiction either in the ATS or otherwise.

The majority concedes that the federal question statute (28 U.S.C. § 1331) does not authorize jurisdiction over international law tort suits, *see* Maj. op. at 19344-45; indeed, the majority cannot avoid this concession, given *Sosa*'s out of hand rejection of the theory, *see* 542 U.S. at 731 n.19. Dissenting in *Sosa*, Justice Scalia argued that by authorizing federal courts to "recognize" certain international law norms, the majority made the ATS superfluous, because "judicially created federal rule[s] based on international norms" are federal common law and therefore " 'arise under' the laws of the United States, not only for purposes of Article III but also for purposes of statutory federal-question jurisdiction." 542 U.S. at 745 n.* (Scalia, J., concurring in part and concurring in the judgment) (citing *City of Milwaukee*, 406 U.S. at 99-100). In its rejoinder, the *Sosa* majority brushed aside Justice Scalia's concern. Congress, it explained, did not intend for § 1331 to

be a vehicle for recognizing international law norms; as such, § 1331 did not authorize federal courts to do so.[13] *See id.* at 731 n.19 (majority opinion) (finding "no reason to think that [statutory] federal-question jurisdiction was extended" subject to the "congressional assumption" that § 1331 would permit courts to "exercise jurisdiction by entertaining some common law claims derived from the law of nations").

*Sosa*'s analysis of congressional intent with respect to § 1331 is equally applicable here: because Congress did not, as the majority supposes, enact the ATS with the intention of allowing federal courts to hear "federally incorporated international law claims" between aliens, we lack the authority to do so. As a result, neither § 1331 nor the ATS nor any other congressional enactment identified by the majority, gives us jurisdiction over such claims.

This conclusion resolves the jurisdictional question raised by this appeal, and it is not necessary to reach the constitutional question raised by the majority's theory, namely, whether after *City of Milwaukee*, international law tort claims fall within the scope of Article III "arising under" jurisdiction. But in light of the foregoing analysis, the majority's conclusion is doubtful. For one thing, *Caperton* and *Hendren* held that international law claims, unmoored from any treaty or congressional enactment, do not arise under the Constitution

---

[13]Although *Sosa* did not provide the basis for its conclusion regarding congressional intent, it is supported by the historical record. Enacted without substantial debate in 1875, § 1331 "was designed to provide a statutory basis for the exercise of federal question jurisdiction provided for in Article III." Curtis Bradley, Jack L. Goldsmith & David H. Moore, Sosa, *Customary International Law, and the Continuing Relevance of* Erie, 120 Harv. L. Rev. 869, 912 (2007). Because in 1875 the law of nations was understood to be "nonfederal general common law," rather than "laws of the United States," *see* section I.B, *supra*, Congress could not have enacted § 1331 "on the understanding that federal courts would be able to hear [international law—]based claims pursuant to § 1331's jurisdictional grant." Bradley et al., 120 Harv. L. Rev. at 913.

or federal law; and these cases remain good law. *See Hendren*, 92 U.S. at 286-87; *Caperton*, 81 U.S. at 228. For another, the majority has not cited a single case in which the Court based its jurisdiction on a judicially created rule with international law implications. Even in the area of international relations, in which the Court has "assumed competence to make judicial rules of decision of particular importance to foreign relations," *Sosa*, 542 U.S. at 726 (citing *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964)), the Court did not base its jurisdiction on those rules. *See, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003) (42 U.S.C. § 1983, World War II treaties); *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 615 (1983) (diversity statute); *Pfizer, Inc. v. Government of India*, 434 U.S. 308, 309 (1978) (Sherman Act); *Sabbatino*, 376 U.S. at 424 (diversity statute).

Historical evidence also weighs against the majority's theory: the Framers did not extend the judicial power generally to claims arising under the law of nations, but rather expressly enumerated the components of the law of nations (international law and admiralty law) to which the judicial power would extend. *See* section I.B, *supra*. Indeed, suits between aliens may well be the only category of international tort claims *not* itemized in Article III, which covers suits between aliens and citizens (via the diversity clause), incidents offending ambassadors ("Cases affecting Ambassadors, other public Ministers and Consuls," U.S. Const. art. III, § 2, cl. 1), and acts of piracy ("admiralty and maritime Jurisdiction," *id.*).

Despite the clear-cut limitations on the scope of our jurisdiction under the ATS, the majority claims that *Sosa* itself authorized this expansion of our jurisdiction to hear claims between aliens. The majority bases this conclusion on three variations on the theme that *Sosa* held, *sub silentio*, that federal courts may hear claims between aliens. First, it notes that *Alvarez-Machain v. United States*, 331 F.3d 604 (9th Cir. 2003) (en banc), *rev'd sub nom Sosa v. Alvarez-Machain*, 542

U.S. 692 (2004), "applied" *Marcos I*, where we held that Congress gave federal courts subject matter jurisdiction over a suit between two aliens, *see In re Estate of Ferdinand E. Marcos Human Rights Litig.* (*Marcos I*), 978 F.2d 493, 502-03 (9th Cir. 1992). Maj. op. at 19342-43. While acknowledging that *Sosa* reversed *Alvarez-Machain*, the majority contends that "it did so on unrelated grounds," and "the best reading of *Sosa* is that it confirms our circuit law on this point." Maj. op. at 19343. Second, the majority argues that by failing to mention two amicus briefs arguing that the Court lacked jurisdiction to hear a suit between two aliens, *Sosa* necessarily determined that suits between aliens fall within the ATS. *See* Maj. op. at 19347-48. And third, the majority contends that *Sosa*'s warning to federal courts to be wary of "the potential implications for the foreign relations of the United States of recognizing" claims involving "the power of foreign governments over their own citizens," 542 U.S. at 727, presupposes that federal courts have subject matter jurisdiction over those claims. Maj. op. at 19348-49.

These three arguments fail for the same reason: the Supreme Court has been absolutely clear that its assumption of jurisdiction without discussion has no precedential effect. *See Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1448-49 (2011); *Rasul v. Bush*, 542 U.S. 466, 496-97 (2004) ("Of course 'the existence of unaddressed jurisdictional defects has no precedential effect.' " (quoting *Lewis v. Casey*, 518 U.S. 343, 352 n.2 (1996))); *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) ("[T]his Court has followed the lead of Chief Justice Marshall who held that this Court is not bound by a prior exercise of jurisdiction in a case where it was not questioned and it was passed sub silentio."). It is apparent that neither *Sosa*'s failure to mention our erroneous jurisdictional holding in overruling *Alvarez-Machain*, nor its failure to address an argument amounting to a half page in two amicus briefs, among 21 such

briefs comprising over 360 pages in the aggregate,[14] is binding on us or the Court.

Indeed, *Sosa* had no reason to address the Article III issues lurking in the background, because the tort claims against Sosa shared a common nucleus of operative fact with his original and jurisdictionally unproblematic claims against the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), and the DEA agents under the diversity statute, *see* 28 U.S.C. § 1332(a)(2). *See Alvarez-Machain v. United States*, 107 F.3d 696, 699-700 (9th Cir. 1996). As such, the district court could have exercised supplemental jurisdiction over the balance of Sosa's claims, *see* 28 U.S.C. § 1367(a), and the Court could have reviewed the entire case as it would any other final judgment, *see* 28 U.S.C. § 1254(1); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966). Had the jurisdictional question been squarely before it, *Sosa* would have been obliged to grapple with this complex and difficult issue. The majority's suggestion that *Sosa* silently brushed off this jurisdictional concern is unreasonable and foreclosed by Supreme Court precedent.[15] Rather than being empowered by the silence of *Sosa*, the majority is in fact constrained by the Supreme Court's express statements and reasoning in *Mossman*, which make clear that Section 9, like Section 11, gives federal courts jurisdiction only over suits between an alien and a citizen. *Mossman* has never been overruled, and we are bound by it. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997).

---

[14]The amicus briefs quoted by the majority represent an anemic .074 percent of the 20,357 lines in *Sosa*'s 21 amicus briefs.

[15]The majority's assertion that courts and scholars "agree" that *Sosa* "necessarily implies" that customary international law is jurisdiction-conferring, Maj. op. at 19343, 19347, is wrong. Rather, the scope and meaning of the ATS remain hotly disputed. *Compare* Maj. op. at 19348-49, 19350-51 *with, e.g.*, Bradley et al., 120 Harv. L. Rev. 869; Eugene Kontorovich, *Implementing* Sosa v. Alvarez-Machain*: What Piracy Reveals About the Limits of the Alien Tort Statute*, 80 Notre Dame L. Rev. 111 (2004).

In sum, the majority has failed to identify any basis for exercising jurisdiction over this suit between two aliens. All it has to rely on is its own pronouncement of jurisdiction.

IV

The First Congress was careful. It drafted the Judiciary Act to provide courts with jurisdiction in those cases that would help the nation avoid giving offense to foreign nations. But it limited this grant of jurisdiction to prevent courts from meddling in a foreign sovereign's affairs in a manner that would engender the very offense that the First Congress sought to avoid.

The majority fails to show the same wisdom. Proving that the judiciary lacks the "aptitude" for decisions pertaining to foreign policy, *Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948), the majority accords itself the power to hear virtually any claim by an alien against other aliens for torts anywhere in the world, despite the obvious potential for working the types of mischief the Framers aimed to avoid. *See* Br. of the Governments of the United Kingdom of Great Britain and Northern Ireland and the Commonwealth of Australia as Amici Curiae in Supp. of Defs-Appellees/Cross-Appellants 1 (arguing that they have long maintained "their opposition to overly broad assertions of any extraterritorial civil jurisdiction arising out of aliens' claims for alleged injuries sustained abroad . . . [which] is based on their concern that such exercises of jurisdiction are contrary to international law and create a substantial risk of jurisdictional conflicts"). *See also* Government of Switzerland, *Aide Memoire* (2007) (stating, in opposition to the Second Circuit's decision in *Khulumani v. Barclay Nat. Bank. Ltd.*, 504 F.3d 254 (2nd Cir. 2007), that "a broad assertion of jurisdiction to provide civil remedies for violations perpetrated by foreign corporations against aliens in foreign places is inconsistent with international law and may indeed undermine efforts to promote human rights and their protection"), *reprinted in* Br.

for the United States as Amicus Curiae in Supp. of Petitioners app. C at 7a-8a, *Am. Isuzu Motors, Inc. v. Ntsebeza*, 128 S. Ct. 2424 (2008) (mem.) (No. 07-919).

Even more concerning, however, is that the majority has not placed any limit on how it will select and apply rules of international law. Without legislative direction or even a legal framework, the majority announces in conclusory fashion that "international law" recognizes both corporate liability and aiding and abetting liability, and that plaintiffs' complaints allege the elements (as selected by the majority from sources of varying weight) of two of plaintiffs' international law causes of action. In adopting this idiosyncratic approach, the majority pays lip service to, but fails to heed, *Sosa*'s warning that federal courts should exercise restraint and "not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted." 542 U.S. at 732.

The dangers created by the majority's method of creating (or "recognizing") international rules of law, to say nothing of their application to foreign nationals suing one another in federal court, are obvious. I dissent from this ill-conceived, ill-reasoned, and, I fear, ill-fated exercise of judicial power.